## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

———————————————————

In Re:              )
                   )
DIAMONDHEAD CASINO    )
CORPORATION,         )     C. A. No. 24-11354-JKS
                   )
    ALLEGED DEBTOR.    )     Chapter  7

———————————————————

# MOTION OF THE ALLEGED DEBTOR, DIAMONDHEAD CASINO CORPORATION, TO DISMISS THE INVOLUNTARY BANKRUPTCY PETITION OR, IN THE ALTERNATIVE, TO CONVERT THE CASE TO CHAPTER 11

On June 12, 2024, the Petitioning Creditors commenced this action by filing an Involuntary Petition for bankruptcy against the alleged Debtor, Diamondhead Casino Corporation. The alleged Debtor, by and through counsel, moves (i) that the Involuntary Petition for Bankruptcy under Chapter 7 filed herein be dismissed pursuant to Section 303 of the Bankruptcy Code, (ii) to recover fees, costs and damages under Section 303(i) of the Bankruptcy Code; (iii) that the Court abstain from exercising jurisdiction in this matter pursuant to Section 305(a)(1) of the Bankruptcy Code; or, alternatively, (iv) that the case be converted to a Chapter 11.

## BACKGROUND

Diamondhead Casino Corporation ("the Company"), is a Delaware corporation which was incorporated on November 15, 1988.    In 1989, the

Company became a publicly-held company.  The Company has been in business for over thirty-three years. (Vitale Declaration, ¶16)

The Company is a fully-reporting publicly traded company. The Company has an outside auditor, Marcum, LLP and an outside accountant. The Company files Annual Reports on Form 10-K with the Securities and Exchange Commission ("SEC"), together with audited financial statements. The Company files Quarterly Reports on Form 10-Q with the SEC together, as required, with financial statements reviewed by its outside auditors. The Company is current in its filings. On June 20, it filed a Form 8-K with the SEC to report the filing of this Petition. The Company has approximately 2,000 common stockholders. (Vitale Declaration, ¶20-22)

## A.  The Diamondhead, Mississippi Property

The alleged Debtor owns a residential lot in Diamondhead, Mississippi. A wholly-owned subsidiary of the alleged Debtor, Mississippi Gaming Corporation, ("MGC"), owns approximately 400-acres of land on Interstate 10 in Diamondhead, Mississippi ("the Property"). This Property consists of four separate parcels of land which are zoned "C-2-Interstate Commercial/Gaming/Resort." (Vitale Declaration, ¶32, 33, 35)

On August 21, 2014, the Mississippi Gaming Commission unanimously voted to grant Gaming Site Approval to Mississippi Gaming Corporation for a

fifty-acre gaming site on the east end of the Property. The Property's location, coupled with the zoning and Gaming Site Approval, make this a very valuable gaming property. (Vitale Declaration, ¶36-37)

Newmark Knight Frank Valuation and Advisory, LLC performed the most recent appraisal on the Property. In its report dated January 5, 2024, it appraised the Property "as is" at $55.2 million. (Vitale Declaration, Exhibit 1) With reference to an entity other than a partnership and a municipality, the Bankruptcy Code defines "insolvent,", as a "financial condition such that the sum of such entity's debts is greater than all such entity's property, at a fair valuation." 11 U.S.C. §101(32(A). The Company is not insolvent. The Company has more than enough equity in its assets to pay all of its debts, including all secured and all unsecured creditors of the Company. (Vitale Declaration, ¶47, 48, 114, 115)

## B.  The Petitioners

The Petitioners are eight of thirteen Debenture Holders who purchased Debentures from the Company pursuant to a Private Placement. The deal was structured by Mr. Wurst, counsel herein for the Petitioners, two of the Petitioners, Messrs. Arneault and Emerson, and the Company. The funds raised were used to move the Diamondhead Project forward and for other corporate purposes.  Henley

& Company, LLC ("Henley"), a New York securities firm, served as the Placement Agent for the Offering. [1] (Vitale Declaration, ¶99)

