## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In Re: | ) |
| | ) |
| DIAMONDHEAD CASINO | ) |
| CORPORATION, | )        C. A. No. 24-11354-JKS |
| | ) |
| ALLEGED DEBTOR. | )        Chapter 7 |

**DECLARATION OF DEBORAH A. VITALE IN SUPPORT OF THE
MOTION OF THE ALLEGED DEBTOR, DIAMONDHEAD CASINO
CORPORATION, TO DISMISS THE INVOLUNTARY BANKRUPTCY
PETITION OR, IN THE ALTERNATIVE,
<u>TO CONVERT THE CASE TO CHAPTER 11</u>**

Deborah A. Vitale, being duly sworn according to law, deposes and says as follows:

1.    I hereby file this Declaration in Support of the Motion of the Alleged Debtor, Diamondhead Casino Corporation, to Dismiss the Involuntary Bankruptcy Petition or, in the Alternative, to Convert the Case to Chapter 11.

2.    I have personal knowledge of the facts stated herein and if called as a witness, could and would competently testify thereto.

3.     I am President, Chief Executive Officer, Secretary, Treasurer, and Chief Financial Officer of the Defendant, Diamondhead Casino Corporation ("hereinafter "Diamondhead Casino" or "the Company"). I am also a Director of the Company.

4.     I am President, Chief Executive Officer, Secretary, and Treasurer of Mississippi Gaming Corporation, a wholly-owned subsidiary of the Company. I am also Chairman of the Board of Directors of Mississippi Gaming Corporation.

5.     I also hold various other positions in the Company's subsidiaries which are not relevant to the current motion before the Court.

6.     I am an attorney in good standing and licensed to practice law in Washington D.C., Maryland and the Commonwealth of Virginia. I have been admitted *pro hac vice* in various federal and state courts.

7.     I served as Listing Official for the U.S. Environmental Protection Agency in 1986. As Listing Official, I had government-wide debarment authority over contracts, grants, and loans, sub-contracts, sub-grants and sub-loans. I worked with large polluters to get things done without having to delist them, which would have had severe ramifications for companies that were publicly traded and their shareholders.

8.     I am an experienced trial attorney with over thirty years of experience having handled complex civil litigation, including corporate, contractual,

commercial, environmental, personal injury, medical malpractice, legal malpractice and some pharmaceutical litigation.

9.    Prior to becoming an attorney, I worked as a research analyst and management consultant providing management consulting services to corporations and various federal and state agencies.

10.    Ironically and pertinent here, while working as a consultant to a large medical health and equipment manufacturer outside of Chicago, Illinois, I was responsible for an accounts receivable department that collected millions of dollars in dated receivables from numerous purchasers throughout the nation.  As a direct result of that collection experience, I quickly learned that it was in the financial best interest of my client to work with its debtors if we wanted to get paid.

11. In February of 1998, when I became President of the Company, I assumed management of all aspects of the day-to-day operations of the publicly-traded company, then one of the largest off-shore gambling ship operators in the United States and then in dire financial straits. I supervised and managed approximately 450 land and ship-based employees and the operation of four casino ships sailing to and from international waters from ports located in Miami Beach, Ft. Myers Beach, and Madeira Beach, Florida. In the September 2002 issue of *International Gaming & Wagering Business Magazine*, I was named one of the "Best CEO

Operators" in the industry and ranked fourth among the top "five best CEO operators."

12.  I negotiated and drafted significant settlement agreements with the Florida Department of Revenue, Internal Revenue Service, Department of Labor and numerous vendors and creditors to prevent the seizure of all of the Company's assets and allow for the eventual sale, in the ordinary course of business, of four casino ships, port leases, equipment, and other items, to satisfy the Company's obligations and to save its primary asset, an approximate 400-acre property in Diamondhead, Mississippi.  I  negotiated with and restructured outstanding loan agreements with First Union National Bank of Florida and numerous other creditors and secured incremental financing through private equity offerings to sustain the Company, maintain its vessels and operations, and transition into a potential, land-based casino entity. I was responsible for dramatically slashing the publicly traded Company's legal, accounting, insurance-related and other numerous expenses.

13. I negotiated and drafted all contracts relating to the lease, sublease and/or assignment of gambling ships and Florida ports, negotiated and drafted all contracts relating to the sale, delivery and transfer of four gambling ships, gambling equipment and other equipment, and negotiated and drafted the documents relating to the settlement of all significant corporate, securities-related,

employee-related, and other legal matters incident to all aspects of the business of the Company and/or its then eleven subsidiaries. I drafted numerous contracts with various parties relating to all operations of the publicly-traded company, including all drydock agreements, letters of intent, and joint venture agreements.

