**THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

In re:

DIAMONDHEAD CASINO
CORPORATION.,

               Alleged Debtor.

Chapter 7

Case No. 24-11354 (JKS)

**PETITIONING CREDITORS' ANSWERING BRIEF IN OPPOSITION TO MOTION OF THE ALLEGED DEBTOR, DIAMONDHEAD CASINO CORPORATION, TO DISMISS THE INVOLUNTARY BANKRUPTCY PETITION OR, IN THE ALTERNATIVE, TO <u>CONVERT THE CASE TO A CHAPTER 11</u>**

**ARMSTRONG TEASDALE LLP**

Jonathan M. Stemerman (No. 4510)
Denisse Guevara (No. 7206)
1007 North Market Street, Third Floor
Wilmington, Delaware 19801
Telephone: (302) 416-9670
jstemerman@atllp.com
dguevara@atllp.com

*Counsel to Petitioning Creditors*

Dated: September 3, 2024
       Wilmington, Delaware

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

FACTS ............................................................................................................................... 1

The Debentures and Consent Judgment ........................................................................... 2

The Debtor's Financial Condition ..................................................................................... 5

The Debtor's Unsuccessful Efforts to Sell the Property ................................................... 6

NATURE AND STAGE OF THE PROCEEDINGS ........................................................ 7

ARGUMENT ..................................................................................................................... 7

    I.    THE INVOLUNTARY PETITION WAS FILED IN GOOD FAITH ........................... 7

      A.   Petitioning Creditors Did Not Breach the Land Deed of Trust ............................ 8

      B.   Petitioning Creditors Did Not Breach a November 21, 2023, Agreement ............ 9

    II.   THE INVOLUNTARY PETITION SERVES A LEGITIMATE BANKRUPTCY PURPOSE .... 12

      A.   Collection is Valid Purpose for Involuntary Bankruptcy ..................................... 12

    IV.   ABSTENTION IS NOT WARRANTED ................................................................. 14

    V.   THERE IS NO AUTOMATIC RIGHT TO CONVERT TO A CHAPTER 11 ............. 15

    VI.   PETITIONING CREDITORS AGREE AND EVIDENTIARY HEARING IS NECESSARY. 16

CONCLUSION ................................................................................................................. 17

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re AMC Investors, LLC,*
    406 B.R. 478 (Bankr. D. Del. 2009) .................................................................. 15

*In re Analytica Wire, Inc.,*
    392 B.R. 618 (Bankr. D. Del. 2008) .................................................................. 14

*In re Better Roads Asphalt, LLC,*
    608 B.R. 7 (Bankr. D. P.R. 2019) ...................................................................... 12

*In re Forever Green Athletic Fields, Inc.,*
    2007 WL 1753104 (Bankr. E.D. Pa. May 3, 2017) ........................................... 14

*In re Forever Green Athletics Fields Inc.,*
    804 F.3d 328 (3d Cir. 2015) ........................................................................... 7, 8

*Glantz Contracting Co. v. General Electric Co.,*
    379 So. 2d 912 (Miss. 1980) ............................................................................... 9

*Godsell Mgmt., Inc. v. Turner Promotions, Inc.,*
    2007 WL 4226667 (Del. Ch. Nov. 28, 2007) ................................................... 10

*Jackson v. Nocks,*
    2018 WL 1935961 (Del. Ch. Apr. 24, 2018)..................................................... 10

*Landrum v. Livingston Holdings, LLC,*
    2024--- So.3d ----2022 WL 22854595 (Miss. Jul. 18, 2024) .............................. 9

*In re Lilley,*
    91 F.3d 491 (3d Cir. 1996) .................................................................................. 8

*In re Luxeyard, Inc.,*
    556 B.R. 627 (Bankr. D. Del. 2016).................................................................. 12

*In re Nash Engineering Co,*
    643 B.R. 654 (Bankr. D. Conn. 2022)............................................................... 12

*In re NLG,*
    2023 WL 2053920 (Bank. D. Del. Feb. 13, 2023) ...................................... 15, 16

*In re Northshore Mainland Services, Inc.,*
    537 B.R. 192 (Bank. D. Del. 2015)................................................................... 14

**Statutes**

11 U.S.C. § 303(h)(1) ............................................................................................................. 8

United States Code title 11 Chapter 7 ............................................................................. *passim*

Bankruptcy Code Chapter 11 ........................................................................................... *passim*

Bankruptcy Code Section 303 ................................................................................ 7, 13, 14

