# THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>DIAMONDHEAD CASINO CORPORATION.,<br><br>Alleged Debtor. | Chapter 7<br><br>Case No. 24-11354 (JKS) |

**DECLARATION OF EDSON ARNEAULT IN SUPPORT OF PETITIONING CREDITORS' ANSWERING BRIEF IN OPPOSITION TO MOTION OF THE ALLEGED DEBTOR, DIAMONDHEAD CASINO CORPORATION, TO DISMISS THE INVOLUNTARY BANKRUPTCY PETITION OR, IN THE ALTERNATIVE, TO CONVERT THE CASE TO A CHAPTER 11**

I, Edson Arneault, under penalty of perjury, declare and state as follows:

1. I am a creditor of Diamondhead Casino Corporation (the "Debtor") and am one of the petitioning creditors in the above-captioned bankruptcy case. I make this declaration in support of the Petitioning Creditors' (defined below) answering brief (the "Answering Brief") filed in opposition to the Debtor's motion to dismiss the involuntary petition or, in the alternative, convert the case to one under chapter 11 of the Bankruptcy Code [D.I. 9] (the "Motion").

2. I have personal knowledge of the facts set forth and circumstances described herein and, if called to testify as a witness, could and competently would testify to such facts.

3. On or about August 14, 2024, the Debtor filed a form 10-Q with the Securities and Exchange Commission for the period ending June 30, 2024 (the "10-Q" ). A true and correct copy of the 10-Q is attached hereto as **Exhibit A**.

4. On or about June 12, 2024, I, together with Kathleen and James Devlin, J. Steven Emerson, Emerson Partners, J. Steven Emerson as Successor to Steven Emerson Roth IRA, John Hawley as Servicing Agent for Argonaut 2000 Partners, L.P., Steven Rothstein, Barry and Irene

Stark (collectively, the "Petitioning Creditors") commenced the above-captioned action by filing an involuntary petition under Chapter 7 of the Bankruptcy Code.

5. In 2014, in order to raise funds to enable the Debtor to pay pre-construction expenses for the development of a casino on the Property,[1] the Debtor borrowed $1,850,000 from various individuals and entities, including the Petitioning Creditors, who contributed $1,500,000 of this amount.

6. Petitioning Creditors are each holders of collateralized convertible senior debentures (collectively, the "Debentures") memorializing the terms of the loans made to the Debtor. Each of the Debentures provides that it shall bear interest at a fixed rate of 4% per annum and payable annually on March 1 of each year. Copies of the Petitioning Creditors' Debentures are attached hereto as **Exhibit B**.

7. The Debentures are secured by a Land Deed of Trust covering the Property. A true and correct copy of the Land Deed of Trust is attached hereto as **Exhibit C**.

8. Although the Debtor made the 2015 installment of interest under the Debentures, albeit late, it failed to make the interest payment due March 1, 2016.

9. On or about October 25, 2016, Petitioning Creditors (other than John Hawley) filed an action against the Debtor in the United States District Court for the District of Delaware under Case No. 1:16-cv-00989 (the "District Court Case"). On or about February 28, 2019, John Hawley brought an action against the Debtor in the Superior Court of the State of Delaware under Case No. N19C-02-239 RRC (the "State Court Action" and together with the District Court Action, the "Prior Actions"). The Prior Actions sought to recover the amount of one million five hundred

---

[1] All capitalized terms not defined herein shall have the same meaning as set forth in the Answering Brief.

thousand dollars in principal plus interest thereon from the Debtors, which amounts were duly owing under the Debentures.

10. In or about December 2019, the Parties entered into a settlement agreement (the "Settlement Agreement") resolving the Prior Actions. A copy of the Settlement Agreement attached hereto as **Exhibit D.** Pursuant to the Settlement Agreement Debtor agreed to pay the Petitioning Creditors certain amounts, including principal owed on the Debentures held by Petitioning Creditors, plus interest and other amounts, calculated differently depending on when (or if) the Property was sold by MGC.

11. Following execution of the Settlement Agreement, the parties entered into a stipulation of dismissal and the District Court Action was dismissed on or about January 15, 2020.

12. Under the terms of the Settlement Agreement, if the Property were not sold by MGC by December 31, 2021, the Petitioning Creditors were entitled to a judgment based on certain calculations.

13. The Property was not sold by December 31, 2021. Nevertheless, the Debtor requested additional time, stating that it had engaged a real estate broker and was actively attempting to sell the Property. To that end, the parties entered into an amendment to the Settlement Agreement effective as of April 1, 2022 (the "Amendment"). A true and correct copy of the Amendment is attached hereto as **Exhibit E**.

14. On or about July 5, 2023, having seen no progress in selling the Property, and the Debtor being in default of the Settlement Agreement and Amendment, Petitioning Creditors filed a Motion to Reopen Case, Vacate Dismissal and Enter Judgment on Consent in the District Court Case.

