## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF DELAWARE

_____

In Re:                                                )
                                                          )
DIAMONDHEAD CASINO  CORPORATION    )
                                                          )          C. A. No. 24-11354-JKS
                                                          )
        ALLEGED DEBTOR.                      )          Chapter  7
_____  )


**POST-HEARING BRIEF OF THE ALLEGED DEBTOR, DIAMONDHEAD CASINO CORPORATION, IN SUPPORT OF ITS MOTION TO DISMISS THE INVOLUNTARY BANKRUPTCY PETITION OR, IN THE ALTERNATIVE, TO CONVERT THE CASE TO CHAPTER 11**


BIGGS & BATTAGLIA
/s/ Robert D. Goldberg
Robert D. Goldberg (Delaware Bar ID #631)
921 N. Orange Street
Wilmington, DE  19899-1489
Telephone: (302) 655-9677
email: Goldberg@batlaw.com
ATTORNEY FOR DIAMONDHEAD
CASINO CORPORATION


Dated: February 11, 2025

## <u>TABLE OF CONTENTS</u>

NATURE AND STAGE OF THE PROCEEDINGS ............................................................. 1

SUMMARY OF ARGUMENT ........................................................................................ 1

STATEMENT OF FACTS ............................................................................................. 2

ARGUMENT ............................................................................................................. 13

I.      THE PETITION SHOULD BE DISMISSED INASUMCH AS PETITIONERS
HAVE FAILED TO ESTABLISH JURISDICTION ............................................. 13

II.     THE TOTALITY OF CIRCUMSTANCES WARRANTS A FINDING OF BAD
FAITH AND DISMISSAL UNDER 11 U.S.C. §303(a)(1) ..................................... 15

A.     THE PETITION SHOULD BE DISMISSED INASMUCH AS IT WAS
FILED TO COLLECT A DEBT, AN IMPROPER BANKRUPTCY PURPOSE .... 16

B.     THE PETITION SHOULD BE DISMISSED INASMUCH AS THERE ARE
STATE REMEDIES AVAILABLE FOR PETITIONERS TO COLLECT THEIR
DEBT ................................................................................................................. 17

C.     THE PETITION SHOULD BE DISMISSED BECAUSE IT DOES NOT SERVE
A VALID BANKRUPTCY PURPOSE ...................................................... 18

D.     THE PETITION SHOULD BE DISMISSED INASMUCH AS THERE WAS NO
EVIDENCE OF ANY PAYMENT OF A PREFERENCE OR DISSIPATION OF
ASSETS ON THE PART OF THE DEBTOR ........................................................... 19

E.     THE PETITION SHOULD BE DISMISSED INASMUCH AS PETITONERS
MADE NO REASONABLE INQUIRY INTO THE RELEVANT FACTS
AND PERTINENT LAW BEFORE FILING THIS  PETITION ................................. 23

III.    ABSTENTION IS WARRANTED IN THIS CASE UNDER 11 U.S.C. §305(a)(1) ... 24

IV.    IN THE EVENT THE COURT DECLINES TO DIMSISS THE
INVOLUNTARY CHAPTER 7 PETITION, THE CASE SHOULD BE
CONVERTED TO CHAPTER  11 ............................................................................. 29

CONCLUSION ............................................................................................................ 30

# <u>TABLE OF AUTHORITIES</u>

## <u>CASES</u>

*In re Century Tile Marble, Inc.*, 152 B.R. 688, 689-90 (Bankr. S.D. Fla. 1993) ................  16

*In re Canon Express Corp.*, 280 B.R.450, 455-56 (Bankr.W.D.Ark. 2002) ......................  17

*In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3rd Cir. 2015) ...........................  15

*In re Forever Green Athletic Fields, Inc.*, 500 B.R. 413, 428 (Bankr. E.D.Pa. 2013) ........  17

*In re Mazzocone*, 200 B.R, 568, 575 (E.D. Pa. 1996) ...........................................  24

*In re Mountain Dairies, Inc*., 372 B.R. 623, 635 (Bankr. S.D.N.Y. 2007) .......................  16

*In re Murray*, 900 F.3d 53, 59-60 (2d Cir. 2018), 377 B.R. at 471 ...................................  17

*In re NLG,* 203 WL 2053920 (Bank. D. Del. Feb. 13, 2023) ...............................................  30

*In re Nordbrock*, 772 F.2d 397, 400 (8th Cir. 1985) ...........................................................  18

*In re Northshore Mainland Servs., Inc.*, 537 B.R. 192, 203 (Bankr. D.Del. 2015) ...........  24

*In re Peto Fill, Inc*., 144 B.R. 26, 31 (Bankr. W. D. Pa. 1992) .........................................  17

 *In re Premier General Holdings, Ltd.*., 428 B.R. 592, 600 (Bankr. W.D.Tex. 2010) .......  29

*In re Stillwater Asset Backed Offshore Fund, Ltd.,* 485 B.R. 498, 50.
 (Bankr. S.D.N.Y. 2013) ..........................................................................................................  27

*In re Tamecki*, 229 F.3d 205, 207 (3d Cir. 2000) ..............................................................  15

*Roemer v. Board of Public Works of Maryland*, 426 U.S. 736, 742, n.4 (1976) ...............   19

## <u>AUTHORITIES</u>

11 U.S.C. §303(a)(1) .......................................................................................................  15

11 U.S.C. §303(b)(1) .......................................................................................................  13

11 U.S.C. §305(a)(1) .......................................................................................................  24

2 <u>Collier on Bankruptcy</u> §305.02(c) at 305 (15th ed. 1981) ...........................................  27

## NATURE AND STAGE OF THE PROCEEDINGS

On June 12, 2024, the Petitioning Creditors commenced this action by filing an Involuntary Petition for Bankruptcy under Chapter 7 against the alleged Debtor, Diamondhead Casino Corporation ("hereinafter "Diamondhead") (D.I. 1).  On July 18, 2024, the Debtor filed a motion (i) to dismiss the Involuntary Petition pursuant to Section 303 of the Bankruptcy Code; (ii) to recover fees, costs and damages under Section 303(i) of the Bankruptcy Code; (iii) for the Court to abstain from exercising jurisdiction in this matter pursuant to Section 305(a)(1) of the Bankruptcy Code; or, alternatively, (iv) for the case to be converted to a Chapter 11. (D.I. 9).  On December 4, 2024 and January 16, 2025, the Court heard the testimony of three witnesses for the Debtor and two witnesses for the Petitioners with respect to this motion. This is the Debtor's post-trial brief in support of its motion.

## SUMMARY OF ARGUMENT

1.      The Petition should be dismissed inasmuch as Petitioners failed to establish jurisdiction under 11 U.S.C. §303(a)(1) since they contend that all debt owed to Petitioners is secured.

2.      The totality of circumstances in this case warrants a finding of bad faith and dismissal under 11 U.S.C. §303(a)(1).

3.      The Petition should be dismissed inasmuch as it was filed to collect a debt, an improper bankruptcy purpose.

4.      The Petition should be dismissed inasmuch as there are state remedies available for Petitioners to collect their debt, including one which Petitioners previously agreed to use.

5.      The Petition should be dismissed because it does not serve a valid bankruptcy purpose.  A bankruptcy would not serve to maximize the value of any assets, but would do just the opposite.

6.    The Petition should be dismissed because there was no evidence of any payment of a preference or dissipation of assets on the part of the Debtor.

7.    The Petition should be dismissed inasmuch as Petitioners made no reasonable inquiry into the relevant facts and pertinent law before filing this Petition.

8.    The totality of circumstances demonstrate that this Court should exercise its discretion to abstain under 11 U.S.C. §305(a)(1) inasmuch as the interests of the creditors and the Debtor would be better served by dismissal.