The Petitioners are secured and unsecured creditors of the Company. The principal of their Debentures, with interest at 4% per annum, is secured by a first lien on the Property. The additional interest due on their Debentures and attorneys fees the Company agreed to pay Petitioners pursuant to a Consent Judgment, constitute unsecured debt of the Company. The Petitioners' first lien is shared with five additional Debenture Holders and is in *parri passu* with an Executives' Lien for $2 million. The first lien also secures Property taxes paid by the Chairman of the Board of the Company in the approximate amount of $400,000. The first lien is approximately $5.5 million. (Vitale Declaration, ¶44)

There are a total of twenty-one liens on the Property. The liens total approximately $8.5 million in principal and approximately $11 million with interest. In order for the Petitioners to obtain all amounts owed to them, the twenty property liens subsequent to their first lien must be paid off to reach the unsecured amounts due to Petitioners. Thus, it is critical, even for Petitioners, that nothing be done to diminish the value of the land (i.e., a fire sale of the Property in a Chapter

---

[1] Henley was represented by Ruskin Moscou Faltischek, P.C. Mr. Wurst was a partner with that law firm. Mr. Wurst is now a partner with the law firm of Armstrong Teasdale, which filed the Petition herein.

7) if the Petitioners' intent is to obtain full payment of their debt.[2] Ironically, the President of the Company would be the largest beneficiary of any fire sale of the Property. The President's first lien is for approximately $2 million. (Vitale Declaration, ¶41-43)

## ARGUMENT

## I.   THE PETITION SHOULD BE DISMISSED BECAUSE IT WAS FILED IN BAD FAITH AND IN BREACH OF TWO AGREEMENTS

This Petition was filed in bad faith and in breach of two agreements with the alleged Debtor. Bad faith provides an independent basis for dismissing an involuntary petition. *In re Forever Green Athletic Fields, Inc*., 804 F.3d 328, 334 (3d Cir. 2015). Once a party calls into question a petitioner's good faith, the burden shifts to the petitioner to prove his good faith." *See In re Tamecki*, 229 F.3d 205, 207 (3d Cir. 2000).

### A.   The Petition Filed Herein was Filed in Breach of the Land Deed of Trust

The Debentures which are the subject of this matter were issued pursuant to a Private Placement Memorandum dated February 14, 2014. The wording of the Debentures is essentially the same, except for the Debenture Holder's identifying information, the dates therein and the amount of each Debenture. The debt due

---

[2] This is especially true as to the Petitioner, Edson Arneault, who served as Chairman of the Company and President of a subsidiary of the Company. Mr. Arneault is owed past due salary of $75,000, an unsecured debt of the Company. He shares a fifth lien on the Property for Directors' fees owed in the amount of $11,250.

pursuant to the Debentures was secured with the Diamondhead, Mississippi Property. This security interest is evidenced by a Land Deed of Trust recorded in Hancock County, Mississippi on September 26, 2014. The Debentures expressly state as follows:

> SECTION 2.3.  Security. The Company is securing its obligations to pay the principal of and all interest on this Debenture by executing and recording a Deed of Trust. In the event of a conflict between the provisions of the Deed of Trust and this Debenture, the provisions of the Deed of Trust shall govern. (Exhibits 2 and 3 to Vitale Declaration, at page 3)

The Deed of Trust expressly provides for "a judicial foreclosure action" in Mississippi in the event of a default. It identifies the procedures to be followed to sell the Property in the event of a default (see Exhibit 4 to Vitale Declaration, at page 2) and specifically names the Trustee, a Mississippi attorney, who would handle the sale. (*Id*. at page 1) The Deed of Trust also includes a provision to change the Trustee. (See Exhibit 4 to Vitale Declaration, page 4, ¶8.) Thus, Mississippi is the proper forum for any collection action in the event of a default as alleged by the Petitioners.

The Petition herein was filed in breach of the Deed of Trust. It appears that it is designed to circumvent the chosen forum, to circumvent the procedures agreed to by Petitioners in the Deed of Trust, and to substitute a new Trustee for the Mississippi Trustee previously selected. The proper forum for Petitioners to obtain

relief is in Mississippi and the Bankruptcy Court should require Petitioners to honor the agreement they made with the Company and dismiss this proceeding.