14. I prepare, in conjunction with outside accountants and auditors, all materials for corporate filings with the Securities and Exchange Commission, including Forms 10-K, Forms 10-Q and Forms 8-K.

15. I am responsible for all litigation, hearings, and permits relating to the Diamondhead, Mississippi site and all environmental matters and communications with federal, state and local agencies and authorities responsible for permitting, zoning and licensing, including the U.S. Army Corps of Engineers, Mississippi Department of Environmental Quality, Mississippi Department of Marine Resources, Hancock County Planning Commission, Hancock County Board of Supervisors, City of Diamondhead, and the Mississippi Gaming Commission.

**The Company.**

16. The Company is a Delaware corporation which was incorporated on November 15, 1988, under the name "Europa Cruises Corporation." The Company has been in business for over thirty-three years. In 1989, the Company became a publicly-held company.

17.    From inception through approximately August of 2000, the Company operated gambling vessels in international waters. The vessels sailed from various state ports into international waters where gaming operations were conducted. From approximately 1994 through August of 2000, operations were conducted primarily out of ports located in Miami Beach, Florida, Ft. Myers Beach, Florida, and Madeira Beach, Florida. At its height, the Company carried approximately 300,000 passengers per year, sailed seven days per week, twice per day, and employed approximately 450 people.

18. The ship-based casino industry suffered a serious decline as a result of the advent of land-based gambling in Florida and Mississippi. By the end of 2000, the Company had divested itself of its ship-based gaming operations to satisfy its financial obligations to its vendors, lenders and taxing authorities and to focus its resources on the development of a casino resort in Diamondhead, Mississippi

19. On November 22, 2002, the Company amended its Certificate of Incorporation to change its name to "Diamondhead Casino Corporation." This was done to reflect the fact that the Company was out of the cruise-to-nowhere industry in Florida and was turning its attention to the development of its property in Diamondhead. Mississippi.

20. The Company has no current operations in any state. The Company has had no income or revenue from any operations since 2000. The Company currently has

one employee, the undersigned Declarant, who serves in an executive officer capacity. The Company has approximately 2,000 common stockholders.

**Securities and Exchange Commission Filings**

21.    The Company is a fully-reporting public company. The Company has an outside auditor, Marcum, LLP, and an outside accountant.  The Company files Annual Reports on Form 10-K with the Securities and Exchange Commission ("SEC"), together with audited financial statements. The Company files Quarterly Reports on Form 10-Q with the SEC together, as required, with financial statements reviewed by its outside auditors.

22. The Company is current in its filings with the Securities and Exchange Commission. On June 20, 2024, the Company filed a Form 8-K with the SEC to report the filing of this action.

23.    On June 17, 2024, the Financial Industry Regulatory Authority ("FINRA"), in the mistaken belief that the Company had filed for bankruptcy, added a "Q" after the Company's stock symbol. This had an immediate, negative effect on the stock price. On June 18, 2024, the Company informed FINRA that *the Company* had not filed for bankruptcy. FINRA removed the "Q" after the Company's stock symbol.

**Current Management Assumed Control of Day-to-Day Operations of the Company and Was Successful in Completing an Out-of-Court Workout to Pay All of the Company's Secured Creditors in Full**

24.   This is not the first time this Company has had to sell assets to pay its creditors. The last time this happened, *current* management was successful in getting all of its secured creditors paid in full, together with all interest due, and in getting all of its unsecured creditors paid in full or settling with them.

25. Current management assumed control of the day-to-day ship-based operations of the Company and its subsidiaries in 1998. Because of the ship-based operations, the Company was in dire financial straits. The Company owed significant debt to First Union National Bank of Florida ("the Bank") and other secured lenders, the Internal Revenue Service, the Florida Department of Revenue, various county and local taxing authorities, and numerous venders who supplied its gaming ships in at least three cities in Florida. The Bank and the Florida Department of Revenue both threatened to seize the Company's assets.

26. I convinced the Bank, the Florida Department of Revenue and the Internal Revenue Service to work with us and to allow the Company to sell its four ships in the normal course of business. I warned them that the ships, if sold at auction, would never bring in enough money to pay them. These were very sophisticated lenders and taxing authorities and they already knew this. I worked with these creditors to conduct an out-of-court workout.

27.    The Company's four ships were old with outdated gaming equipment.  The Company hired an eminently-qualified ship broker and sold its four ships for a total of approximately $13,950,000.[1] As a result, <u>all</u> secured lenders were paid in full, together with <u>all</u> interest due. The Company paid the Internal Revenue Service all amounts due. It paid all unsecured creditors in full or settled with them. The Company reached a settlement agreement with the Florida Department of Revenue.

28.    All stakeholders came out ahead.  The Company survived and did not have to go bankrupt and ended up with the Diamondhead, Mississippi Property.