<u>PRELIMINARY STATEMENT</u>

There is no basis to dismiss nor convert this bankruptcy case. The Involuntary Petition (defined below) filed by Edson Arneault, Kathleen and James Devlin, J. Steven Emerson, Emerson Partners, J. Steven Emerson as Successor to Steven Emerson Roth IRA, John Hawley as Servicing Agent for Argonaut 2000 Partners, L.P., Steven Rothstein, Barry and Irene Stark (collectively, the "<u>Petitioning Creditors</u>") was filed in good faith for a legitimate bankruptcy purpose. Each of the Petitioning Creditors (along with others) loaned monies to Diamondhead Casino Corporation (the "<u>Debtor</u>") on March 31, 2014 and December 31, 2014, as documented collateralized debentures. In the ten years since the Debtor incurred its obligations under the debentures it made only one payment and has been in default of payment since March 1, 2016. The Debtor is a company that has not operated since 2000, has no source of income and is currently heavily indebted to a wide variety of creditors including the Petitioning Creditors and others, with the amount of its indebtedness increasing. The Debtor has a wholly owned subsidiary (which appears to be its only asset) which owns undeveloped real property upon which it has had dreams of developing a casino resort on the Mississippi Gulf Coast. However, despite over ten years of dreams, none has come to fruition and the Petitioning Creditors, *inter alia*, can no longer stand down. A chapter 7 liquidation is the proper method to marshal the Debtor's assets and achieve a fair distribution to all creditors. A chapter 11 would serve no purpose, as the Debtor has no hope of reorganizing.

<u>FACTS</u>

According to the Debtor's filings with the Securities and Exchange Commission:

[t]he [Debtor] has had no operations since it ended its gambling cruise ship operations in 2000. Since that time, the [Debtor] has concentrated its efforts on the development of its Diamondhead, Mississippi property. That development is dependent upon the [Debtor] obtaining the necessary capital, through either equity and/or debt financing, unilaterally or in conjunction with one or more partners, to

1

master plan, design, obtain permits for, construct, open, and operate a casino resort.[1]

The Debtor's wholly owned subsidiary, Mississippi Gaming Corporation ("MGC") is the sole owner of certain real property located at 7051 Interstate 10, Diamondhead, Mississippi (the "Property").  According to the Debtor, the Property was appraised in January 2024 at an "as is" value of $55.2 million.  Upon information and belief, the "as is" value of the Property is significantly less.[2]

According to the Debtor's latest 10-Q report, its:

>  intent was and is to construct a casino resort and other amenities on the Property unilaterally or in conjunction with one or more joint venture partners. However, the [Debtor] has been unable, to date, to obtain financing to move the project forward and/or enter into a joint venture partnership. There can be no assurance that the substantial funds required for the design and construction of the project can be obtained or that such funds can be obtained on acceptable terms. In addition, the [Debtor] has been unable to obtain financing to sustain the [Debtor]. Due to its lack of financial resources, the [Debtor] was forced to explore other alternatives, including a sale of part or all of the Property.[3]

## The Debentures and Consent Judgment

In 2014, in order to raise funds to enable the Debtor to pay pre-construction expenses for the development of  a casino on the Property, the Debtor borrowed $1,850,000 from various individuals and entities, including the Petitioning Creditors, who contributed $1,500,000 of this amount.[4]  Petitioning Creditors are each holders of collateralized convertible senior debentures (collectively, the "Debentures") memorializing the terms of the loans made to the Debtor.[5]  Each

---

[1] *See* Diamondhead, Inc. 10-Q for the period ending June 30, 2024 (the "10-Q" )at 6.  A true and correct copy of the 10-Q is attached to the Declaration of Edson Arneault in Support of Petitioning Creditors' Answering Brief in Opposition to Motion of the Alleged Debtor Diamondhead Casino Corporation, to Dismiss the Involuntary Bankruptcy Petition or, in the Alternative, to Convert the Case to a Chapter 11 (the "Arneault Decl."), filed contemporaneously herewith, at Exhibit A.

[2] *See* Arneault Decl. at ¶¶ 19-20.

[3] 10-Q at 6.

[4] Arneault Decl. at ¶ 5.

[5] *Id.* at ¶ 6.

of the Debentures provides that it shall bear interest at a fixed rate of 4% per annum and payable annually on March 1 of each year.[6] The Debentures are secured by a Land Deed of Trust covering the Property. True and correct copies of the Petitioning Creditors' Debentures are annexed to the Arneault Decl. as Exhibit B. The Land Deed of Trust is attached to the Arneault Decl. as Exhibit C.