15. On or about August 2, 2023, the Debtor filed a response stating that it did not oppose the Petitioning Creditors' motion or the relief sought.

16. Thus, on September 20, 2023, the District Court reopened the case, vacated the dismissal and entered the consent judgment (the "Consent Judgment"). A true and correct copy of the Consent Judgment is attached hereto as **Exhibit F**.

17. The Consent Judgement awarded a judgment in favor of Petitioning Creditors and against the Debtor as follows:

> 1. . . . judgment in the principal amount of ONE MILLION FIVE HUNDRED THOUSAND DOLLARS ($1,500,000); together with interest thereon at the rate of Four Percent (4%) per annum for the period from January 1, 2015 through December 31, 2019 in the amount of THREE HUNDRED THOUSAND DOLLARS ($300,000); plus interest on the principal amount at the rate of Six Percent (6%) per annum for the period from January 1, 2020 through March 31, 2022 in the amount of ONE HUNDRED TWELVE THOUSAND FIVE HUNDRED DOLLARS ($112,500); plus interest on the principal amount at the rate of Eight Percent (8%) per annum for the period from April 1, 2022 through the date of payment to each [Petitioning Creditor] (in place of any statutory post judgment rate of interest). No post-judgment interest shall be calculated as interest upon interest (e.g. post-judgment interest shall only apply to the $1,500,000 principal amount and not to any interest thereon).
>
> 2. The Judgment shall also include the amount of ONE HUNDRED SEVENTY-FIVE THOUSAND DOLLARS ($175,000) as and for [Petitioning Creditors]' attorneys' fees and costs, however no post-judgment interest shall apply to these attorneys' fees and costs.[2]

18. The Debtor has long claimed that it has been attempting to sell the Property but with no success. The Debtor, through its president, Deborah Vitale, has told me numerous times of parties potentially interested in purchasing all or part of the Property, but she has been unable or unwilling to consummate any transaction.

19. Although the Debtor had shown me an appraisal of the Property indicating an "as is" value of $55.2 million, I cannot imagine any purchaser paying that much.

---

[2] Consent order at pp. 3-4.

20. I am advised by our counsel, Jeffrey Wurst, Esq., that in anticipation of filing our involuntary petitions he met with several real estate firms that regularly assist debtors in selling real property through the bankruptcy process, including Hilco, Gordon Brothers and Keen-Summit. He has told me that in his conversations with them none believed that it could obtain a price anywhere near the inflated price desired by the Debtor.

21. I have not seen any evidence that the Debtor has received any firm offers to purchase the Property, despite many years of trying and, upon information and belief, no firm offer exists.

22. I read in the Motion papers that the Debtor contends that Petitioning Creditors somehow breached an imagined "oral" agreement arising out of a telephone call had on November 21, 2023. The Debtor alleges that during that call an oral agreement was reached whereby if the Petitioning Creditors were not paid by January 31, 2024, the Debtor would "put the Diamondhead Property up for sale."

23. Mr. Wurst and I participated in the November 21, 2023, call along with Ms. Vitale and Mr. Harrison, the chairman of the Diamondhead board of directors. My recollection is that at the commencement of the call, which was very cordial, Mr. Wurst stated that the purpose of the call was to discuss a settlement and was subject to Rule 408 of the Federal Rules of Evidence and not admissible in any litigation.

24. While the parties did discuss terms upon which the Petitioning Creditors would continue to forbear, no such agreement was reached. In addition, it was my understanding that the Property had been listed for sale since at least March 25, 2019, when the Debtor engaged Newmark Knight Frank. *See, e.g.* Section 6 of Settlement Agreement.

25. It is noteworthy that the negotiations during the November 21, 2023, call broke down when, in part, the Debtor, as an inducement for the Petitioning Creditors to forebear, refused to provide an additional $50,000 to reimburse the Petitioning Creditors for their ongoing attorneys' fees – such amount to be in addition to the $175,000 that the Debtor had already agreed to in the Amendment, which amount was included in the Consent Judgment.

26. As a result, although the Petitioning Creditors were open to compromise certain of their rights in the context of yet another written amendment, no meeting of the minds resulted from the November 21, 2023, call and no oral or written agreement was reached.

27. Had the parties actually reached an agreement on that call, given the parties' contentious history, I would have insisted on it being memorialized in writing to avoid any misunderstandings.

28. Further, not only did we not reach an agreement to any of the Debtor's proposed terms, neither Mr. Wurst nor I had any authority to bind other Petitioning Creditors – we could only come to them and support terms to be memorialized in a document to be executed by each of the Petitioning Creditors and the Debtor.

29. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated: September 3, 2024

/s/ Edson Arneault
Edson Arneault