9.    In the event the Court declines to dismiss the Involuntary Chapter 7 Petition, the case should be converted to Chapter 11.

## STATEMENT OF FACTS

Diamondhead Casino Corporation is a Delaware corporation which was incorporated on November 15, 1988. In 1989, the Company became a publicly-held company. (TRI-92:8) The Company has been in business for over thirty-five years. (TRI-92:7) The Company is a fully-reporting, publicly-traded company with an outside auditor and an outside accountant. The Company files Annual Reports on Form 10-K with the Securities and Exchange Commission ("SEC"), together with audited financial statements and Quarterly Reports on Form 10-Q with the SEC together, as required, with financial statements reviewed by its outside auditors. The Company is current in its filings. The Company has approximately 2,000 common stockholders. (TRI-114:18)

The most valuable asset of the Debtor is Mississippi Gaming Corporation, ("MGC"), a wholly-owned subsidiary of the Debtor, which owns approximately 400 acres of land on Interstate 10 in Diamondhead, Mississippi (the "Property" or "Company"). The Property consists of four separate parcels of land which are zoned "C-2-Interstate Commercial/Gaming/Resort." It

fronts Interstate 10 for approximately two miles and fronts the Bay of St. Louis for approximately two miles. Over 18.5 million vehicles pass the site annually. (TRI-91:20-92:3)[1]

Prior to Hurricane Katrina, a casino at the Property had to be built in, on or above the water and draft a minimum of six feet which made construction at the site costly. After Hurricane Katrina destroyed most of the casinos on the Gulf Coast, Mississippi changed the law to allow casinos in certain statutorily designated areas, including the Diamondhead site, to be built entirely on land. (TRI-92:21-93:6)

As is not uncommon in large development projects of this nature, the Company spent many years obtaining permits and the required zoning for the site, spent approximately five years waiting for an Environmental Impact Statement, spent two to three years waiting for the area to recover from Hurricane Katrina (TRI-93:10) and for the infrastructure that had been destroyed to be replaced and later, recovering from the adverse publicity surrounding the BP oil spill (TRI-93:13); spent years obtaining the required surveys, wetland delineation studies, environmental analyses, mean high water line surveys, and expensive engineering needed for the site; spent years litigating with environmental groups in federal and state courts, and spent years engaging with the U.S. Army Corps of Engineers, the Mississippi Department of Environmental Quality, the Environmental Protection Agency, the Mississippi Department of Marine Resources, the Mississippi Gaming Commission, and various other federal, state, and local agencies. (TRI-93:16-23)

On August 21, 2014, the Mississippi Gaming Commission voted unanimously to grant Gaming Site Approval to Mississippi Gaming Corporation for a fifty-acre gaming site on the east end of the Property. (Ex. 9) As Ms. Vitale put it, this was "the birthday of this property." (TRII-

---

[1] Citations in the form "TRI -__:__" and "TRII -__:__." are to the transcripts of the December 4, 2024 and January 16, 2025 hearings respectively.

97:18). The right to build a casino at the Diamondhead location, entirely on land, makes this a very valuable property. (TRII-97:19-21).

**The Company is Not Insolvent**

On August 27, 2015, after the Company received Gaming Site Approval, the Property was appraised by CB Richard Ellis Valuation & Advisory Services (CBRE) at $39.35 million. (Ex. 1) Mr. Arneault and Ms. Vitale chose this particular appraiser after Mr. Arneault became Chairman of the Board because this appraiser is renowned in Las Vegas. (TRI-109:15-20).

On March 19, 2019, the Property was appraised by Newmark Knight Frank Valuation and Advisory, LLC at $54.86 million. (Ex. 2) This appraiser was selected by an unrelated third party lender. (See Ex. 2, cover page). During the conference call on November 21, 2023, Messrs. Wurst and Arneault stated that they might have some possible purchasers for the property and requested the last property appraisal. On November 21st, right after the call, Ms. Vitale sent this March 19, 2019 appraisal to them. (TRI-144:11-12)(D.I. 9-12) Mr. Wurst thanked her and reminded her to send the maps he had requested. *Id.*

On January 5, 2024, the Property was appraised by Newmark Knight Frank Valuation and Advisory, LLC, "as is" at $55.2 million. (Ex. 3). On January 7, 2024, Ms. Vitale sent this appraisal to Messrs. Wurst and Arneault. (Ex. 20).  The value of the 350 non-casino acres on the Property is expected to go up once the Company does a new wetland delineation study and gets rid of the wetlands. (TRI-116:14-18)(See Ex. 11). [2]

---

[2] As Ms. Vitale, a former Listing Official for the EPA, explained in a memorandum to Mr. Wurst dated November 12, 2023, the appraisals were based on wetland delineation studies performed prior to the decision in *Sacket v. Environmental Protection Agency*, 598 U.S. ___ (2023), which changed the definition of wetlands, and that a significant number of areas previously classified as wetlands would, in her opinion, no longer be classified as wetlands. (See Ex. 11). "This changes the whole nature and value of this property." TRI-116:10-11.

The Company relied on these appraisals. (Tr. 109:14-15). Mr. Arneault, the Company, and Mr. Wurst 's then law firm, relied on the 2015 appraisal to value the Tranche III Debentures. (See Ex.10, Year in Review, p.6) In 2023, Messrs. Wurst and Arneualt requested the last appraisal to send to interested parties. Mr. Harrison testified that no one complained about the appraisals or valuations. (TRI-54:4-6) He testified that the Company had a Letter of Intent from a group that offered $40 million for the Property (TR1-72:1-3) and that Ms. Vitale was on her seventh draft of a purchase agreement for a $50 million deal ("the Bruce" deal) (TRI-72:16-19), which ended with the filing of this Petition. Mr. Wurst testified that his clients were fully secured. (TRII-81:7to82:10) In doing so, Mr. Wurst impliedly conceded that the Company was not insolvent, since the attorneys fees and increased interest agreed to in the Consent Judgment entered on September 20, 2023 were not covered under the Petitioners first lien and would only get paid after all 21 property liens had been paid off first.

Ms. Vitale testified that the Company's "casino property is a million an acre. There's no doubt about that." (TRI-116:11-13) (See also Joint Ex. 64 )(Phoenix Gaming and Entertainment Letter of Intent to buy 25 acres of the MGC Property for $1 million per acre). Ms. Vitale testified that she never had a problem with respect to the valuation of the Property. "It's always been them coming up with the money. In our industry, this [$55.2 million] is not expensive." (TRI-110:2-7). Finally, in or about April 2024, after completing its extensive investigation of the property, Colliers International put the Property on the market for sale at $60 million. (TRI-19:18-20(See Ex. 25).

Based on Colliers' assessment, Mr. Harrison's testimony, Ms. Vitale's testimony, Mr. Wurst's testimony, the documentary evidence, and the parties' prior reliance on and use of the

foregoing appraisals, the Company is not insolvent.[3] The Company has more than enough equity in its assets to pay all of its debts. There was no evidence presented contradicting the foregoing testimony or documentary evidence.