**B.    The Petition Filed Herein was Filed in Breach of the November 21, 2023 Agreement**

On November 21, 2023, Mr. Wurst, counsel for the Petitioners, the President of the Company, the Chairman of the Board of Directors of the Company and the Petitioner, Mr. Arneault, attended a conference call scheduled by Mr. Wurst. The call was very amicable. Mr. Wurst made it clear that his clients wanted to get paid and that all parties needed to work together to get everyone paid. Mr. Harrison made it very clear that he wanted to get paid. Ms. Vitale, the Company's largest creditor, also made it clear that she wanted to get paid. (Harrison Declaration at ¶24-26)

Mr. Wurst demanded a "drop dead date" by which his clients (the eight Petitioners herein) would be paid. If they were not paid by the drop dead date, the Company would have to put the Diamondhead Property up for sale. Otherwise, Mr. Wurst would be forced to take action since his clients were "antsy."  He asked Ms. Vitale, the President, to suggest a drop dead date. Ms. Vitale suggested January 31, 2024 as the drop dead date. Everyone agreed this was an acceptable date. (Harrison Declaration at ¶26)

The Company realized it could not pay the Petitioners by January 31, 2024. Therefore, in December of 2023, in line with the Company's agreement with

Petitioners, the Company signed an agreement with Colliers International to put the Property up for sale. (Vitale Declaration, ¶71) In addition to putting the Property up for sale, the Company gave Colliers permission to secure a loan, if possible or secure an equity investment to bring funds in. The Colliers agreement was a non-exclusive agreement which allowed Messrs. Wurst and Arneault, who had indicated they might have a possible purchaser for the Property and others to bring in a purchaser.

Colliers International is a well-recognized and eminently qualified real estate brokerage firm that deals with a wide range of clients, including those in financial distress. It is not uncommon for a firm of Colliers' size and scope to represent companies with various financial problems. Colliers has extensive experience and a track record for handling distressed real estate and assets in bankruptcy. Their role typically involves leveraging their extensive network and expertise to maximize the value of assets. Colliers has approximately 19,000 employees and operations in 68 countries. In retaining Colliers, the Company felt it was essentially engaged in an in-house workout which would maximize the value of its assets without burdening Colliers with all the negative baggage a bankruptcy would entail. The Company felt that its creditors would be thrilled with its choice. (Vitale Declaration, at ¶74)

Colliers has four principal people working on the Diamondhead deal. Colliers, at no cost to the Company, had two researchers and a four-person marketing team, prepare marketing and sales materials, including a twenty-three-page detailed offering and sales brochure. Colliers has sent this material out to hundreds of prospects.  Colliers has a gaming group, a hospitality and leisure group, a data center group, a marine group, and a golf course group. These are all areas of special importance given the location and zoning for the Property and, of course, its valuable Gaming Site Approval. (Vitale Declaration, at ¶75)

On January 7, 2024, Ms. Vitale sent the updated Property appraisal for $55.2 million to Messrs. Wurst and Arneault. (Vitale Declaration, at ¶76) On February 21, 2021, Ms. Vitale gave Mr. Arneault an update.  As usual, Mr. Arneault offered to help if he could.  Again, the parties were working together to get everyone paid. On May 7, 2024, Mr. Harrison sent the Colliers brochure to two of the Petitioners herein, Messrs. Arneault and Emerson. Mr. Emerson is the largest Debenture holder. (Vitale Declaration, at ¶78 and Exhibit 14)

Incredibly, on June 10, 2024, just two days *before* the Petition was filed, the Petitioner, Mr. Arneault, called Ms. Vitale. Ms. Vitale gave Mr. Arneault a status report from Colliers and informed him, in part, that Colliers had one casino that was very enthusiastic and would be doing another mail out soon. Mr. Arneault, who has an extensive gaming background, informed Ms. Vitale that he really liked

the Colliers brochure. Ms. Vitale informed Mr. Arneault that she had made it crystal clear to Colliers that she was dispensable and that no one coming in needed to keep her around. (Vitale Declaration, at ¶79 and Exhibit 15)   There was not a hint that Mr. Arneault would be filing this Petition two days later. This filing came as a complete shock to the Company.