29.    The entity that purchased the Company's casino ships renovated them and installed new gaming equipment. This entity subsequently ended up with serious tax and other legal problems. The U.S. government seized the four casino ships from this entity and sold them at auction, together with all the new equipment that had been installed, for approximately $1,517,000. This was a mere eleven percent (11%) of what the Company had obtained in a sale of the same assets in the ordinary course of business and before the ships had been renovated.

---

[1] At December 31, 1997, the Company carried its vessels, equipment and fixtures, less accumulated depreciation, at $13,238,633. Prior to depreciation, it valued its four vessels at $15,527,221, vessel improvements at $1,778,632, and gaming equipment at $2,199,981. See Diamondhead Casino Corporation, f/k/a Europa Cruises Corporation, Form 10-K for the period ending December 31, 1997, at pages F-3 and F-15).

30.    This case illustrates what happens when assets are sold in a distressed environment in the casino industry. Gaming properties simply do not do well when sold in distress sales. The Revel (hotel and casino) in Atlantic City, New Jersey, which cost approximately $2.4 billion to construct, sold for less than $100 million in a distress sale.

31. This case also illustrates how successful current management was in getting the Company's secured and unsecured creditors paid. The Company's secured creditors would never have gotten paid in full and would likely have gotten little, if anything, if they had not worked with the Company and allowed the Company to sell its four vessels in a non-distress environment. The State and other taxing authorities would have gotten little, if anything. The unsecured creditors would have gotten nothing and the Company's shareholders would have been wiped out. All of this was prevented by allowing the Company and its broker to sell the ships in the ordinary course of business.

**The Diamondhead, Mississippi Property**

32.    Diamondhead Casino Corporation ("DHCC") owns a residential lot in Diamondhead, Mississippi.

33.    Mississippi Gaming Corporation ("MGC"), a wholly-owned subsidiary of DHCC, owns approximately 400-acres of land on Interstate 10 in Diamondhead,

Mississippi ("the Diamondhead Property" or "the Property"). The Property consists of four separate parcels of commercial land. The commercial land is undeveloped.

34.    The Diamondhead Property fronts Interstate 10 for approximately two miles. Interstate 10 is a major interstate highway running through the southern United States. The Property, which is long and narrow, also fronts the Bay of St. Louis for approximately two miles. Based on the latest traffic count, approximately 18.6 million vehicles pass the site each year. Every vehicle traveling west to east on Interstate 10 from Louisiana to reach the Biloxi or Gulfport casinos must pass this site. According to the Mississippi Gaming Commission, approximately twenty per cent of the traffic going to Gulf Coast casinos originates in Louisiana.  In the year ending December 31, 2023, the twelve Gulf Coast casinos generated gross gaming revenue of approximately $1.6 billion.

35.    The Diamondhead property is located entirely within the City of Diamondhead. The entire Diamondhead Property is zoned as "C-2-Interstate Commercial/Gaming/Resort." Thus, the entire approximate 400-acres is zoned for gambling.

36.    In Mississippi, local zoning is not enough for a casino. An owner or operator must also obtain Gaming Site Approval from the Mississippi Gaming Commission for a casino site.  In 2014, MGC applied for Gaming Site Approval. This is an expensive process which requires significant engineering, surveying and legal

work. On August 21, 2014, the Mississippi Gaming Commission voted to grant Gaming Site Approval to Mississippi Gaming Corporation, for a fifty-acre gaming site on the east end of the Property.

37.    The Property's location, coupled with the zoning and the Mississippi Gaming Commission's Gaming Site Approval, make this a very valuable gaming property.

**2024 Property Appraisal**

38.    The most recent Property appraisal, dated January 5, 2024, was performed by Newmark Knight Frank Valuation and Advisory, LLC. The Diamondhead Property was appraised "as is" at $55.2 million. (See Exhibit 1, Property Appraisal, pages 1-6)

39.    On January 7, 2024, after obtaining the Property appraisal, the Company sent the appraisal to counsel for the Petitioners, Jeffrey Wurst, Esquire and to the Petitioner, Edson ("Ted") Arneault.

40.    The Property taxes are paid and MGC has sufficient funds to pay the Property taxes when due again (estimated at approximately $60,000.)

**Property Liens**

41.    There are 21 liens on the Diamondhead Property. These liens and all terms relating to each lien are fully disclosed in the Company's SEC filings.

42.    There are approximately 35 lien holders. The lien holders include shareholders and non-shareholders of the Company.

43. The 21 liens total approximately $8.5 million in principal.[2] With interest, all liens total approximately $11 million. Some liens carry no interest, but call for payment of common stock of DHCC in lieu of interest. The liens range from $25,000 to approximately $5.5 million (the first lien). Some liens include more than one lien holder. For example, the second lien includes seven persons who loaned the Company funds, including one shareholder who loaned the Company $2,500. (This is the smallest lien on the Property.)