Although the Debtor made the 2015 installment of interest under the Debentures (albeit late), it failed to make the interest payments due March 1, 2016 and each year thereafter.[7]

On or about October 25, 2016, Petitioning Creditors (other than John Hawley) filed an action against the Debtor in the United States District Court for the District of Delaware under Case No. 1:16-cv-00989 (the "District Court Case").[8] On or about February 28, 2019, John Hawley brought an action against the Debtor in the Superior Court of the State of Delaware under Case No. N19C-02-239 RRC (the "State Court Action" and together with the District Court Action, the "Prior Actions").[9] The Prior Actions sought to recover the amount of one million five hundred thousand dollars in principal plus interest thereon from the Debtors, which amounts were duly owing under the Debentures.[10]

In or about December 2019, the Parties entered into a settlement agreement (the "Settlement Agreement") resolving the Prior Actions.[11] A true and correct copy of the Settlement Agreement is attached to the Arneault Decl. as Exhibit D. Pursuant to the Settlement Agreement Debtor agreed to pay the Petitioning Creditors certain amounts, including principal owed on the Debentures held by Petitioning Creditors, plus interest and other amounts, calculated differently

---

[6] *Id.*
[7] *Id.* at ¶ 8.
[8] *Id.* at ¶ 9.
[9] *Id.*
[10] *Id.*
[11] *Id.* at ¶ 10.

depending on when (or if) the Property was sold by MGC.[12]  Following execution of the Settlement

Agreement, the parties entered into a stipulation of dismissal and the District Court Action was

dismissed on or about January 15, 2020.[13]

Under the terms of the Settlement Agreement, if the Property were not sold by MGC by

December 31, 2021, the Petitioning Creditors were entitled to a judgment based on certain

calculations.[14]  The Property was not sold by December 31, 2021.[15]  Nevertheless, the Debtor

requested additional time, stating that it had engaged a real estate broker and was actively

attempting to sell the Property.[16]  To that end, the parties entered into an amendment to the

Settlement Agreement effective as of April 1, 2022 (the "Amendment").[17]  A true and correct copy

of the Amendment is attached to the Arneault Decl. as Exhibit E.

On or about July 5, 2023, having seen no progress in selling the Property, and the Debtor

being in default of the Settlement Agreement and Amendment, Petitioning Creditors filed a Motion

to Reopen Case, Vacate Dismissal and Enter Judgment on Consent in the District Court Case.[18]

On or about August 2, 2023, the Debtor filed a response stating that it did not oppose the

Petitioning Creditors' motion nor the relief sought. [19]  Thus, on September 20, 2023, the District

Court reopened the case, vacated the dismissal and entered the consent judgment (the "Consent

Judgment").[20]  A true and correct copy of the Consent Judgment is attached to the Arneault Decl.

as Exhibit F.

The Consent Judgement awarded a judgment in favor of Petitioning Creditors and against

---

[12] *Id.*
[13] *Id.* at ¶ 11.
[14] *Id.* at ¶ 12.
[15] *Id.* at ¶ 13.
[16] *Id.*
[17] *Id.*
[18] *Id.* at ¶ 14.
[19] *Id.* at ¶ 15.
[20] *Id.* at ¶ 16.

the Debtor as follows:

> 1... judgment in the principal amount of ONE MILLION FIVE HUNDRED THOUSAND DOLLARS ($1,500,000); together with interest thereon at the rate of Four Percent (4%) per annum for the period from January 1, 2015 through December 31, 2019 in the amount of THREE HUNDRED THOUSAND DOLLARS ($300,000); plus interest on the principal amount at the rate of Six Percent (6%) per annum for the period from January 1, 2020 through March 31, 2022 in the amount of ONE HUNDRED TWELVE THOUSAND FIVE HUNDRED DOLLARS ($112,500); plus interest on the principal amount at the rate of Eight Percent (8%) per annum for the period from April 1, 2022 through the date of payment to each [Petitioning Creditor] (in place of any statutory post judgment rate of interest). No post-judgment interest shall be calculated as interest upon interest (e.g. post-judgment interest shall only apply to the $1,500,000 principal amount and not to any interest thereon).

> 2. The Judgment shall also include the amount of ONE HUNDRED SEVENTY-FIVE THOUSAND DOLLARS ($175,000) as and for [Petitioning Creditors]' attorneys' fees and costs, however no post-judgment interest shall apply to these attorneys' fees and costs.[21]

Accordingly, interest on the $1,500,000 principal amount of the Consent Judgment continues to accrue at the rate of 8% per annum.