The same issue came up in the last bankruptcy case filed against the Debtor in this Court in which the same CBRE appraisal was at issue. In that case, the Court stated:

> While it is true that CBRE did not testify, its valuation would have to be off by multiple orders of magnitude for Diamondhead to have been insolvent when the Executives Lien was granted. The Petitioning Creditors assert that the Court should give no credit to Ms. Vitale's testimony and "should the Court conduct an insolvency analysis, it should rely upon the value the Company has given to the Property listed on its books and records for over fifteen years." This position is not only inconsistent with the standards for conducting a solvency analysis, but with Petitioning Creditors' investments in the Company. The Court doubts that the Petitioning Creditors actually believe that Diamondhead is insolvent today...and none of them testified to that belief.....Investments were made, or should have been made, based on the development potential of the Property. A general review of the Company's filings with the Securities and Exchange Commission show that Diamondhead, at all times, disclosed in glorious detail, the cash poor position of the Company, the necessary borrowings to cover ordinary expenses, the accumulated deficits, the losses to shareholders, and the need to develop the Property in order for stockholders to obtain a return on their investment. Thus, even if the Court were to discount Ms. Vitale's undisputed testimony, based on the totality of the evidence presented, the Court finds that a trustee would have significant hurdles proving insolvency as of September 26, 2014. (footnotes omitted.) *In re Diamondhead Casino Corporation* (U.S. Bankruptcy Court for the District of Delaware)(Case 15-11647-LSS)( I.D. 91, at 40-42)

The Petitioners are eight of thirteen Debenture Holders who purchased Debentures from the Company pursuant to a Private Placement Offering of securities in 2014. (Ex. 4 & 5) The Petitioners knew when they invested in the Company, that the Company was a development stage company, that it had no operations and no revenue stream and that it relied on borrowed funds to sustain itself and move the Diamondhead project forward. The Petitioners knew that

---

[3] With reference to an entity other than a partnership and a municipality, the Bankruptcy Code defines "insolvent," as a "financial condition such that the sum of such entity's debts is greater than all such entity's property, at a fair valuation." 11 U.S.C. §101(32(A).

developments of this size can take decades. They were expressly warned that the investment involved a high degree of risk (Ex. 4, p.11), that they must be prepared to bear the financial risks of this investment for an indefinite period of time (Ex. 4, p.1) and that they must be able to withstand a total loss of their investment. (Ex. 4, fourth unnumbered page following cover page.) The nine pages of risk factors included the fact that the Company was critically dependent on a single employee, Ms. Vitale, to whom it owed significant sums, including salary in excess of $1 million, who was critical to its operation at each and every level (Ex. 4, p.12); that the Company's office and all of its files were located in an office building owned by her, and that the Company was obligated to pay her rent but that it "had yet to pay any base rent." (Ex. 4, p.13).

The Petitioners' deal was structured by Mr. Wurst's then law firm, Mr. Arneault, Mr. Emerson, the largest debenture holder, and the Company. The funds raised were used to move the Diamondhead Project forward and for other corporate purposes. The 13 Debenture Holders paid a total of $3 million for the Debentures which was placed in escrow. (Ex. 4) There are 13 Tranche I Debentures and 10 Tranche II Debentures for a total of 23 Debentures. On March 31, 2014, there was a Closing on the 13 Tranche I Debentures at which time Diamondhead received $1 million. On December 31, 2014, there was a Closing on the 10 Tranche II Debentures at which time Diamondhead received $850,000. The deal called for a Tranche III Closing at which time Diamondhead would have received the final $850,000 from escrow, but there was no Tranche III closing because the Tranche III Closing required the following:

> The Company has held an Annual Meeting of Stockholders ..... at which the stockholders of the Company approved an increase in the number of authorized shares of Common Stock of the Company from fifty million to one hundred million or otherwise obtained such approval by written consent of its stockholders....( See Ex. 4, (PPM), p.7, Item 4 to p.8, Item 1)(TRII-86:13-87:13)

The Annual Meeting of Stockholders was held on June 8, 2015. (Ex. 10, p.6) However, due to a proxy contest, the shareholders' vote to approve the increase in authorized shares fell short. Diamondhead promptly returned the $850,000 to the investors as was required pursuant to the Private Placement. The Tranche III failure to close was based on the vote count taken on June 8, 2015 by the Inspector of Elections and nothing else.[4] [5] Mr. Arneault resigned effective June 8, 2015. This really hurt the Company which had made Mr. Arneault "head of Casino World and the whole project ... He was supposed to be the guy raising the money to do this and, you know, we had a proxy contest and he ran away .... But bottom line is it really hurt us." (TRI-104:3-12)

In October of 2016, less than two years after closing on their deal, after the Company was in no position to pay interest on the debentures, and despite the "Representations and Warranties" made by the Petitioners in the Subscription Agreements they signed (Ex. 5, pgs. A-2-A-6), the Petitioners filed suit against the Company in the U.S. District Court for the District of Delaware. The case was settled, reopened, and eventually ended with the entry of a Consent Judgment on September 20, 2023 in which the Debtor agreed to pay Petitioners additional interest on their four percent debentures and $175,000 in attorneys' fees to end the litigation.

---

[4] The Tranche III failure to close had nothing whatsoever to do with Ms. Vitale, any alleged offer, or any alleged refusal on the part of Ms. Vitale to step aside for same. Mr. Wurst's testimony on this matter was false. Ms. Vitale would make millions, given her stock position, on the announcement of any deal to construct a casino. Ms. Vitale previously stepped aside in favor of Mr. Arneault to do a mere $3 million deal. It defies logic to suggest she would refuse to step aside for an offer sufficient to finance the construction of the casino. (TRII-88:14-89:6)

[5] Mr. Wurst testified via proffer that "Post magazine [this should be "Pulse Magazine" based on the written proffer] named him the top bankruptcy attorney in 2017...." (TRII-47:10-11.) Debtor can find no such accolade, only that Mr. Wurst was named *one* of Long Island Pulse Magazine's "2017 Top Ten Legal Eagles" in *Nassau and Suffolk counties.*

**The November 21, 2023 Conference Call**

On November 21, 2023, sixty-one days after the Consent Judgment had been entered, Mr. Wurst, Mr. Arneault, Mr. Harrison and Ms. Vitale had a conference call at Mr. Wurst's request. Petitioners' contend that during the call, negotiations broke down when Ms. Vitale refused to pay an additional $50,000 in attorneys' fees for the Petitioners to forebear. (TRII-28:25-29:13) Mr. Wurst testified "that petitioning creditors were considering filing an involuntary Chapter 7 against Diamondhead and that, as an inducement to continue to forebear, Diamondhead would need to agree to pay them additional attorneys' fees, but that Ms Vitale refused to do so." (TRII-54:19-25) Ms. Vitale agreed to increase the interest rate to be paid to Petitioners.)(TRII-72:9-14) Otherwise put, had the Debtor agreed to pay yet another $50,000 in attorneys' fees, there would have been no bankruptcy filing. Petitioners were obviously not concerned about any preference payments or any dissipation of assets. The documentary evidence and Mr. Wurst's testimony is replete with never-ending demands for attorneys' fees. At one point, Mr. Wurst even demanded that Ms. Vitale "**personally** guarantee" payment of attorneys' fees. (Ex. 46)(Ex. 50).

During the conference call on November 21, 2023, the parties agreed that if the Petitioners were not paid by January 31, 2024, the "drop dead" date, that the Company would put the property up for sale.[6] (TRI-104:17-107:13)(TRI-32:8-33:17; 40:6-41:4) Mr. Wurst admits that "Ms. Vitale suggested January 31st, 2024 as a drop-dead date." (TRII-55:7-8).