Indeed, the Company was moving forward in good faith and in line with its out-of-court agreement. Colliers had spent considerable resources on this matter and could not have been doing a better job. When a creditor files an involuntary petition, the creditor must ensure not only that he is an eligible creditor, but that the process was undertaken in good faith. Bankruptcy courts have "strong roots in equity" and determinations of good and bad faith protect the "integrity of the bankruptcy courts by rendering their powerful equitable weapons ... available only to those debtors and creditors with 'clean hands." *In re Forever Green Athletic Fields, Inc*., 804 F.3d 328, at 334 (3d Cir. 2015). In this case, the Petitioners reneged on the agreement they demanded which was designed to maximize the value of the Company's assets and get all of the creditors paid. The Petitioners' do not have clean hands here. The Petition should be dismissed for this reason alone.

## II.   THE PETITION SHOULD BE DISMISSED BECAUSE THERE IS NO BANKRUPTCY PURPOSE TO BE ACCOMPLISHED HERE

Involuntary bankruptcies are extraordinarily rare. It is well-established that cases that serve no legitimate bankruptcy purpose do not belong in bankruptcy.

The primary purpose behind involuntary petitions is to protect against the depletion of assets or to prevent the unequal treatment of similarly situated creditors. The primary reasons that justify an involuntary bankruptcy are absent in this case.

As its SEC filings clearly show, the Debtor here is conducting its affairs in a manner consistent with one operating in good faith. There can be no fear here that a debtor is rapidly depleting assets or resources available to pay creditors. The assets that require preservation consist of a residential lot and four parcels of commercial land in Mississippi valued at $55.2 million. Given the fact that Petitioners have a first lien on the Property, there can be absolutely no fear that the Debtor, a publicly traded company, can somehow abscond with the 400 acres and leave the Debtor with no assets! On the contrary, these valuable assets exist thanks only to current management.

Mr. Harrison, the Chairman of the Board of Directors of the Company, paid approximately $400,000 in property taxes due on the commercial Property. His payments kept the property from being auctioned off by Hancock County, Mississippi, for pennies on the dollar at a tax sale.  Had he not paid these taxes, the Company would have no assets whatsoever, let alone valuable assets, with which to pay the Petitioners and other creditors. (Vitale Declaration, at ¶¶44-45) This fact is well documented in the Company's SEC filings. Moreover, while Mr. Harrison has a first lien on the Property, he holds additional liens on the Property for

significant amounts advanced to the Company to pay auditors fees, accountant's fees and other corporate expenses over the years. His goal is to maximize the value of the Property for the benefit of the shareholders and creditors of the Company. This would be readily apparent from even a cursory review of the Company's SEC filings.

Likewise, there can be no concern here about any hemorrhaging of money. The Company's subsidiary, MGC, has funds to maintain operations thanks to a settlement reached in eminent domain proceedings in Mississippi which are disclosed in great detail in the Company's SEC filings. The Company would not have this money but for the enormous amount of work done by its President, an attorney, and its Chairman, Mr. Harrison, a licensed Mississippi civil engineer, who spent countless hours on this complex matter. The Company, after a very difficult negotiating and legal process, reached a settlement with Cooperative Energy, a Mississippi utility, for $1 million. The use of these funds is fully documented, was audited by outside auditors, and is disclosed in financial statements included in the Form 10-K filed with the SEC for the year ending 2023 and in the Form 10-Q filed for the period ended March 31, 2024. The Company's books and financial records are also available for inspection by approximately 2,000 shareholders. Every penny the Company spends is disclosed to the public in its SEC filings.

The President of the Company is its largest creditor and is owed approximately $4 million.[3] Only $2 million is covered under the first lien. Like Mr. Harrison, she will only collect the full amount she is owed if her liens that are subordinate to the first lien, are paid. This is fully disclosed in the Company's Form 10-K. Obviously, management has absolutely nothing to gain by depleting the Company's only assets.