**The First Lien**

44.    The first lien secures i) Debentures issued to thirteen (13) Debenture Holders, including the eight (8) Petitioners herein. These Debentures total $1.85 million in principal. The interest rate in the Debentures is 4%. ii) The first lien is in *parri passu* with an Executives Lien which is $2 million. There is no interest on

---

[2] This includes the automatic first lien for paying property taxes to preserve the Property, which is approximately $400,000.

this lien. I am the primary beneficiary of the Executives Lien. iii) The first lien also secures amounts paid for property taxes paid to preserve the Property. This lien is approximately $400,000. The Property taxes were paid by Mr. Harrison, the Chairman of the Board of Directors of the Company.

45.    If Mr. Harrison had not paid the Property taxes, the Property would have been sold at a tax sale years ago for pennies on the dollar and there would be no assets to pay anyone.

46.    The first lien was placed on the Property on September 26, 2014. The last lien, the twenty-first lien, was placed on the Property on May 16, 2022 to secure a loan from an unrelated party in the principal amount of $50,000.

47.    There is more than enough equity in the Property to pay all secured lien holders assuming the Property is sold or monetized in the ordinary course of business rather than in a fire sale.

48.    There is more than enough equity in the Property to also pay all unsecured creditors assuming the Property is sold or monetized in the ordinary course of business rather than in a fire sale.

**The Land Deed of Trust**

49.    The Petitioner, Edson ("Ted") Arneault, worked closely with me to structure the Private Placement that gave rise to the sale of the Debentures to the Petitioners

herein. The Private Placement was designed to accommodate the requests of the Petitioner, Mr. Emerson, the largest Debenture holder. These requests were very reasonable and the Company had no objection to them or to the proposed structure of the deal.

50.    The Debentures which are the subject of this matter were issued pursuant to a Private Placement Memorandum.

51.  Mr. Wurst's prior law firm supplied the draft Debenture agreements that were used in the deal and drafted the Debenture instruments with Mr. Arneault and the Company.

52.    The documents relating to the deal that are pertinent here, are as follows:

i) Diamondhead Casino Corporation Amended and Restated First Tranche Collateralized Convertible Senior Debenture (Exhibit 2); ii) Diamondhead Casino Corporation Second Tranche Collateralized Convertible Senior Debenture; (Exhibit 3); and iii) the Land Deed of Trust recorded in Hancock County, Mississippi on September 26, 2014 (Exhibit 4).

53.    The first two items are referred to herein as "the Debentures." All the Debentures issued to Petitioners and the other Debenture Holders are essentially the same, except for the Debenture Holder's identifying information, dates, and the amount of each Debenture.

54.    The Debentures were secured with the commercial Property located in Diamondhead, Mississippi. This was evidenced by the Land Deed of Trust.

55.    The Land Deed of Trust provides for "a judicial foreclosure action" in Mississippi in the event of a default. It identifies the procedures to be followed and identified the Trustee, a Mississippi attorney, who would handle the foreclosure sale. (See Exhibit 4, at page 2)

56.    The Land Deed of Trust includes a provision to change the Trustee selected, if desired. The "Secured Party #1 and Secured Party #2, acting together may at any time, without giving formal notice to the original or any successor Trustee, but giving notice to Debtor, .... appoint another person ... to act as Trustee...." (See Exhibit 4, at page 4, ¶8.)

57.    The Petitioners have never given notice to the Debtor or reached out to the Secured parties to appoint another Trustee.

58.    The forum chosen was Mississippi because that is where the security is located.

**The November 2023 Agreement**

59.    On November 20, 2023, Mr. Wurst, counsel for the Petitioners, set up a conference call for November 21, 2023 with the President of the Company (the undersigned, Deborah A. Vitale), the Chairman of the Board of Directors of the Company (Gregory A. Harrison) and the Petitioner, Mr. Arneault. (See Exhibit 5)

60.    The call was very amicable. Mr. Wurst made it clear that his clients wanted to get paid and we needed to work together to get everyone paid. Mr. Harrison made it very clear that he wanted to get paid. I made it clear that I wanted to get paid, too.

61.    Mr. Wurst demanded a "drop dead" date by which his clients (the eight Petitioners herein) would be paid. If they were not paid by the drop dead date, the Company would put the Property up for sale. Otherwise, Mr. Wurst would be forced to take action to liquidate the Property since his clients were "antsy."

62.    Mr. Wurst asked me to suggest a drop dead date. I suggested January 31, 2024 as the drop dead date. Everyone agreed this was an acceptable date.