## The Debtor's Financial Condition

The Debtor has no operations, having ceased operating in 2000. Moreover, the Debtor "has had no income or revenue from any operations since 2000."[22] There are currently 21 liens on the Property totaling approximately $8.5 million.[23] On August 14, 2024, the Debtor filed its Form 10-Q with the Securities and Exchange Commission for the quarterly period ending June 30, 2024.[24] The 10-Q listed the Debtor as having assets totaling $5,662,651 and liabilities totaling $19,471,680.[25] Included in the Debtor's liabilities were:

---

[21] Consent Order at pp. 3-4.
[22] *See* Vitale Declaration [D.I. 9-] at ¶ 6.
[23] *Id.* at ¶ 41, ¶.4.
[24] Arneault Decl. at ¶ 3.
[25] 10-Q at 1. This was an increase from the Debtor's total liabilities as of December 31, 2023, which totaled $18,676,733.

| Description | Total |
|---|---|
| Accounts payable and accrued expenses due related parties | $8,705,147 |
| Accounts payable and accrued expenses – others | $5,634,552. |
| Convertible notes and line of credit payable | $1,962,500 |
| Convertible debenture payable | $1,800,000 |

The Debtor's latest 10-Q also listed a total stockholders' deficit in the amount of $13,809,029. For the six month period ending June 30, 2024, the Debtor reported a net loss of $919,737.

According to its 10-Q, the Debtor has not filed its federal tax returns for the tax years 2016-2023, nor has it filed its Mississippi state tax returns for the tax years 2018-2023.[26] Throughout this entire period, the Debtor has been controlled by Deborah Vitale and Gregory Harrison.[27] Each of Ms. Vitale and Gregory A. Harrison, Chairman of the Debtor's Board of Directors, has alleged that he and she hold both secured and unsecured claims against the Debtor.

## The Debtor's Unsuccessful Efforts to Sell the Property

Vitale has made multiple efforts to sell the Property over many years.[28] Nevertheless, she has been unwilling or unable to effect a sale of the Property.[29] While the Debtor claims to believe that the Property is worth an amount in excess of $50 million, prior to the filing of the Involuntary Petition, counsel for the Petitioning Creditors met with several well-known real estate firms, including Hilco, Gordon Brothers and Keen-Summit.[30] None of these entities believed they could obtain a price anywhere near the inflated price presented by the Debtor.[31] Indeed, the Debtor has

---

[26] *Id.* at 18.
[27] Vitale Decl. at ¶ 11; Harrison Decl. at ¶ 6.
[28] Arneault Decl. at ¶ 18.
[29] *Id.*
[30] *Id.* at ¶ 20.
[31] *Id.*

not provided any evidence that it has received any firm offers to purchase the Property, despite many years of trying and, upon information and belief, no firm offer exists.[32]

NATURE AND STAGE OF THE PROCEEDINGS

On June 12, 2024, the Petitioning Creditors commenced this bankruptcy case by filing an involuntary petition (the "Involuntary Petition") under Chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") [D.I. 1]. The Debtor filed a motion to dismiss (the "Motion to Dismiss") the Involuntary Petition or, in the alternative, convert the case to a case under Chapter 11 of the Bankruptcy Code [D.I. 9]. This is Petitioning Creditors' Answering Brief in opposition to the Motion. A hearing on the Motion to Dismiss is scheduled for September 25, 2024 at 1:00 p.m. [D.I. 10].

## ARGUMENT

## I. THE INVOLUNTARY PETITION WAS FILED IN GOOD FAITH

The Involuntary Petition meets all the requirements of Section 303 of the Bankruptcy Code, was filed in good faith, and the Court should deny the Debtor's Motion to Dismiss. "Section 303 of the Bankruptcy Code, which governs involuntary cases under Chapter 7 or 11, contains three requirements for commencing an action against a debtor who has twelve or more creditors: (1) there must be three or more petitioning creditors; (2) each petitioning creditor must hold a claim against the debtor that is not contingent as to liability or the subject of a bona fide dispute; and (3) the claims must aggregate at least $15,325 more than the value of liens on the debtor's property." *In re Forever Green Athletics Fields Inc.*, 804 F.3d 328, 333 (3d Cir. 2015) (citing 11 U.S.C. § 303(b)(1)). Here, the Debtor does not challenge that these elements have been met. Likewise, the Debtor does not challenge Section 303(h)(1)'s requirement that the Debtor is "generally not paying

---

[32] *Id.* at ¶ 21.

such debtor's debts as they become due." *See* 11 U.S.C. § 303(h)(1).