In December 2023, knowing the Company would be unable to pay Mr. Wurst's clients by the January 31, 2024 deadline, the Company retained Colliers International to market and sell or

---

[6] On December 12, 2023, at the very next meeting of the Board of Directors of the Debtor, the minutes state: "Ms. Vitale informed the Board that she agreed that if the creditors who were represented by Mr. Wurst that had a consent judgment against Diamondhead Casino Corporation were not paid by January 31, 2024, that parts or all of the property would be listed for sale." (See Ex.18, Minutes of the Board of Directors, at p. 2.)

otherwise monetize the Property. It did so on a non-exclusive basis since Messrs. Arneault and Wurst had represented that they may have had some interested parties and the Company believed they were all working together. Petitioners were notified of Colliers' retention and of the significant efforts taken by it and the Company in preparation for the solicitation of offers. (TRI-106:9-108:16)

Colliers, at no cost to Debtor, and the Debtor itself, spent months preparing marketing materials and two brochures. (Ex. 24 and Ex. 25). In May, 2024, Colliers distributed its brochures in a mass mailing.  On May 7, 2024, Mr. Harrison forwarded a copy of a Colliers brochure to Mr. Arneault and Mr. Emerson, the largest debenture holder, stating:

> As Deborah promised, we have now listed our property with Colliers during December 2023 to sell part or all of the property or construct a joint venture project .... Colliers is a multi-billion Corporation with many offices around the world. They said they have received many responses to this brochure. (Ex. 22)

On June 10, 2024, just two days *before* the Petition was filed, Mr. Arneault called Ms. Vitale. Ms. Vitale gave Mr. Arneault a status report and informed him that Colliers had one casino company that it said was very enthusiastic; that she had a casino company that sold casinos going to the area with their operator in July; that Colliers got the brochure out in May and would be doing another mail out; and that she made it clear to Colliers that no one needed to keep her. Mr. Arneault told her he really liked the brochure. Ms. Vitale sent an email to Mr. Harrison documenting the conversation. (Ex. 23). There was not a hint that Mr. Arneault would be filing this Petition. On June 12, 2024, just two days later, the Petitioners filed the Petition herein. Mr. Arneault admittedly concealed the fact that the Petitioners were filing this Petition.

The timing of this Petition is suspect. The Petitioners filed the Petition knowing Colliers was engaged with a casino company. The Petitioners knowingly sabotaged Colliers' efforts. Colliers had no time, after distributing its marketing materials and brochures, and after it had

spent months and significant resources preparing these materials, to engage with interested parties without the threat of a bankruptcy hanging over the Company. The Petitioners knew that this filing would undermine Colliers' efforts to market and sell the Property, which is precisely what happened. As Mr. Slagle of Colliers testified: "the bankruptcy filing cut our legs out from under us." (TRI-11-16)

It has been approximately ten years since December 31, 2014, when the Petitioners closed on their Tranche II Debentures.  In the ten years, the Company has been immersed in non-stop litigation. Shortly after obtaining Gaming Site Approval, the Debtor was hit with three lawsuits and with a full-blown proxy contest by a group trying to take control of the Company. (See Year in Review, Ex. 10). It spent 2015 in litigation relating to the proxy contest which it won on June 8, 2015. Approximately sixty days later, on August 6, 2015, members of the same proxy group filed a Chapter 7 Involuntary Petition which kept the Debtor immersed in bankruptcy proceedings for over a year. Even before the last bankruptcy case closed, in October 2016, the Petitioners here filed their lawsuit in federal court which eventually ended with a Consent Judgment entered on September 20, 2023. (Ex. 32, p. 24). The Company has also been immersed in complicated eminent domain proceedings since 2020. (Ex. 32, p.23) Thus, in the last ten years, the Company has been in bankruptcy proceedings for almost two years and in on and off litigation with the Petitioners for eight years. The Company, along with most businesses, also suffered through two years of Covid, during which time no one even went to see the Diamondhead Property. Thanks to the financial support of management and management's willingness to work for nothing pending a deal, the Debtor has managed to preserve and protect its primary asset for the benefit of all creditors and stakeholders.

**Diamondhead, Mississippi Property Liens**

There are 21 liens on the Diamondhead Property. (See attachment to Ex. 57 for a list of liens and the principal amounts thereof). These liens, the purpose for each loan underlying each lien, and all terms relating to each lien, are fully disclosed in the Company's SEC filings. There are approximately 35 lien *holders* behind these liens, including the 8 Petitioner holders. The liens include shareholders and non-shareholders of the Company. The 21 liens total approximately $8.5 million in principal.[7] With interest, all liens total approximately $11 million. (Ex. 57; TRI-114:10-21)

The liens range from $25,000 to approximately $5.5 million (the first lien). Some liens include more than one lien holder. For example, the second lien includes seven persons who loaned the Company funds, including one shareholder who loaned the Company $2,500. (TRI-114:22-25) This is the smallest lien holder. The first lien was placed on the Property on September 26, 2014. The last lien was placed on the Property on May 16, 2022 to secure a loan from an unrelated party in the principal amount of $50,000. (Ex. 57). No additional liens have been placed on the property.[8]

**The First Lien (Diamondhead Casino Corporation Debentures and Executives' Lien)**

The first lien secures: i) Debentures issued to 13 Debenture Holders, including the 8 Petitioners herein. These Debentures include 13 First Tranche Debentures and 10 Second Tranche Debentures for a total of 23 Debentures. The 23 Debentures total $1.85 million in principal. ii) The first lien is in *pari passu* with an Executives Lien which is $2 million. There is

---

[7] This includes the automatic first lien for paying property taxes to preserve the Property, which is approximately $400,000. (See Ex. 36: chart showing taxes paid by Mr. Harrison.)

[8] In closing argument, counsel for the Petitioners insinuated that the Company may have put more liens on the Property. (TRII 118/3-4) The insinuation is unfounded. All liens placed on the Property by the Company are recorded in Hancock County, Mississippi. All liens and the terms thereof are also fully described and disclosed in the Company's SEC filings.

no interest on this lien. Ms. Vitale is the primary beneficiary of the Executives Lien.[9] iii) The first lien also secures amounts paid by Mr. Harrison for property taxes paid to preserve the Property. If Mr. Harrison had not paid the Property taxes, the Property would have been sold at a tax sale years ago for pennies on the dollar and there would be no assets to pay anyone. This lien is approximately $400,000. (Ex. 36) The first lien totals approximately $5.5 million with interest. (TRI-118:2-118:25)

**20 Additional Liens**

There are 20 additional liens on the Property. (Ex. 57) These 20 liens were placed on the Property to secure 20 Mississippi Gaming Corporation Promissory Notes. As Exhibit 57 shows, fourteen of these Promissory Notes require no interest payments in cash, only in stock.

## ARGUMENT

## I.    THE PETITION SHOULD BE DISMISSED INASUMCH AS  PETITONERS HAVE FAILED TO ESTABLISH JURISDICTION

The threshold issue to be decided is whether this Court has jurisdiction in this case.[10] Section 303(b)(1) requires that each petitioning creditor hold non-contingent, undisputed, unsecured claims totaling at least $18,600 *more* than the value of any lien on property of the debtor.  Mr.  Wurst, counsel for the Petitioners, testified at the hearing as follows:

> Question: Do you believe any part of your clients' debt is unsecured?
>
> ***
>
> Answer:   All right, let me respond as best I can. I think, first of all, the documents speak for themselves as to what is and what is not secured. So, do I believe -- I believe your term is generic when you say my clients' debt. One of

---

[9]  Contrary to Petitioners' Closing argument, the Debtor has never made a payment on this *pari passu* $2 million lien.

[10] The Debtor is  not paying its long term debt and Ms. Vitale's salary as it becomes due. It pays rent when it has the funds to do so. It is paying its day-to-day operating expenses, Diamondhead property taxes, SEC-related filing expenses and auditing and accounting fees.

the issues that has come up over and over is the extensive legal fees that my clients have been forced to pay to protect their rights. No, I do not believe those are secured under the debentures, but to some extent they are secured as part of the judgment. The debtor, Diamondhead agreed to $175,000 of legal fees, that is part of the judgment amount. The judgment amount becomes a judgment lien. So, certainly to the extent of $175,000 of legal fees, yes, I do believe those are secured. All interest and principal is secured.