Given the foregoing, any possible suggestion that management is somehow depleting assets in this Company would be absurd. If anyone is depleting the assets, it is the Petitioners. The filing of an involuntary petition does absolutely nothing to preserve the assets of the Company. On the contrary, the Company's financial and limited personnel resources will be wasted on this case. The Company's only assets will likely materially decline in value as a result of the negative taint this bankruptcy filing will have on the Company and its gaming Property. The mere prospect of a distress sale could only result in the immediate and dramatic diminution in the value of a gaming Property. The Petitioners are sophisticated and accredited investors who knew full well when they filed this Petition that a bankruptcy filing against this Company would have immediate and

---

[3] Not only is management not depleting any assets or resources available to pay creditors, the President of the Company has routinely deferred her salary to keep the Company and its assets alive. In the past *nine* years, the President, an attorney, has received a grand total of *$30,000* in gross salary from the Company.

disastrous ramifications for the Company, the value of its gaming Property and its stock.

Instead of allowing Colliers to sell or monetize the Property in a non-distress manner for the benefit of all creditors, the Petitioners have reneged on their agreements and are asking the bankruptcy court to appoint a substitute Trustee to collect their debt. "[T]he bankruptcy court is not a collection agency." *In re Mountain Dairies, Inc.*, 372 B.R. 623, 635 (Bankr. S.D.N.Y. 2007). *See also In re Century Tile Marble, Inc.*, 152 B.R. 688, 689-90 (Bankr. S.D. Fla. 1993) (creditors' attorney sanctioned and involuntary petition dismissed pursuant to section 303 for "utilizing bankruptcy court as a collection agency instead of going to state court where collection claims are properly filed"). The use of the Bankruptcy Court here for collection purposes is wholly improper.

## III.   THE COMPANY SHOULD BE AWARDED ITS FEES, COST AND DAMAGES UNDER SECTION 303(i)

There is a presumption that costs and attorney's fees will be awarded to a putative debtor where an involuntary petition is dismissed. *In re Express Car Truk & Rental, Inc.*, 440 B.R. 422, 431-32 (Bankr. E.D. Pa. 2010). A petitioner bears the burden of proof on justifying a denial of costs and fees.  Given Petitioners' foregoing bad faith, it is respectfully requested that the Court enter judgment

against the Petitioners and in favor of Debtor for costs, attorney's fees and damages.

## IV.   ABSTENTION IS WARRANTED IN THIS CASE UNDER SECTION 305(a)(1)

Even where the petitioning creditors are able to prove all of the elements for the granting of an involuntary petition and even when there is no issue as to whether the petitioning creditors have acted in good faith, a Bankruptcy Court may still dismiss an involuntary petition under the doctrine of abstention. The Debtor respectfully requests that the Court exercise its authority to dismiss this case based on the doctrine of abstention.

Under §305(a)(1) of the Bankruptcy Code, a bankruptcy court, after notice and a hearing, may dismiss a case at any time "if the interests of creditors and the debtor would be better served by such dismissal." 11 U.S.C. §305(a)(1). Dismissal under this provision is determined on a case-by-case basis and rests within the sound discretion of the court. *In re Sky Grp. Int'l, Inc*. 108 B.R. 86, 91 (Bankr. W.D.Pa. 1989). Dismissal under section 305(a) is appropriate where the court finds that both creditors *and the debtor* would be better served by dismissal. See *In re AMC Investors, LLC*, 406 B.R. 478, 487-88 (Bankr. D.Del. 2009). A decision to abstain under section 305 is subject to limited review under an abuse of discretion standard. The reviewing court must affirm the bankruptcy court's fact findings on any grounds fairly supported by the record unless they are illogical, implausible, or

without support in the record. See *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009).

The interests of both the creditors and the debtor would be better served by a dismissal of this action and by allowing the Company and Colliers International to proceed with their efforts. If a Trustee were appointed, the Trustee would have an affirmative duty to maximize recovery for the creditors, which Colliers is already doing at great expense to Colliers and at absolutely no cost to the Company and, accordingly, its creditors.