63.    Mr. Harrison, the Chairman of the Board, and I had no objection to this drop dead date. The Company's last deal, which took months to structure, had collapsed.

64.    Everyone, including management, the Board of Directors, and the Company's stockholders, were understandably frustrated when the last deal was not funded. Mr. Wurst had been kept appraised of the developments of this deal. The Chairman of the Board attempted to resurrect the deal, but was unsuccessful in doing so.

65. After the collapse of that deal, the Company began working with Messrs. Wurst and Arneault to find an interested party. On November 12, 2023, in an email titled "Diamondhead Sale of Property/Sackett v EPA," Ms. Vitale sent a lengthy

email to Messrs. Wurst and Arneault informing them of wetland-related information any interested party would need and of a recent important Supreme Court decision that could affect the number of wetlands on the Property. (See Exhibit 6)  (It should be noted that most of the casinos on the Gulf Coast of Mississippi are constructed in wetlands because prior to Hurricane Katrina they had to be constructed in, on or above the water.)

66.    On November 17, 2023, Mr. Arneault called Mr. Harrison and informed Mr. Harrison that he might have a buyer for the Property.  Mr. Arneault requested "an updated property description" and informed me that my "analysis of the new rules with respect to developable land was great." (See Exhibit 7). On November 17, I sent Mr. Arneault a number of documents relating to the Property that any interested buyer would need. (See Exhibit 8).

67.    In order to sell the Property, a new property appraisal was required because the last appraisal dated March 19, 2019, was considered too "old."  On November 17, 2023, I informed Messrs. Wurst and Arneault as follows:

> I ordered an updated property appraisal at 8:30 a.m. this morning from Newmark. The last appraisal was done in December 2018. Most prospects want a new appraisal. We will likely need a new appraisal for any sale. (See Exhibit 9).

68.    On November 20, 2023, Newmark Knight Frank Valuation & Advisory LLC ("Newmark") sent me an engagement letter for an updated appraisal and an

invoice. On November 20, 2023, I signed the engagement letter and sent Newmark a check to pay for the updated appraisal. (See Exhibit 10).

69.    On November 21, 2023, during our conference call, Messrs. Wurst and Arneault indicated that they might have some possible purchasers and requested the previous property appraisal and property maps. After the conference call, I sent Messrs. Wurst and Arneault the previous Property appraisal.    Mr. Wurst responded, wishing me a happy and meaningful Thanksgiving and sent me a reminder to send him the maps he had requested. (See Exhibit 11).

70.    On November 28, 2023, after returning to the office from New Jersey, I sent Mr. Wurst the maps he requested and some additional items.  (See Exhibit 12)  It was my understanding that we were working together to find a prospect or a purchaser.

71.  I realized the Company would not meet the January 31, 2024 drop dead date. On December 14, 2023, in line with the Company's agreement with Petitioners, I signed an agreement with Colliers International to sell all or part of the Property. Colliers signed the agreement on December 20, 2023.

72.    In addition to giving Colliers permission to find a purchaser for all or part of the Property, I gave Colliers permission to secure a loan, if possible, or to secure an equity investor(s). To speed things up and get a non-exclusive agreement, I agreed to increase some of the fees Colliers had requested.

73.    Both Messrs. Wurst and Arneault had indicated that they might have a possible purchaser for the Property. Therefore, I needed to make sure that the Colliers agreement was a non-exclusive agreement. The non-exclusive agreement allowed the Company, Messrs. Wurst and Arneault and others, to continue to pursue other prospects.

74.    Colliers International is a well-recognized real estate firm that deals with a wide range of clients, including those in financial distress. It is not uncommon for a firm of Colliers' size and scope to represent companies with various financial problems. Colliers has extensive experience and a track record for handling distressed real estate and assets in bankruptcy. Their role typically involves leveraging their extensive network and expertise to maximize the value of assets. Colliers has approximately 19,000 employees and operations in 68 countries. In retaining Colliers, the Company felt it was essentially engaged in an in-house workout which would maximize the value of its assets without burdening Colliers with all the negative baggage a bankruptcy would entail. The Company felt that its creditors, including Petitioners herein, would be thrilled with its choice.

75.    Colliers has four principal people working on the Diamondhead deal. Colliers, at no cost to the Company, had two researchers and a four person marketing team, prepare marketing and sales materials, including a twenty-three page detailed offering and sales brochure. Colliers has sent this material out to

hundreds of prospects. Colliers has a gaming group, a hospitality and leisure group, a data center group, a marine group, and a golf course group. These are all areas of special importance given the location and zoning for the Property and, of course, Gaming Site Approval.