Instead of challenging the Involuntary Petition as failing to meet Section 303's statutory requirements, the Debtor incorrectly argues that the Petitioning Creditors filed the Involuntary Petition in bad faith. *See* Motion at 5. The determination of bad faith is "a fact intensive determination …" *In re Lilley*, 91 F.3d 491, 496 (3d Cir. 1996). The Petitioning Creditors are "presumed to have acted in good faith." *In re Forever Green*, 804 F.3d at 335 (citing *In re Bayshore Wire Prods. Corp.,* 209 F.3d 100, 105 (2nd Cir .2000)*.* "To dismiss the petition, the debtor must show by a preponderance of the evidence that the creditors acted in bad faith." *Id.* (citation omitted). In the Third Circuit, bad faith is determined under the "totality of the circumstances" test. *In re Forever Green*, 804 F.3d at 336.

Here, the Debtor's assertion of bad faith is based on allegations that the Petitioning Creditors breached the Land Deed Trust and an alleged November 21, 2023, agreement. Both allegations of breach are incorrect.

### A. Petitioning Creditors Did Not Breach the Land Deed of Trust

The Debtor incorrectly asserts that the Involuntary Petition violates the Land Deed of Trust because the document "expressly provides for a 'judicial foreclosure action' in Mississippi in the event of a default … thus Mississippi is the proper forum for any collection action in the event of a default as alleged by the [Petitioning Creditors]." Motion at 6. As written, the Debtor suggests that it—Diamondhead—cannot be placed into bankruptcy in Delaware because any collection action must occur in Mississippi. But, **the Land Deed of Trust is for *Mississippi Gaming Corporation*,** not the Debtor. *See* Vitale Dec. Ex. 4. Thus, the filing of the Involuntary Petition against the Debtor cannot be in violation of non-Debtor Mississippi Gaming Corporation's Land Deed of Trust.

Moreover, **a judicial foreclosure proceeding is not the exclusive remedy** to collect on non-Debtor Mississippi Gaming Corporation's real estate assets.  <u>First</u>, the judicial foreclosure option is available only after a declaration of default and then only "at the request" of the Secured Party.  There is no indication that it is the exclusive remedy for a default. *See Landrum v. Livingston Holdings, LLC*, 2024--- So.3d ----2022 WL 22854595, at *18 (Miss. Jul. 18, 2024) (noting contractual provision using "shall" "certainly does not claim to be exclusive nor does it claim to limit any other recovery.").  Rather, the provision merely indicates that if a Secured Party requests judicial foreclosure, the Trustee is mandated to follow the procedures outlined in the Land Deed of Trust.

<u>Second</u>, numbered paragraph 9 of the Land Deed Trust provides, in relevant part: "Each privilege, option or remedy provided in this Deed of Trust to Secured Party is distinct from every other privilege, option or remedy contained herein or afforded by law or equity, and may be exercised independently, concurrently or successively by Secured Party ….."  Deed of Trust at ¶ 9.  This provision makes clear that, despite judicial foreclosure being *a* remedy, it is not the *exclusive* remedy.  *See Glantz Contracting Co. v. General Electric Co.,* 379 So. 2d 912, 917 (Miss. 1980) (applying Mississippi law that "[c]ourts must construe contracts so that they give effect to all provision and do not produce an unfair and unreasonable result.").

Thus, the filing of the Involuntary Petition does not breach the Land Deed of Trust and cannot be a basis for dismissal.

## B.     Petitioning Creditors Did Not Breach a November 21, 2023, Agreement

The Debtor's contention that Petitioning Creditors somehow breached an agreement for a January 31, 2024 "drop dead date" by which Petitioning Creditors would be paid or the Debtor

would have to "put the Diamondhead Property up for sale"[33] also fails, as no such agreement existed. As the Debtor does not point to any written agreement, the Debtor appears to suggest that an oral contract exists, but only points to two terms of that supposed contract.

"An enforceable contract must contain all material terms, and the acceptance must be identical to the offer." *Jackson v. Nocks*, 2018 WL 1935961, at *6 (Del. Ch. Apr. 24, 2018). Thus, in order for an oral contract to be enforceable, the party claiming an oral contract exists must prove by "clear and convincing evidence that the parties reached a complete meeting of the minds on all material terms of the oral contract." *Godsell Mgmt., Inc. v. Turner Promotions, Inc.*, 2007 WL 4226667, at *3 (Del. Ch. Nov. 28, 2007).