Now, if the question is whether we are secured or under-secured, that's a different question, but I believe the collateral that's out there to secure it secures it. Is that responsive to your question? (TRII-81:19-82:10)

The Petitioners have the burden of establishing jurisdiction. Yet, as their own lawyer testified, both the debentures and the judgment lien for attorneys' fees and additional interest are secured. Therefore, the eight Petitioners have failed to establish that *each* Petitioner holds an *unsecured* claim totaling at least $18,600 more than the value of any lien on property of the *debtor.*

The Petitioners cannot have it both ways. They cannot claim their debt is unsecured, to the extent required to establish jurisdiction, and later claim it is fully secured so as to take precedence over unsecured claims. Given Mr. Wurst's testimony, the Petitioners have failed to meet their burden of establishing that *each* of their claims aggregate at least $18,600 *more* than the value of any lien on property of the *debtor.* Therefore, this Court lacks jurisdiction under Section 303(b)(1).[11]

---

[11]  Requiring three eligible petitioning creditors would, in most cases, protect a debtor from the involuntary bankruptcy risk of a single creditor. In this case, however, the same group with the same debt, with the same lawyer, has acted as a single unit for years, satisfying the technical requirement, but not the intent of the numeric requirement. Indeed, Mr. Wurst testified that "several of the debenture holders declined to enforce their rights ..." (TRII 48/8-9)

## II.    THE TOTALITY OF CIRCUMSTANCES WARRANTS A FINDING OF BAD FAITH AND DISMISSAL UNDER 11 U.S.C. §303(a)(1)

Creditors who file an involuntary bankruptcy petition against a Debtor must satisfy the statutory requirements under §303. Meeting the 303(b)(1) criteria is just the first hurdle. Assuming, *arguendo*, the Petitioners met those requirements, the next issue is whether the petition may, nonetheless, be dismissed as a bad faith filing under section §303.

Bad faith provides an independent basis for dismissing an involuntary petition even where the criteria for filing a petition have been met and where the debtor is not paying its debts as they become due. An involuntary bankruptcy petition filed in bad faith is subject to dismissal. *In re Forever Green Athletic Fields, Inc*., 804 F.3d 328, 334 (3rd Cir. 2015). Once a party calls into question a petitioner's good faith, the burden shifts to petitioner to prove his good faith." See *In re Tamecki*, 229 F.3d 205, 207 (3d Cir. 2000). In determining bad faith, the Court looks at the totality of circumstances. As the Third Circuit said, in pertinent part, and as is applicable here:

> In conducting this fact-intensive review, courts may consider a number of factors, including, but not limited to, whether: ... the involuntary petition was meritorious; the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing; there was evidence of preferential payments to certain creditors or of dissipation of the debtor's assets; the filing was motivated by ill will or a desire to harass; the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same; ... the filing was used as a substitute for customary debt-collection procedures; and the filing had suspicious timing. *In re Forever Green Athletic Fields, supra*, at 336

As demonstrated below and in section III relating to abstention, a review of the totality of circumstances present in this case warrants dismissal.

## A.    THE PETITION SHOULD BE DISMISSED INASMUCH AS IT WAS FILED TO COLLECT A DEBT, AN IMPROPER BANKRUPTCY PURPOSE

The use of the Bankruptcy Court here for debt collection purposes is wholly improper. The <u>only</u> Petitioner who testified in this matter was Edson Arneault. Mr. Arneault testified that

his motivation for filing the petition was "to get our money back after a ten-year period." TRII-37

;20-24. The Petitioners contend that the collection of a debt constitutes a permissible use of the Bankruptcy Court. As they stated in closing argument: "That's the reason why an involuntary bankruptcy gets filed: people want to get paid." TRII-117:10-11. "Collection is a valid purpose for an involuntary bankruptcy." TRII-119:17-18. The Debtor respectfully disagrees.

In addition, Petitioners contend that if they had filed the Involuntary Petition "in the first instance," and "before obtaining a Consent Judgment" that "that could be considered a collection effort." (TRII-128:12-20) However, the mere fact that Petitioners obtained a Consent Judgment *before* filing the Petition herein confers no special right on Petitioners to use the Bankruptcy Court to collect their debt. The case law on this subject is pellucid. Involuntary bankruptcy proceedings are not to be used as a collection device. "[T]he bankruptcy court is not a collection agency." *In re Mountain Dairies, Inc*., 372 B.R. 623, 635 (Bankr. S.D.N.Y. 2007). *See, e.g., In re Century Tile Marble, Inc*., 152 B.R. 688, 689-90 (Bankr. S.D. Fla. 1993) (creditors' attorney admonished and sanctioned and involuntary petition dismissed for "utilizing the bankruptcy court as a collection agency instead of going to state court where collection claims are properly filed"). The evidence shows that the filing herein is being used as a substitute for customary debt-collection procedures.

Mr. Arneault, the former Chairman of the Board of Directors of the Debtor, testified that he did not consider the impact that the filing would have on the publicly traded company. He did not consider the impact that the filing would have on the other creditors. He did not consider the impact the filing would have on the shareholders. He did not consider the impact the filing would have on the company's stock price. (TRII-38:14-25). In short, the filing was without any regard

16

whatsoever to the impact it would have on the Debtor and other stakeholders. This total disregard for the impact the filing would have on other creditors, let alone his own former shareholders, creditors and employees, constitutes bad faith. See, *In re Forever Green Athletic Fields, Inc.*, 500 B.R. 413, 428 (Bankr. E.D.Pa. 2013), citing *In re Canon Express Corp.*, 280 B.R. 450, 455-56 (Bankr.W.D.Ark. 2002)(finding that petitioning creditor's statement that he filed "to get my money" without regard to other creditors' priorities was evidence of bad faith.)

**B.  THE PETITION SHOULD BE DISMISSED INASMUCH AS THERE ARE STATE REMEDIES AVAILABLE FOR PETITIONERS TO COLLECT THEIR DEBT**

The Petition should be dismissed inasmuch as there are adequate state remedies available to Petitioners to collect their debt. *In re Murray*, 900 F.3d 53, 59-60 (2d Cir. 2018), 377 B.R., at 471,  *In re Peto Fill, Inc*., 144 B.R. 26, 31 (Bankr. W. D. Pa. 1992) The debt due pursuant to the Debentures is secured with a lien on the Property, which is owned by Mississippi Gaming Corporation and evidenced by a Land Deed of Trust recorded in Hancock County. The Deed of Trust expressly provides for "a judicial foreclosure action" in <u>Mississippi</u> in the event of a default. It identifies the procedures to be followed to sell the Property in the event of a default and specifically names the Trustee, a Mississippi attorney, who would handle the sale. The Petitioners admit, as they must, that the foreclosure procedure in the Land Deed of Trust provides *a* remedy for collection. They claim this foreclosure procedure is not the exclusive remedy and, therefore, that they have the right to file a bankruptcy proceeding. TR -.II, 113:5-8.

In addition to the Mississippi remedy provided in the Land Deed of Trust, the Petitioners obtained a Consent Judgment against the Debtor in the U.S. District Court for the District of Delaware.[12] Thus, they can pursue their collection rights pursuant to their Consent Judgment

---

[12]  The Petitioners already had a lien on the Diamondhead Property. The only real benefit achieved by the federal court filing was to gain attorneys' fees earned, in large part, by filing the

using customary debt-collection procedures. The Petitioners contend that "they've got a judgment against Diamondhead so, there's no prohibition for them operating under that, including [putting] Diamondhead Casino Corporation, into bankruptcy." TRII-113:25-114:3. Again, Petitioners are mistaken. The fact that the Petitioners first went to federal court to obtain a Consent Judgment does not give them any special right to go to a bankruptcy court to enforce their judgment.