Most courts employ a "totality of the circumstances" test in determining whether to grant relief under section 305. See *In re Northshore Mainland Servs., Inc.*, 537 B.R. 192, 203 (Bankr. D.Del. 2015). The factors considered, when applicable here, weigh in favor of abstention. There is no economy or efficiency to be gained in bankruptcy since the Company has already put its assets up for sale with an eminently qualified broker at no cost to the Company and its creditors. Petitioners' interests are already protected in another forum, Mississippi. Moreover, there is an alternative means of achieving an equitable distribution of assets which Petitioners already agreed to, namely, putting the Property up for sale in a non-distress manner. The alleged Debtor and the petitioning creditors were already able to work out a less expensive out-of-court arrangement which better serves all interests in the case. Finally, there are unsettled issues with respect to two

16

permanent Mississippi eminent domain easements. This complicated matter, which is now in *media res,* can most efficiently and less expensively be resolved by current management rather than an appointed trustee.

Courts have recognized that §305(a)(1) "was designed to be utilized where, for example, a few recalcitrant creditors attempted to interfere with an out-of-court restructuring that had the support of a significant percentage of the debtor's creditors." *In re Stillwater Asset Backed Offshore Fund, Ltd.,* 485 B.R. 498, 509 (Bankr. ,S.D.N.Y. 2013). See also, 2 Collier on Bankruptcy §305.02 at 305-4 (15th ed. 1981)(An example of a situation in which the court might choose to dismiss or suspend a case under section 305(a) would be where an arrangement is being worked out by creditors and the debtor out of court in which there is no prejudice to the rights of creditors and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment.) Where, as here, the Petitioners requested the out-of-court resolution now in place which will serve the best interests of all creditors and the debtor, abstention is clearly appropriate.

The filing of an involuntary petition by a creditor must be carefully scrutinized by the Court because such an action is extreme in nature and carries with it serious consequences to the alleged debtor. Impairing or destroying an alleged Debtor's ability to survive and run its business, particularly as here, where

there are other means already in progress to get the Petitioners paid, makes no financial, legal, economic, or other sense. Absent dismissal or abstention, the Debtor here will suffer unnecessary and irreparable harm and a real threat to its very existence which will hurt all creditors as well as its stockholders. There is simply no economic reason for placing this solvent entity into bankruptcy which will only end up costing the Debtor and its creditors substantial professional fees and many millions of dollars in lost property value. This Petition does nothing to further the public policy goal underpinning the Bankruptcy Code of maximizing value for all stakeholders. On the contrary, it does precisely the opposite.

## V.   IN THE EVENT THE COURT DECLINES TO DIMSISS THE INVOLUNTARY CHAPTER 7 PETITION, THE CASE SHOULD BE CONVERTED TO CHAPTER 11

"[E]ven if an order for relief is entered on a petitioning creditor's involuntary chapter 7 petition, the debtor has a near unbridled right to convert the case to chapter 11." *In re Premier General Holdings, Ltd.*., 428 B.R. 592, 600 (Bankr. W.D.Tex. 2010); 11 U.S.C. § 706(a) ("the debtor may convert a case under this chapter to a case under chapter 11 ... at any time"); *In re Amanat*, 321 B.R. 30, 41 (Bankr. S.D.N.Y. 2005)("even an involuntary debtor has an absolute right to convert a case under Chapter 7 to a case under Chapter 11").

The case at bar has not previously been converted. Therefore, in the event the Court does not dismiss the Involuntary Petition, the Debtor respectfully

requests that the Court permit the Debtor to convert this case to a Chapter 11 so that the Company can continue to work with Colliers International to get the Petitioners and the other creditors paid and propose a plan that is in the best interests of all involved.

## VI.   THE COMPANY REQUESTS AN EVIDENTIARY HEARING

The alleged Debtor respectfully requests that the Court hold an evidentiary hearing to permit the Company to make a full record with respect to its motion and to allow the Court to make findings justifying dismissal and an award of costs, fees and damages.  The Company requests a jury trial on all issues triable by jury.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court grant the Motion to Dismiss or, alternatively, convert the case to a Chapter 11 and grant such other and further relief as the Court deems proper.

Dated:  July 18, 2024

Respectfully submitted,

BIGGS & BATTAGLIA
/s/ Robert D. Goldberg
Robert D. Goldberg (Delaware Bar ID #631)
921 N. Orange Street
Wilmington, DE  19899-1489
Telephone: (302) 655-9677
email: Goldberg@batlaw.com
ATTORNEY FOR DIAMONDHEAD
CASINO CORPORATION