76.    On January 5, 2024, Newmark Knight Frank Valuation & Advisory LLC issued its updated Property appraisal. The "as is" appraisal came in at $55.2 million. (See Exhibit 1, pages 1-6 of Appraisal)  On January 7, 2024, I sent the updated Property appraisal to Messrs. Wurst and Arneault. (See Exhibit 13)

77.    On February 21, 2024, I gave Mr. Arneault an update. As usual, Mr. Arneault offered to help if he could.  I indicated we might use him since he had a gaming background and could speak to the benefits of the location for gaming.

78.    On May 7, 2024, Mr. Harrison sent the Colliers brochure to two Petitioners herein, Messrs. Arneault and Emerson. (See Exhibit 14). Mr. Emerson is the largest Debenture Holder and the largest Petitioner in this matter.

79.    On June 10, 2024, just two days *before* this Petition was filed, Mr. Arneault, called me. We had a very nice talk.  I gave him a status report I had gotten from Colliers and informed him that Colliers had one casino that was very enthusiastic. I told him that I had been talking to a gentleman that had sold three casinos that was going to go see the Property in July with his casino operator. I told him it took a long time for Colliers to do the sales brochure. He told me he really liked the

Colliers brochure. I told him that Colliers would be doing another mail out. I told him that I had made it crystal clear to Colliers that I was dispensable and that no one coming in needed to keep me around. (See Exhibit 15).

80.    This was important because any interested casino entity would likely want to bring in its own management team to design, construct and operate the casino resort. Having to retain prior management could be a deal breaker for some casino prospects.

81.    Mr. Arneault brought up the recent passing of his best friend and told me he was putting his condo in Florida up for sale. Because of his recent loss, it was a sad, but very friendly conversation. There was not a hint that Mr. Arneault would be filing this Petition two days later. I sent an email to Mr. Harrison informing him of my conversation with Mr. Arneault. (See Exhibit 15).

82.    On June 14, 2024, I was driving to New Jersey when Colliers International called me to inform me that this Involuntary Chapter 7 Petition had been filed.

83.    I questioned the caller because I was sure he was mistaken. He was not mistaken.

84.    I was upset and embarrassed. I had informed Colliers about our deal with the Petitioners. I could not believe the Petitioners had done this. We had a deal and we did what we agreed to do. They were supposed to be working with us, not against

us. Neither I nor Colliers could understand why they would do this. It made no financial sense to either of us.

85.    The Company managed to get one of the strongest brokers in the world to handle the sale of the Property and now the Petitioners, who demanded that I put the Property up for sale by a "drop dead" date, were interfering with the very sale they had demanded.

86.    As Colliers put it, they are "sabotaging" the deal and making it difficult to maximize the value of the property.

87.    Mr. Arneault has a gaming background and knows that Mississippi Gaming Site Approval is a privilege. He knows that the Property would plummet in value if we lost our Gaming Site Approval. He knows how sensitive State Gaming Commissions can be. This filing is dangerous. It could cause serious problems with our Mississippi Gaming Site Approval and, if that happens, the value of the Property would plummet.

**Finalization of Eminent Domain**

88.    The filing of the Petition at this particular time makes no sense for yet another reason. The Petitioners and counsel for the Petitioners know, that Mississippi Gaming Corporation ("MGC") has been immersed in eminent domain litigation relating to the entire northern portion of the Diamondhead Property in the Special Court of Eminent Domain in Hancock County, Mississippi, where the

Diamondhead Property is located. *Cooperative Energy, a Mississippi Electric Cooperative v. Mississippi Gaming Corporation* (In the Special Court of Eminent Domain, Hancock County, Mississippi (Case No. CC20-0221) and *Cooperative Energy, a Mississippi Electric Cooperative v. Mississippi Gaming Corporation, et al* (**all lien holders of the Diamondhead Property**.) (In the Special Court of Eminent Domain, Hancock County, Mississippi (Case No. CC23-0153).

89.    The Plaintiff, Cooperative Energy, served all lien holders, including the Petitioners herein, as defendants in the above matter.  The Company's filings with the Securities and Exchange Commission clearly show that the Company is in the process of finalizing the easements awarded in these eminent domain proceedings. The Company filed very detailed disclosures regarding the proceedings, including a chronology relating to the negotiations and each of the offers made by Cooperative Energy and rejected by MGC before the parties finally reached a $1 million settlement. (See Exhibit 16). The filing of this Petition on the eve of finalizing these important documents makes absolutely no sense.

90.    As the Company's SEC filings disclose, the parties in the eminent domain proceeding are negotiating the very wording of the two permanent easements.  This is taking time because of the importance of the wording.  Every word is critical and MGC has been fighting over the wording to prevent Cooperative Energy from

taking advantage of the situation. The easements are <u>permanent</u>. The value of the Property can fall dramatically if these easements are not very carefully worded.