Here, there can be no oral contract because there was no meeting of the minds. As set forth in the Arneault Declaration, neither he nor Mr. Wurst agreed that the Diamondhead Property would be "put up for sale" if no payment was received by January 31, 2024, because he and Mr. Wurst believed at the time that the Debtor was already trying to sell the Diamondhead Property. *See* Arneault Decl. at ¶¶ 24-25. Indeed, they believed that the Debtor had been trying to sell the Diamondhead Property since at least March 25, 2019, when the Debtor engaged Newmark Knight Frank. *See Id.* at ¶ 25 (citing Section 6 of Original Settlement Agreement).

Additionally, in the parties negotiations, Mr. Wurst had required an additional $50,000 in attorneys fees *and* that the agreement be memorialized in writing, but Diamondhead rejected these terms. *Id.* at ¶ 26. Thus, no agreement was reached. Had the parties actually reached any agreement, especially given the parties' history, Mr. Arneault would have insisted on it being memorialized to avoid any misunderstandings. *Id.* at ¶ 28

Further, as acknowledged by the Debtor, *see* Motion at 7, Mr. Wurst was the attorney for

---

[33] *See* Motion.at 7.

the Petitioning Creditors in these negotiations. But Mr. Wurst had no authority to accept the terms of any proposal without the consent of his clients.[34]

Even, assuming *arguendo,* this Court were to believe the Debtor's version of the material terms of the agreement (which it should not), the term "put up for sale" is ambiguous, as its meaning is capable of multiple interpretations. It could mean, for example, that the property be formally listed for sale. The Debtor has not explained its interpretation of what "put up for sale" even means. The Debtor apparently believes that "put up for sale" means the engagement of Colliers, and not an actual formal listing or other type of announcement with that the Property is for sale. Tellingly, the Debtor does not state what actions Colliers took following its engagement and prior to January 31, 2024. Thus, if "put up for sale" means something other than listing the property for sale a broker, such as Colliers, even under the Debtor's supposed interpretation, the Debtor has not proven it complied with this alleged provision.

It should also be noted that the alleged oral "agreement" between the Debtors and Petitioning Creditors has no "drop dead" date by when the Property would need to be sold. The Petitioning Creditors would never have agreed to such an open-ended condition. Nor would Petitioning Creditors have agreed to any "deal" without a written memorialization of the agreement, precisely to avoid any issues regarding the agreement's terms and meaning.[35]

The lack of a written memorialization of the terms of any agreement here is particularly strong evidence that no agreement exists when one considers that each side was represented by experienced attorneys.[36] Because no agreement exists, there can be no breach and there is no basis to assert that the Petitioning Creditors acted in bad faith.

---

[34] *Id.* at ¶ 29.
[35] *Id.* at ¶ 28.
[36] *See* Vitale Decl. at ¶ 8 (describing herself as "an experienced trial attorney with over thirty years of experience having handled complex civil litigation including corporate, contractual, commercial … litigation."

## II.    THE INVOLUNTARY PETITION SERVES A LEGITIMATE BANKRUPTCY PURPOSE

Petitioning Creditors filed the Involuntary Petition for a legitimate bankruptcy purpose. Here, the purpose of the bankruptcy is to marshal the Debtor's assets and liquidate them for the benefit of all creditors.  Indeed, "when the debtor is a corporation, the only purpose of a Chapter 7 case is to marshal and distribute assets as part of the fair and orderly liquidation of assets for creditors, *which may explain the relatively few corporate Chapter 7 cases dismissed for lack of a legitimate bankruptcy purpose under either section 707(a) or 305(a).*"   *In re Nash Engineering Co,* 643 B.R. 654, 662 (Bankr. D. Conn. 2022) (emphasis added) *rev'd*  on other grounds by *In re Nash  Engineering  Co.¸* 619  F.Supp.3d  268  (D.  Conn.  2022).   Here,  as  set  forth  below,  the Petitioning Creditors have a legitimate bankruptcy purpose for filing the Involuntary Petition and there is no basis to dismiss this bankruptcy case.