The Petitioners have a myriad of state law remedies available to them to collect their debt. They do not need the protections of a Bankruptcy Court. The filing is being used as a substitute for customary debt-collection procedures and to circumvent the state forum and Mississippi Trustee they previously agreed to use in the indenture. In any case, it is improper for a creditor to use the bankruptcy court as a debt-collection device. *In re Nordbrook*, 772 F.2d 397, 400 (8th Cir. 1985)("A creditor does not have a special need for bankruptcy relief it  can go to state court to collect a debt.")

## C.    THE PETITION SHOULD BE DISMISSED BECAUSE IT DOES NOT SERVE A VALID BANKRUPTCY PURPOSE

To invoke this Court's jurisdiction, a petitioner must possess a valid bankruptcy purpose. In the context of a Chapter 7 proceeding, that purpose must be to marshal a debtor's assets in order to achieve a greater pro rata distribution among a debtor's various unsecured creditors then what would otherwise be available outside of bankruptcy. A petitioner must have some plausible reason to believe that the bankruptcy system is necessary to maximize the recovery for a debtor's creditors. *In re Forever Green Fields, Inc.*, 500 B.R. 413 at 425. In a court of equity, a petitioning creditor must come to the court for a proper purpose.

---

case itself. There was no standard provision for the payment of attorneys' fees in the event of a default in the debentures.

A Chapter 7 bankruptcy and a fire sale auction of the subsidiary's land would only benefit Petitioners and principals of the Company to the detriment of other creditors, stockholders and former employees of the Company.  It would not maximize recovery for the Debtor's creditors in this case. The only way to maximize recovery here for the creditors is to avoid a fire sale of the subsidiary's asset. The best interests of both the creditors and the Debtor lie in the continued existence of the Company and allowing Colliers to do what it was already doing. A Chapter 7 would only end in the sale of the subsidiary's property at a severely depressed price, thereby minimizing, rather than maximizing value.

In this case, a bankruptcy presents an even greater risk to a loss of value to the primary asset of the subsidiary. The Diamondhead Property is extremely valuable because it is site-approved for a casino. Mississippi Gaming Site Approval is revocable under the regulations of the Mississippi Gaming Commission. (Miss. Gaming Regulation 1.4.)[13]  Mississippi Gaming Site Approval is not tantamount to an easement that runs with the land. Instead, it is controlled by and subject to the Mississippi Gaming Control Act and the rules and regulations of the Mississippi Gaming Commission. All legal proceedings related to the approval must be adjudicated in the courts of Mississippi. (See Ex. 9, p.9)

## D.   THE PETITION SHOULD BE DISMISSED INASMUCH AS THERE WAS NO EVIDENCE OF ANY PAYMENT OF A PREFERENCE OR DISSIPATION OF ASSETS ON THE PART OF THE DEBTOR

The primary purpose behind involuntary petitions is to protect against the depletion of assets or to prevent the unequal treatment of similarly situated creditors. The primary reasons that justify an involuntary bankruptcy are absent in this case. There was no evidence presented of any preferential payment or dissipation of assets. On the contrary, the evidence proved that the

---

[13]  A Court may take judicial notice of state regulations. *Roemer v. Board of Public Works of Maryland*, 426 U.S. 736, 742, n.4 (1976)(taking judicial notice of state regulations).

only funds available to make any payments to anyone came from the eminent domain settlement and that one hundred percent of those funds went to *Mississippi Gaming Corporation ("MGC"),* not to the *Debtor*. Thus, there could be no preference payments made by the Debtor since any payments made by MGC were not payments made by the *Debtor*. Therefore, any such payments made could not, as a matter of law, constitute preference payments made *by the Debtor*.[14] This Petition was filed in bad faith inasmuch as the Petitioners knew this.

The evidence shows that Petitioners were not concerned that their debentures were in jeopardy or that the Debtor was dissipating assets. They were more than willing to forebear provided they got more attorneys fees. The documentary evidence confirms this. The Petitioners threatened the Debtor with bankruptcy so as to cash in on the proceeds of the eminent domain settlement which the Company needed to survive. On June 2, 2023, the attorney for the Petitioners offered to forebear if:

1. DHCC paid all of the Debenture Holders legal costs incurred since March 1, 2023...

2. The 8% interest rate previously set from 4/1/22 be recast to 10% from 4/1/22.

3. **Forebearance Fee in an amount equal to 10% of the Settlement obtained from the eminent domain proceeding ...**

4. In the event that the transaction under the Letter of Intent dated March 23, 2023[15] [the "OJ" deal] does not result in funding sufficient to pay...the Debenture Holders on or before July 1, 2023, **the remaining proceeds (after the**

---

[14] The Debtor also introduced documentary evidence to dispel any notion that any improper payments were made by anyone, including the Debtor's subsidiary.

[15] The terms of the "OJ" deal are described in Exhibit 28, the Form 8-K filed with the SEC on April 3, 2023. Contrary to Mr. Wurst's testimony that Ms. Vitale "refused" to subordinate her first lien (TR II, 69/1-3), the Form 8-K confirms, as Ms. Vitale testified, that Ms. Vitale did, in fact, subordinate her first lien so that the Petitioners herein could get paid first. It expressly states as follows: "The proceeds from the initial sale of Common Stock [$3 million] will be used to pay plaintiff/lienholders who are owed payment in the approximate amount of $2,207,500 pursuant to an Amendment to Settlement Agreement entered in *Arneault et al. v. Diamondhead Casino Corporation* (In the United States District Court for the District of Delaware (C.A. No. 1:16-cv-00989-LPS)." Ex. 28, at p. 2 (the last sentence).

**Forebearance Fee) ...obtained from the settlement will be** paid on account to the Debenture Holders, who shall retain all liens until such time as all interest and fees have been paid to the Debenture Holders. (Emphasis added.) Ex. 48).

This was a demand for a payment equal to one hundred percent of the eminent domain proceeds which, if paid, would have forced the Company into certain bankruptcy! These eight Petitioners would readily forebear provided they got paid ahead of any other creditors, including the five remaining debenture holders who held <u>identical</u> debentures, and ahead of their co-lien holder, Ms. Vitale, with whom they were supposedly in *pari passu*. Otherwise put, the Petitioners herein, who see preference payments where none actually exist, apparently had no problem with such a payment provided it were made to them. This pre-petition behavior is the epitome of bad faith. See, *In re Forever Green Athletic Fields, Inc.*, 500 B.R. 413, 428 (Bankr. E.D.Pa. 2013) *citing In re Earl Sims, Jr.*, 994 F.2d 210, 217 (5th Cir.1993)(recognizing that the rules limiting who may institute an involuntary petition were intended to avoid the possibility that the threat of an involuntary petition may be used "to compel the debtor to make preferential payments to one or more litigious creditors").

The Debtor rightly refused the onerous terms sought by Petitioners. On June 9, 2023, Ms. Vitale informed Mr. Wurst that she had spoken with Cooperative Energy's attorneys and her own attorney and that "[t]he Judge or jury decides on the division of proceeds from the settlement....It is not up to us how much each interested party will get." (Exhibit 50). As to attorney's fees, she rightly informed him that the "Board of Directors cannot agree to a blank check." *Id.*

On November 16, 2023, Ms. Vitale notified Mr. Wurst, via email, that the Court ordered the eminent domain proceeds to be paid ***to MGC***. (Ex. 59) She informed him that she had been borrowing against the anticipated eminent domain settlement to keep the Company alive. Ms.