91.    Once the easements are finalized and signed by Mississippi Gaming Corporation ("MGC"), MGC will get the remaining proceeds due under the Court Order approving the settlement agreement. (See Exhibit 16).

92.    The filing of this Petition stays any further eminent domain proceedings. This Petition not only interferes with, but prevents, the finalization of the matter. Until the easements are finalized and signed by the President of Mississippi Gaming Corporation, there will be a cloud over the scope of the easements and the Diamondhead Property.

93.    Based on a conversation Mr. Harrison, the Chairman of the Board of Directors, had with the Petitioner, Mr. Arneault, it appears that the Petitioners are angry because they did not receive any portion of the eminent domain proceeds.

94.    However, Cooperative Energy, the Plaintiff in the eminent domain action, served all of the Petitioners in the action and with notice of a hearing to be held on September 11, 2023 in Mississippi. In Mississippi, lien holders can request a portion of the eminent domain proceeds. No Petitioner filed any response in the action. No Petitioner showed up for the scheduled hearing and no Petitioner requested a portion of the eminent domain proceeds.

95.    Only two defendants appeared at the scheduled hearing. Mississippi Gaming Corporation, the Property owner, appeared by and with Mississippi counsel. I filed a responsive pleading in my individual capacity and appeared at the hearing in my individual capacity as a lien holder.

96.    At a subsequent telephonic hearing held on the matter, I informed the Court that, although I was appearing in my individual capacity and was the largest lien holder, as President of Mississippi Gaming Corporation, I preferred that the proceeds of the eminent domain settlement be paid to Mississippi Gaming Corporation, the owner of the Property, which needed the money. I informed the Court that Mississippi Gaming Corporation had settled the matter because it needed this money, had borrowed funds against the anticipated settlement, and really needed to get this money into the Company.

97.    The Judge ordered the Clerk of the Court to pay the amount which Cooperative Energy had already placed in escrow with the Clerk of the Court, to Mississippi Gaming Corporation (approximately $850,000) and ordered that the remainder of the settlement amount of $1 million (approximately $150,000) be paid to Mississippi Gaming Corporation once the easements had been signed.

98.    In doing so, management acted in the best interest of the Company, rather than its own best interest. I was also able to get Cooperative Energy to pay a hefty court fee related to the escrow.

**The Eight Petitioners**

99.    The Petitioners are eight of thirteen Debenture Holders who purchased Debentures from the Company pursuant to a Private Placement. The deal was structured by Mr. Wurst's then law firm, two of the Petitioners, Messrs. Arneault and Emerson, and the Company. The funds raised were used to move the Diamondhead Project forward and for other corporate purposes.    Henley & Company, LLC ("Henley"), a New York securities firm, served as the Placement Agent for the Offering. [3]

100.    The eight Petitioners herein have been represented by Mr. Wurst since at least 2016. Attached hereto is a disclosure from the Company's Form 10-Q which summarizes the litigation between these eight Petitioners and the Company which was initiated by Petitioners in October 2016. (Exhibit 17). In December of 2022, the Company entered into an Amended Settlement Agreement with the Petitioners and agreed to pay these eight Petitioners additional interest on their Debentures and attorneys fees of $175,000. The Company previously agreed to a Consent Judgment which was entered in the case on September 20, 2023.

101.    On November 21, 2023, two months after the Consent Judgment was entered,

---

[3] Henley was represented by Ruskin Moscou Faltischek, P.C. Mr. Wurst was a partner with that law firm. Mr. Wurst is now a partner with the law firm of Armstrong Teasdale, which filed the Petition herein.

we agreed to put the Property up for sale if we did not pay the Petitioners by January 31, 2024.

**The Petitioner, Edson ("Ted") Arneault**

102.   The Petitioner, Edson ("Ted") Arneault, served as Chairman of the Board of Directors of Diamondhead Casino Corporation and as President of Casino World, Inc., a wholly-owned subsidiary of the Company.  His job was to spearhead the development of the Diamondhead Casino Project.

103.   Mr. Arneault and I were responsible for the disbursement of significant funds received as a result of the sale of the Debentures which Petitioners herein and other Debenture holders purchased. Thus, he is familiar with the way I handle corporate funds and financial records and with our bookkeeping system and data entry. Not once did Mr. Arneault, a CPA, ever express any concern with respect to our use of funds, our recordation of funds, or our bookkeeping procedures.

104.   Mr. Arneault's two Debentures, which total $100,000 in principal, are secured by a first lien on the Property with interest at 4%. The Company agreed to pay additional interest on the Petitioners' Debentures and eventually signed a Consent Judgment that included that interest.  However, the additional interest in excess of 4% per annum is unsecured. The Company also agreed to pay attorneys fees to Petitioners. Those fees are also unsecured. Mr. Arneault is owed his proportional amount of attorneys fees under the Consent Judgment.