### A.    Collection is Valid Purpose for Involuntary Bankruptcy

The Debtor incorrectly argues that collecting on a debt is not a legitimate purpose.  This cannot be the case, as the primary reason a creditor would file an involuntary petition would be to get paid on the debt owed by a debtor to the creditor.  Moreover, a "creditor may use the device of an involuntary petition when bankruptcy is necessary to assure equal distribution among creditors. As such, it is proper to file an involuntary petition to 'protect against other creditors obtaining a disproportionate share of the debtor's assets.'"  *In re Luxeyard, Inc.*, 556 B.R. 627, 640 (Bankr. D. Del. 2016) (citations omitted).  Further, "[s]eeking that other creditors join in filing an involuntary petition in order to pursue debt collection in the bankruptcy court is not an improper bankruptcy purpose."  *In re Better Roads Asphalt, LLC*, 608 B.R. 7, 15 (Bankr. D. P.R. 2019) (citing In re Basil Street Partners, LLC, 477 B.R., 846, 853 (Bankr. M.D. Fla. 2012)).

Here, the Debtor has insiders who are both secured and unsecured creditors.  Moreover,

the debt of the Debtor continues to increase.[37]  In addition to the Petitioning Creditors, there are other creditors who hold a first lien position on the Property.  The most efficient way to fairly and property distribute the Debtor's assets is through a chapter 7 liquidation.

This case is similar to that of *Betterroads*, where the Bankruptcy Court found that "[t]he evidence presented showed that the involuntary debtors had defaulted on their loan payments and, that the lenders had engaged in active collection actions. The discussions by and between the lenders, including the syndicate lenders, and the advice provided by their legal counsel show that the decision to file the involuntary petitions was more in the nature of a studied business decision tha[n] an action to harass or merely seek an alternate collection forum." *Id.*

As the Debtor itself admits, it is indebted to many creditors and has little to no cash available to pay them.  The Debtor has no operations, no liquidity and no prospects for continuing as a going concern.  The only way that the Debtor's creditors will be paid is through a sale of the main asset of its wholly owned subsidiary, Mississippi Gaming Corporation.  The Debtor has stated its attempt to sell the Property for years, with nothing to show.  Meanwhile, the Debtor continues to accumulate more debt.  A Chapter 7 liquidation therefore benefits all of the Debtor's creditors, not just Petitioning Creditors. As such, the Involuntary Petition was filed for a legitimate bankruptcy purpose and the Motion to Dismiss should be denied.

## III.    THE BANKRUPTCY WAS FILED IN GOOD FAITH; NO FEES, COSTS OR DAMAGES SHOULD BE AWARED

As a threshold matter, because the Involuntary Petition meets the requirements of Section 303, an award of fees and expenses in inappropriate under Section 303(i).  But even if this Court determines that the Involuntary Petition was not filed in good faith, relief under Section 303(i) is

---

[37] Although the Debtor asserts that its subsidiary holds approximately $1 million in funds from a settlement agreement, the Debtor does not state the amount of MGC's debts.  Moreover, the Debtor itself is running net losses of over $900,000 every six months.

discretionary and should not be awarded here. *See In re Analytica Wire, Inc.*, 392 B.R. 618, 620 (Bankr. D. Del. 2008) (stating awards under Section 303(i) are discretionary). "To evaluate whether a § 303(i) award is appropriate, bankruptcy courts regularly look to the totality of the circumstances." *In re Forever Green Athletic Fields, Inc.*, 2007 WL 1753104, at *9 (Bankr. E.D. Pa. May 3, 2017). "Applying the totality of the circumstances analysis, bankruptcy courts will consider: (1) the petitioners' relative culpability, (2) the petitioner's motives for joining the involuntary petition, (3) the merits of the involuntary petition, (4) the relative reasonableness of the debtor's and petitioners' conduct, and (5) other circumstances this Court may deem relevant to the exercise of its discretion." *Id.*

Here, the merits of the Involuntary Petition are strong. The Debtor has no operations, no income, and owes a substantial amount to a wide variety of creditors, including the Petitioning Creditors. The Debtor's main asset is its interest in its wholly owned subsidiary, MGC, whose main asset is an undeveloped piece of land that the Debtor has been unable or unwilling to sell. As such, to the extent this Court dismisses this bankruptcy case under Section 303, it should exercise its discretion and not award fees, expenses or other costs to the Debtor.

## IV. ABSTENTION IS NOT WARRANTED

"Whether to dismiss a case or abstain pursuant to section 305 is committed to the discretion of the bankruptcy court, and is determined based upon the totality of the circumstances." *In re Northshore Mainland Services, Inc.*, 537 B.R. 192, 203 (Bank. D. Del. 2015).