Vitale also attached the Legal Proceedings section of the Company's Form 10-Q filed with the SEC to her email. The Form 10-Q expressly stated as follows:

> "[o]n October 17, 2023, the Court entered an Order Approving Settlement in the amount of $1,000,000 and entered an Order Approving Disbursement of Funds **to MGC.** On October 20, 2023, MGC received $845,377.89 as part of the settlement amount. (Emphasis added.)(Ex. 59).

Thus, counsel for the Petitioners knew that the proceeds of the eminent domain settlement were paid to **MGC** and <u>not</u> to the *Debtor*. Mr. Arneault also knew this. (TRII-39:20-40:1)Therefore, when this Petition was filed on June 12, 2024, the Petitioners knew full well that any payments made using these funds were made *by MGC*, not the *Debtor*.

Likewise, the Petitioners presented absolutely no evidence of any dissipation of assets. It is well-established that the payment of rent and salary is not a dissipation of assets. Nevertheless, Counsel for Petitioners seem to believe that a bankruptcy court and a Chapter 7 Trustee are required to run a public company because the company may be leasing too much office space! ("I think the trustee would make a business judgment that there's no reason why a nonoperating entity needs to lease that much space.")(TRII-118:21-23). The argument of counsel is not evidence and the Petitioners' presented no testimony or evidence on this subject.[16]

The critical need for this office space was described, in part, in Exhibit 33, at page 3.[17] Interestingly, Mr. Arneault was not asked a single question about Ms. Vitale's salary, the office, or the rent. This is understandable, inasmuch as the Company's SEC filings confirm that the Company is accruing the same salary and is paying and/or accruing the same rent for the same office it had when Mr. Arneault was Chairman of the Board. If the rent were unreasonable,

---

[16] The Petitioners repeated reliance on mere argument of their attorneys underscores the lack of any evidence to justify this Petition.

[17] As its SEC Form-10 filings will confirm, the Company has no off-site storage.

unnecessary, or too high, Mr. Arneault, as President of the Lessee, had an affirmative duty to reduce it or move the Company to a smaller office.

**E.   THE PETITION SHOULD BE DISMISSED INASMUCH AS THE PETITIONERS MADE NO REASONABLE INQUIRY INTO THE RELEVANT FACTS AND PERTINENT LAW BEFORE FILING THIS PETITION**

The Petition should be dismissed because the Petitioners made no reasonable inquiry into the relevant facts and pertinent law before filing this Petition. Even a cursory review of the case law and literature regarding Involuntary Chapter 7 cases would have alerted counsel to the dangers of filing this Petition. This filing is even more egregious given the fact that counsel for Petitioners was familiar with the last Chapter 7 Involuntary Petition that was filed against the Debtor in this Court in 2015 and even tried to represent the Debtor in that action. (TRII-87:24-88:2). The decision of this Court in the prior bankruptcy case  actually addressed and put to rest some of the same legal arguments raised in this case (i.e., the test for insolvency,  avoiding the Executives' Lien, placing liens on the Property of the subsidiary, the  rent ). Thus, there is no excuse for resurrecting the same issues.

Here, the Petitioners made no attempt to examine the Company's financial records <u>before</u> filing their Petition. After the Petition was filed, the Petitioners requested discovery, but again, made no effort whatsoever to obtain or review the Company's financial records. (TRII-4:20-23)("There was never any discovery documents in this case....") The failure to request any financial records speaks volumes. This lack of due diligence is even more egregious since the Petitioner, Arneault, is a former CPA and could have easily reviewed these records. The Petitioners filed their Petition having had absolutely no evidence whatsoever to support any accusation that the Debtor had made preference payments or was dissipating assets.

### III.    ABSTENTION IS WARRANTED IN THIS CASE UNDER 11 U.S.C. §305(a)(1)

Diamondhead respectfully requests, in the alternative, that the Court exercise its authority to dismiss this case based on the doctrine of abstention. Even where the petitioning creditors are able to prove all of the elements for the granting of an involuntary petition and even when there is no issue as to whether the petitioning creditors have acted in good faith, a bankruptcy court may still dismiss an involuntary petition under the doctrine of abstention.

Under §305(a)(1) of the Bankruptcy Code, a Bankruptcy Court, after notice and a hearing, may dismiss a case at any time "if the interests of creditors **and** the debtor would be better served by such dismissal." 11 U.S.C. §305(a)(1) (Emphasis added). Section 305 grants significant discretion to a bankruptcy court to decline to exercise jurisdiction over a case. The Court may take into account any factors it considers relevant to the determination. The exact factors to be considered and weight to be given to each of them are highly sensitive to the facts of each individual case. *In re Mazzocone*, 200 B.R, 568, 575 (E.D. Pa. 1996). Whether or not to abstain is determined by considering the totality of circumstances. *In re Northshore Mainland Services., Inc.*, 537 B.R. 192, 203 (Bankr. D. Del. 2015). Here, a review of the factors which courts generally consider in deciding whether or not to abstain weigh in favor of abstention.

### 1.    Economy and Efficiency Considerations Favor Dismissal

There is simply no economy or efficiency to be gained in bankruptcy since bringing this case into the bankruptcy court would only add an additional and wholly unnecessary layer of significant expense, including costs for a Trustee under Chapter 7 and additional attorneys or consultants the Trustee would need to engage. This would be especially expensive given the unfinished eminent domain issues in Mississippi. It would be needlessly and excessively costly

to process this debt through a bankruptcy court as opposed to a simple debt collection action in state court.

None of the administrative costs that would be incurred here are necessary since there is no legitimate bankruptcy purpose to be served. There is no threat of harm to the assets of the Debtor or its subsidiary. There is no evidence that improper payments are being made to creditors or that assets are being dissipated. On the contrary, management continues to protect and preserve the Company's assets at its own expense, while continuing to work without pay, so as to get all creditors, both secured and unsecured, fully paid.

**2.      Another Forum is Available to Protect the Interests of the Creditors**

Another forum, in fact, multiple forums, are available to protect the interest of the Petitioners in state courts. There is no need for bankruptcy protection in this case inasmuch as this is a debt collection action which can be adequately prosecuted in more than one state court. The Petitioners' debt is, as Petitioners admit, fully secured. Abstention is further justified inasmuch as the parties previously chose a Mississippi judicial foreclosure process and selected a Mississippi Trustee for this very purpose. Courts have generally ruled in favor of abstention when the parties have access to a state court forum. States have fraudulent conveyance statutes and general equity powers, including power to issue preliminary injunctions where there is a danger of imminent harm. Here, the state court of Mississippi can do everything needed by Petitioners to collect their debt. There are no extraordinary facts or circumstances necessitating intervention by a federal court.

**3.      Federal Proceedings are Not Necessary to Reach a Just and Equitable Resolution**

The Debtor's subsidiary owns Property whose value greatly exceeds the amount of its debts and which far exceeds the amount claimed by creditors in this matter. Federal bankruptcy

proceedings are not necessary to reach a just and equitable resolution here. In fact, the opposite is true. A bankruptcy proceeding will only result in a fire sale of the subsidiary's primary asset and a devastating devaluation of the asset. This is hardly a just and equitable resolution for the other stakeholders who would likely get wiped out by a quick sale.

4.      **Alternative Means are Available for an Equitable Distribution of Assets**

There are alternative means for achieving an equitable distribution of assets, namely, putting the Property up for sale in a non-distress manner or otherwise monetizing the asset via a debt or equity financing. Either of these options is preferable to a court-imposed auction. Moreover, these alternative processes were already in progress when the Petition was filed and Colliers International was given a free hand to do whatever worked best to get everyone paid. The bankruptcy filing made it virtually impossible for Colliers to succeed. Colliers has already done all the work necessary to either find a partner to develop the Property or to sell it outright. (TRI- 10:9-16) For the benefit of the Debtor, the creditors and the stakeholders, Colliers should be permitted to market and sell the property or monetize the asset and resume its forward progress which was brought to a virtual halt by this filing.