105.  Mr. Arneault is owed Director fees in the amount of $11,250 which are secured by a fifth lien on the Property ("the Directors' Lien").

106.  Mr. Arneault is owed approximately $75,000 for unpaid salary, which is also an unsecured debt of the Company.

107.  In order for Mr. Arneault to collect all amounts the Company owes him, all liens on the Property must be paid off to reach his unsecured debt, which is substantial.

108.  The other Petitioners are owed secured and unsecured amounts, too. Therefore, for the other Petitioners to get paid in full, all liens on the Property must be paid off so that we can reach the unsecured debt owed them.

109.  The thirteen Debenture holders who purchased Debentures in the Private Placement did so through Henley & Company, which was then represented by Mr. Wurst's law firm.  The eight Petitioners herein are now represented by Mr. Wurst's new law firm. However, the remaining five Debenture holders also have first liens on the Property.

110. The purchasers of the thirteen Debentures are all sophisticated and accredited investors. They obviously know that the Diamondhead Property must be sold in a non-distress manner if they are to get paid.

**The Prior Chapter 7 Involuntary Petition**

111.   In 2015, after losing a proxy contest, a group of creditor/shareholders filed a Petition for an Involuntary Chapter 7 against the Company in the United States Bankruptcy Court for the District of Delaware (*In re Diamondhead Casino Corporation*, Case No. 15-11647-LSS).

112. The Petitioners filed an emergency motion for the appointment of an interim Chapter 7 Trustee, claiming, among other things, that management were  enriching themselves and running the Company primarily for their own benefit and contrary to the interests of its creditors and shareholders. The Court held an evidentiary hearing on the emergency motion and denied the motion finding that a trustee was not necessary in the gap period to preserve the property of the estate or to prevent loss.

113. The Company filed a motion to dismiss the case and the Court held an evidentiary hearing on the Company's motion to dismiss. The Court found that the Petitioners had satisfied the statutory criteria for filing the Petition. However, based on the totality of circumstances, the Court concluded that the Petitioners' primary concern in filing the Petition was to effect a change in management to benefit their investments as stockholders and that a secondary purpose was to

collect on their promissory notes. The Court dismissed the case and awarded attorneys fees and expenses. (See exhibit 18)

**The Company is Not Insolvent**

114. The Company is not insolvent. It owns, through Mississippi Gaming Corporation, four commercial properties appraised on January 5, 2024 "as is", at $55.2 million. (See Exhibit 1)

115. There is more than enough equity in the Property to pay all of the Company's secured and all of the Company's unsecured creditors all principal and all interest due, in full, with significant funds left over, assuming it's assets are sold or monetized in the ordinary course of business and not in a fire sale.

116. The Company and its finances have been under a legal microscope for many years, including in the above-referenced Chapter 7 Involuntary Bankruptcy case. Its books and records, including its financial records, are open for review to approximately 2,000 shareholders and to every outside party and their attorneys, accountants and advisors seeking to invest in the Company. In addition, the Company files audited financial statements and quarterly reviewed financial statements with the Securities and Exchange Commission.

117. The Company owns land through a subsidiary. It has no hidden assets for a Trustee to find and locate. All of its assets are fully disclosed in its SEC filings. There is nothing to hide and nothing to abscond with. On the contrary, the SEC

filings show that the President and Chairman of the Board have been carrying the Company with their own personal funds for years!

118.    The Petition filed herein is a threat to the Company's very existence and to the value of the assets of the Company. There is nothing this filing can do that Colliers is not already doing. This Petition will succeed only in hurting the Company, its creditors and its shareholders.

119.    Colliers is in discussions with both casino and non-casino prospects. These are financially viable prospects that have been vetted by Colliers.

120.    Colliers has informed me that this Petition is hurting their ability to maximize the value of the land.

121.    If the Company and its broker are not allowed to sell its Mississippi Property in the ordinary course of business, it is extremely unlikely that the secured creditors, including the Petitioners herein, will be paid in full.  The Debenture holders, the President of the Company and the Chairman of the Board of the Company will be the primary beneficiaries of any fire sale. The President would be the largest beneficiary of a fire sale. All other secured and unsecured creditors will likely get nothing. A Company which is 33 years old, will no longer exist and its 2000 shareholders will get wiped out.

Deborah A. Vitale

STATE OF VIRGINIA           )
                                          ) ss.
CITY OF ALEXANDRIA      )

SWORN TO AND SUBSCRIBED BEFORE ME, a Notary Public of the State and

County aforesaid, on this __17__ day of July, 2024.



MJ com exp 4/30/2028
#347285