> The courts that have construed § 305(a)(1) are in general agreement that abstention in a properly filed bankruptcy case is an extraordinary remedy, and that dismissal is appropriate under § 305(a)(1) only in the situation where the court finds that both 'creditors and the debtor' would be 'better served' by a dismissal." "Granting an abstention motion pursuant to § 305(a)(1) requires more than a simple balancing of harm to the debtor and creditors; rather, the interests of both the debtor and its creditors must be served by granting the requested relief." The movant bears the burden to demonstrate that the interests of the debtors and creditors would benefit from dismissal.

*In re AMC Investors, LLC,* 406 B.R. 478, 487-488 (Bankr. D. Del. 2009) (citations omitted).

Here, it is not in the best interests of the Debtor or the creditors to dismiss or abstain from moving forward with this bankruptcy case. As set forth above and below, the Debtor has no operations, no income and continues to incur additional debt with no ability to repay the debt outside of a sale. Nevertheless, the Debtor has been unable or unwilling to voluntarily sell the Property. A chapter 7 liquidation will maximize a recovery to creditors, stop the Debtor from incurring additional debt and will provide equal treatment to all creditors under the Bankruptcy Code's priority scheme.

## V. THERE IS NO AUTOMATIC RIGHT TO CONVERT TO A CHAPTER 11

The Debtor requests, in the alternative, that if the Involuntary Petition is not dismissed, it be allowed to convert the case to one under Chapter 11, asserting it has an automatic right to do so. Motion at 18-19. This is incorrect. Although the Debtor cites cases from outside of this Circuit in support of its assertion, it conspicuously omits this Court's decision from last year finding that there is no absolute right to convert an involuntary 7 to a chapter 11. Rather, this Court, in *In re NLG, LLC*, found that "section 706(a) does not give the Debtor the absolute right to convert the chapter 7 case to a case under chapter 11." 2023 WL 2053920, at *5 (Bank. D. Del. Feb. 13, 2023).

Specifically, this Court explained that "[c]onversion under section 706(a) is limited by the express language of section 706(d), which provides that "a case may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter." *Id.* As was the case in *NLG*, Diamondhead cannot convert this case to one under Chapter 11 because "the Debtor's right to convert is expressly conditioned on NLG satisfying the requirements of the destination chapter – chapter 11." *Id.* As the *NLG* Court explained:

A debtor may not qualify as a "debtor" under chapter 11, if pursuant to 11 U.S.C. § 1112(b)(1), "cause" exists for the court to convert a debtor's chapter 11 case to a chapter 7 case or dismiss it. In deciding a contested motion to convert under section 706(a), with sections 706(d) and 1112(b)(4) in mind, courts consider the "totality of the circumstances," including the factors set forth in 1112(b)(4).

*Id.* at *6.

As in *NLG*, at least two of Section 1112(b)(4)'s "cause" factors are present here: "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," and "inability to effectuate substantial consummation of a confirmed plan." *See In re NLG*, 2023 WL 2053920, at *6. The Debtor's latest 10-Q states that "The Company has incurred losses over the past several years, has no operations, generates no operating revenues and as reflected in the accompanying unaudited condensed consolidated financial statements, incurred a net loss applicable to common stockholders of $970,537 and $916,069 for the six months ended June 30, 2024 and 2023 respectively."[38] This has been the pattern for years and there is no reasonable likelihood of rehabilitation.

Similarly, the Debtor had less than $75,000 in cash as of June 30, 2024 and does not appear capable of funding a plan of reorganization. Any plan under Chapter 11 would necessarily be a plan of liquidation, which can be accomplished in a more cost effective and efficient manner through a Chapter 7.

## VI. PETITIONING CREDITORS AGREE AND EVIDENTIARY HEARING IS NECESSARY

Given the material facts in dispute, including: (a) the existence of the purported November 21, 2023 Agreement and (b) the true value of the Property, Petitioning Creditors agree with the Debtors that an evidentiary hearing is necessary. Prior to any such hearing, however, Petitioning Creditors submit that discovery is necessary and that this Court should issue a discovery schedule.

---

[38] 10-Q at 6.

## CONCLUSION

Wherefore, for the foregoing reasons, this Court should deny the Motion to Dismiss and this case should proceed as a Chapter 7 liquidation.

**ARMSTRONG TEASDALE LLP**

/s/ Jonathan M. Stemerman
Jonathan M. Stemerman (No. 4510)
Denisse Guevara (No. 7206)
1007 North Market Street, Third Floor
Wilmington, Delaware 19801
Telephone: (302) 416-9670
jstemerman@atllp.com
dguevara@atllp.com

*Counsel to Petitioning Creditors*

Dated: September 3, 2024
Wilmington, Delaware