Moreover, there has been no showing that proceeding outside of the bankruptcy court would result in any loss of value to the land. On the contrary, anything done outside a bankruptcy court would result in a higher valuation of the property or financing on more favorable terms. A bankruptcy would obviously result in a dramatic devaluation of the property.

5.      **Whether the Debtor and Creditors are able to work out a less expensive out-of-court arrangement that better serves all interests in the case**

The Company has had good relationships with the majority of its creditors over decades and has been able to work out numerous out-of-court arrangements with its creditors. This action was filed in the interest of only eight creditors who are tired of waiting for their money and want

to force a quick sale of the Property to get paid. The filing is for the sole benefit of these Petitioners who hold a first lien on the Diamondhead Property. It ignores the fact that a quick sale is not in the best interest of both the Debtor and all of the other creditors and stakeholders.

The Debtor was acting in good faith and under the belief that it had worked out a plan with the Petitioners which included putting the Property up for sale by January 31, 2024. This out-of-court workout plan, using Collier International's worldwide resources, was implemented because of Petitioners. Despite the fact that this case has been pending for seven months, not one of the remaining five debenture holders and not one of the other approximate 27 creditors who hold twenty additional liens on the Property, has joined in the Petition. No unsecured creditors of the Company have joined in the Petition. The remaining secured and unsecured creditors of the Debtor obviously realize that a bankruptcy is not in their best interest and that an out-of-court sale or monetization of the Diamondhead Property is the only viable way to maximize the Debtor's assets for the benefit of all creditors.

Courts have recognized that §305(a)(1) "was designed to be utilized where, for example, as here, a few recalcitrant creditors attempted to interfere with an out-of-court restructuring that had the support of a significant percentage of the debtor's creditors." *In re Stillwater Asset Backed Offshore Fund, Ltd.,* 485 B.R. 498, 509 (Bankr. S.D.N.Y. 2013). See also, 2 Collier on Bankruptcy §305.02 at 305-4 (15th ed. 1981)(An example of a situation in which the court might choose to dismiss or suspend a case under section 305(a) would be where an arrangement is being worked out by creditors and the debtor out of court in which there is no prejudice to the rights of creditors and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment.) The Petitioners here have a first lien and, as their own attorney testified, there is ample security to cover all of their debt.

Prior to the filing herein, the Debtor believed it was working *with* the Petitioners towards an out-of-court disposition which would better serve all interests in the case. The alternative is that the Petitioners lulled the Debtor into thinking that was the case to obtain documents and information from the Debtor for its own purposes. And although the Petitioners knew they would be filing a Chapter 7, they allowed Colliers and the Company to expend significant resources on marketing and sales materials to accommodate a workout while hiding their true intentions.

**6.      The Purpose for Which Bankruptcy was Sought by the Petitioners**

In considering dismissal under §305, it is appropriate to consider the motivation of the parties seeking the jurisdiction of the bankruptcy court.  Here, the only articulated motivation, based on the Petitioner's own testimony, is to collect a debt. The Petitioners are tired of waiting to get paid. This is understandable. Creditors always want to get paid. However, this is not a proper bankruptcy purpose. The bankruptcy court is not a collection agency and it cannot allow itself to be used for such a purpose. It is well-established that cases that serve no legitimate bankruptcy purpose do not belong in bankruptcy.

**7.      Other Considerations**

Even in the bankruptcy context, deferral is appropriate in circumstances where a critical issue in a case lies within the purview of a specialized agency.  Here, a critical issue lies within the purview of a specialized court, namely, the Special Court of Eminent Domain, in Hancock County, Mississippi. There are important, unsettled issues with respect to two permanent Mississippi eminent domain easements. This complicated matter, now in *media res*, can most efficiently and less expensively be resolved by current management which is already intimately familiar with the matter. Otherwise, a Trustee would have to retain an attorney, at significant cost to the estate, to do what Ms. Vitale, an attorney, is already doing at absolutely no extra cost to

28

the Debtor. The resolution of the scope of these easements in the Special Court of Eminent Domain is in the best interest of the Debtor, the creditors and all stakeholders. The existence of unsettled issues of state law may permit abstention under section 305(a)(1). 2 Collier on Bankruptcy at 305.02(c) at 305 (15th ed. 1981).

The Debtor does not need or want a bankruptcy discharge. It intends to pay all of its creditors. No assets would be lost or dissipated if this case were dismissed. The Petitioning creditors have adequate remedies under non-bankruptcy law. The Petition here is for their own benefit to the detriment of the other creditors and stakeholders. This is at odds with the spirit of the Bankruptcy Code which is designed to afford a Debtor the opportunity to continue in business and a more promising future, preserve equity, and increase overall creditor recoveries.

The filing of an involuntary petition by a creditor must be carefully scrutinized by the Court. Absent dismissal or abstention, the Debtor here will suffer unnecessary and irreparable harm and a real threat to its very existence. A bankruptcy would harm most of Debtor's creditors as well as its stockholders and former employees. There is simply no economic reason for placing this Company and its shareholders in bankruptcy which could only end up costing the Debtor and its creditors many millions of dollars in lost property value. This Petition does nothing whatsoever to further the public policy goal underpinning the Bankruptcy Code of maximizing value for all stakeholders. On the contrary, it does precisely the opposite.

## IV.    IN THE EVENT THE COURT DECLINES TO DISMISS THE INVOLUNTARY CHAPTER 7 PETITION, THE CASE SHOULD BE CONVERTED TO CHAPTER 11

Section 706(a) of the Bankruptcy Code provides that "[t]he Debtor may convert a case under this chapter to a case under chapter 11 ... at any time," if the case has not previously been converted. "[E]ven if an order for relief is entered on a petitioning creditor's involuntary chapter 7 petition, the debtor has a near unbridled right to convert the case to chapter 11." *In re Premier*

29

*General Holdings, Ltd..*, 428 B.R. 592, 600 (Bankr. W.D.Tex. 2010). In sole support of their contention that the Debtor may <u>not</u> convert this case to a Chapter 11, the Petitioners rely on *In re NLG,* 203 WL2053920 (Bankr. D.Del. 2023). The Petitioners' reliance on this case is misplaced.

Inasmuch as this Court authored the Opinion in the case, a recitation of the facts is not necessary. Suffice it to say, this was a "no assets" case which had been filed in bad faith. Using its equity powers, this Court denied conversion under Section 105(a) of the Bankruptcy Code to prevent an abuse of process. The situation in NLG is inapposite to the situation in the case at bar where the Debtor does not even seek to use the Bankruptcy Court and where there is no bad faith present on the part of the Debtor.

Therefore, in the event the Court does not dismiss the Involuntary Petition, the Debtor respectfully requests that the Court permit the Debtor to convert this case to a Chapter 11 so that the Company can work with potential lenders to obtain financing pursuant to a plan that would be fair to all involved, rather than a Chapter 7 liquidation, which would be devastating for most stakeholders.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court grant the Motion to Dismiss or, alternatively, convert the case to one under Chapter 11 of Title 11 of the U.S. Code and grant such other and further relief as the Court deems proper.

Dated:  February 11, 2025.

<div style="margin-left:40%">

Respectfully submitted,
BIGGS & BATTAGLIA
/s/ Robert D. Goldberg
Robert D. Goldberg (Delaware Bar ID #631)
921 N. Orange Street
Wilmington, DE  19899-1489
Telephone: (302) 655-9677/Goldberg@batlaw.com
Attorney for Diamondhead Casino Corporation

</div>