**THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>DIAMONDHEAD CASINO CORPORATION,<br><br>    Alleged Debtor. | Chapter 7<br><br>Case No. 24-11354 (JKS) |

**PETITIONING CREDITORS' POST-HEARING ANSWERING BRIEF IN OPPOSITION TO MOTION OF THE ALLEGED DEBTOR, DIAMONDHEAD CASINO CORPORATION, TO DISMISS THE INVOLUNTARY BANKRUPTCY PETITION OR, IN THE ALTERNATIVE, TO CONVERT THE CASE TO A CHAPTER 11**

**ARMSTRONG TEASDALE LLP**

Jonathan M. Stemerman (No. 4510)
Denisse Guevara (No. 7206)
1007 North Market Street, Third Floor
Wilmington, Delaware 19801
Telephone: (302) 416-9670
jstemerman@atllp.com
dguevara@atllp.com
*Counsel to Petitioning Creditors*

Dated: March 4, 2025
   Wilmington, Delaware

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................. 1

NATURE AND STAGE OF THE PROCEEDINGS ............................................ 2

SUMMARY OF ARGUMENT .......................................................................... 3

FACTS ................................................................................................................ 5

    The Debtor, MGC, and MGC's Property.......................................................... 5

    The Debentures and Consent Judgment............................................................ 5

    The Debtor's Financial Condition and Amounts Owed to Insiders................... 8

    The Debtor is Insolvent.................................................................................... 10

    The Debtor's Unsuccessful Efforts to Sell the Property.................................. 11

    Payments to Insiders ....................................................................................... 12

ARGUMENT ..................................................................................................... 12

I.      THIS COURT HAS SUBJECT MATTER JURISDICTION.......................... 12

    A.    Petitioning Creditors Hold an Unsecured Claim Against the Debtor .................. 13

    B.    Petitioning Creditors' First Priority Lien Does Not Attach to Property of the Debtor ...................................................................................................... 14

    C.    Secured Creditors Can Properly Be Petitioning Creditors.................................... 14

    D.    To the Extent Secured Creditors Hold a Lien on Property of the Debtor, they are Undersecured in an Aggregate Amount Exceeding $18,600 ......................... 15

II.    THE INVOLUNTARY PETITION WAS FILED IN GOOD FAITH ............................. 16

    A.    Legal Standard ..................................................................................... 17

    B.    Collection of a Debt is a Proper Bankruptcy Purpose ........................................ 17

    C.    The Involuntary Petition Serves a Legitimate Bankruptcy Purpose .................... 19

    D.    Debtor's Management is Dissipating Assets, Showing Preference to Insiders ..................................................................................................... 22

    E.    Petitioning Creditors Made a Reasonable Inquiry into the Fact and Law ........... 23

III.   ABSTENTION IS NOT WARRANTED ......................................................... 25

    A.    Legal Standard ..................................................................................... 25

    B.    Economy and Efficiency....................................................................... 26

    C.    There is No Alternative Adequate Forum ............................................. 26

    D.    Bankruptcy is the Only Adequate Forum ............................................. 27

E.     There is No Adequate Alternative Means Available for an Equitable Distribution of Assets ........................................................................................ 27

F.     The Debtors and Creditors Are Unable to Work Out a Less Expensive Arrangement Which Better Serves All Interests.................................................. 27

G.    The Bankruptcy was Filed for a Legitimate Purpose........................................... 27

H.    A Chapter 7 is in the Best Interests of the Debtors and Creditors ....................... 27

IV.    THE DEBTOR HAS WAIVED ITS REQUEST FOR ATTORNEYS' FEES ............... 28

V.    THIS CASE SHOULD REMAIN IN CHAPTER 7 ....................................................... 29

CONCLUSION.................................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re AMC Investors, LLC,*
    406 B.R. 478 (Bankr. D. Del. 2009) ............................................................. 31, 34

*In re Analytica Wire, Inc.*,
    392 B.R. 618 (Bankr. D. Del. 2008) ..................................................................... 34

*In re Better Roads Asphalt, LLC,*
    608 B.R. 7 (Bankr. D. P.R. 2019) .................................................................. 24, 26

*In re Century Title Marble, Inc.*,
    152 b.r. 688 (Bankr. S.D. Fla. 1993) .................................................................... 25

*In re Diamondhead Casino Corp.*,
    540 B.R. 499 (Bankr. D. Del. 2015) ...................................................................... 21

*In re Forever Green Athletics Fields, Inc.*,
    804 F.3d 328 (3d Cir. 2015) ................................................................................. 23

*In re Forever Green Athletic Fields, Inc.*,
    2007 WL 1753104 (Bankr. E.D. Pa. May 3, 2017) ............................................... 35

*In re Forever Green Athletic Fields, Inc.*,
    500 B.R. 413 (Bank. E.D. Pa. 2013) ..................................................................... 24

*In re Gregory Rockhouse Ranch*,
    380 B.R. 258 (Bankr. D.N.M. 2007) ..................................................................... 20

*Hoyd v. Trussway Holding*,
    LLC, 2019 WL 994048 (Del. Ch. Feb. 28, 2019) ................................................. 21

*In re Lilley*,
    91 F.3d 491 (3d Cir. 1996) ................................................................................... 23

*In re Luxeyard, Inc.*,
    556 B.R. 627 (Bankr. D. Del. 2016) ................................................. 24, 26, 28, 30

*In re Maxus Energy Corp.*,
    641 B.R. 467 (Bank. D. Del. 2022) ....................................................................... 23

*In re Monitor Single Lift I, Ltd.*,
    381 B.R. 455 (Bank. S.D.N.Y. 2008) .................................................................... 31

*In re Mountain Dairies, Inc.*,
    372 B.R. 623 (Bankr. S.D.N.Y. 2007) ............................................................. 24, 25

*In re Murray,*
  543 B.R. ....................................................................................................................... 28

*In re Murray,*
  900 F.3d (2d Cir. 2018) ................................................................................................ 27

*In re Nash Engineering Co,*
  643 B.R. 654 (Bankr. D. Conn. 2022) *rev'd* .............................................................. 26

*In re NLG, LLC,*
  2023 WL 2053920 (Bank. D. Del. Feb. 13, 2023) .................................................. 35, 36

*In re Nordbrook,*
  772 F.2d 397 (8th Cir. 1985) ....................................................................................... 25

*In re Northshore Mainland Services, Inc.,*
  537 B.R. 192 (Bank. D. Del. 2015) .............................................................................. 31

*Paradise Hotel Corp. v. Bank of Nova Scotia,*
  842 F.2d 47 (3d Cir. 1988) ........................................................................................... 21

*In re Park Place Development Primary, LLC,*
  2021 WL 5072976 (Bankr. D. Del. Nov. 2, 2021) ....................................................... 30

*In re Petro Fill, Inc.,*
  144 B.R. 26 (Bank. W.D. Pa. 1992) ......................................................................... 27, 28

*In re Traxcell Technologies, LLC,*
  657 B.R. 453 (Bankr. W.D. Tex. 2024) ........................................................................ 32

**Statutes**

11 U.S.C. § 101(5)(A) .................................................................................................... 21

11 U.S.C. § 303(b)(1) ................................................................................................ *passim*

11 U.S.C. § 547 .............................................................................................................. 29

28 U.S.C. § 3201 ...................................................................................................... 19, 20

## PRELIMINARY STATEMENT

Diamond Head Casino Corporation (the "Debtor") is a holding company with no operations or revenue, whose only asset is its 100% interest in Mississippi Gaming Corporation ("MGC"). MGC's only asset is a a piece of real estate situated in Diamondhead, Mississippi (the "MGC Property") and, perhaps, the right to build a casino on that land. As debenture holders, Petitioning Creditors hold a first lien—*pari passu* with several other lienholders—on the MGC Property itself, but not the gaming rights. The Debtor presented no admissible evidence of the value of MGC's land and gaming rights and, certainly, did not present any admissible evidence of the value of the land itself. What the Debtor did present in its testimony, however, is that it has tried for nearly 25 years to develop or sell the MGC Property, with no success.

Even if the Debtor had presented competent evidence as to the value of the MGC Property based upon appraisals (which it did not), the fact remains that a property is only valued at what a willing purchaser will pay a willing seller and despite some twenty-five years of trying this Debtor has not been able to secure a purchaser willing to pay a price that it was willing to sell at. It is long overdue to have the process taken over by a fair-minded independent person – and that person is the Chapter 7 Trustee to serve in this case.

The Petitioning Creditors commenced this proceeding after years of trying to recover on the debts owed to them and after obtaining a judgment against the Debtor for the principal and interest owing on their debentures (which they claim are secured with a first lien on the MGC Property -which lien is shared *pari pasu* with the Debtor's president), plus attorneys' fees (which are not secured). This Chapter 7 will provide the needed mechanism for the marshalling of assets and an orderly distribution following years of the Debtor's unwillingness or inability to sell the MGC Property.

The involuntary petition was filed in good faith and for a legitimate bankruptcy purpose. It is also in the best interests of the Debtor and its creditors.  The Debtor and its subsidiary, MGC, are unable to pay their debts as they come due and hold no liquid assets other than a small amount of cash. The Debtor testified that it has financed its operating losses by accruing some $20 million in liabilities which continue to grow by sucking the equity (if there is any) out of the MGC Property.  Given the number of creditors holding different priority positions and the need to prevent the insiders from continuing to prefer to themselves (as they did with respect to payments related to an eminent domain proceeding) this Chapter 7 will provide a proper and necessary vehicle to ensure a fair distribution of the Debtor's assets as part of the fair and orderly liquidation of assets for the benefit of all creditors.

Accordingly, this Court should deny the Debtor's motion to dismiss or abstain.

## NATURE AND STAGE OF THE PROCEEDINGS

On June 12, 2024, the Petitioning Creditors commenced this bankruptcy case by filing an involuntary petition (the "Involuntary Petition") under Chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") [D.I. 1].  The Debtor filed a motion to dismiss (the "Motion to Dismiss") the Involuntary Petition or, in the alternative, convert the case to a case under Chapter 11 of the Bankruptcy Code [D.I. 9].  Petitioning Creditors filed their *Answering Brief in Opposition to Motion of the Alleged Debtor, Diamondhead Casino Corporation, to Dismiss the Involuntary Bankruptcy Petition or, in the Alternative, to Convert the Case to a Chapter 11* on September 3, 2024 (the "Answering Brief").  The Debtor did not file a reply.

This Court held an evidentiary hearing on December 4, 2024 and January 16, 2025.[1]  The Court heard testimony from Deborah Vitale, Gregory Harrison, Edson Arneault and Jeffrey Wurst.

---

[1] *See generally* Transcript dated December 4, 2024 (the "Dec. 4, 2024 Tr.") [D.I. 27] and Transcript dated January 16, 2025 (the "Jan. 16, 2025 Tr.") [D.I. 36].

On February 11, 2025, the Debtor filed its Post-Hearing Brief of the Alleged Debtor, Diamondhead Casino Corporation, in Support of its Motion to Dismiss the Involuntary Bankruptcy Petition or, in the Alternative, to Convert the Case to Chapter 11 [D.I. 38] (the "Op. Br."). This is Petitioning Creditors' Post-Hearing Answering Brief.

## SUMMARY OF ARGUMENT

1. Petitioning Creditors meet all requirements of Section 303(b)(1), as they are not secured in any property of the Debtor. Petitioning Creditors did obtain the Consent Judgment against the Debtor in the amount of $1,500,000 and interest thereon (as enumerated in the Consent Judgment) plus attorneys' fees in the amount of $175,000. And it is true that the Petitioning Creditors share a portion of a first lien on the MGC Property. However, a federal judgment only creates a security interest in real property held by the Debtor and the Debtor does not own real property, The MGC Property is owned by MGC- not the Debtor. But even if the Court were to disregard this (which it should not), Petitioning Creditors remain unsecured creditors of the Debtor with respect to their attorneys' fee judgment – none of which is secured under any theory. . Even if the Petitioning Creditors did have a security interest in property of the Debtor, the Debtor failed to adduce any evidence as to the value of the MGC Property and, therefore, Petitioning Creditors are undersecured in an aggregate amount exceeding $18,600.

2. The Involuntary Petition was filed for a legitimate bankruptcy purpose. Debt collection is a legitimate bankruptcy purpose and, indeed, the only purpose of a chapter 7 case is to marshal and distribute assets as part of a fair and orderly liquidation. Where, as here, there are a number of secured and unsecured creditors, including insiders who have distributed funds to themselves and secured creditors (including insiders) who as *pari passu* to one another, an involuntary bankruptcy is a proper vehicle. Petitioning Creditors are knowledgeable about the

facts of this matter and the law, and determined that chapter 7 bankruptcy was the best course of action to ensure that the Debtor's creditors can get paid in a fair an efficient manner.

3.      For those same reasons, abstention is not warranted.  The orderly marshaling and liquidation of the Debtor's assets in bankruptcy will be fair and efficient.  Indeed, the Debtor currently accrues $400,000 in additional liabilities every three (3) months.  There is no better forum to accomplish this than the bankruptcy court. A chapter 7 bankruptcy will "stop the bleeding", preventing the Debtor—a non-operating entity—from accruing additional salary, rent and directors' fee expenses, among other accruing expenses.  The only way creditors will get repaid is through a sale of the MGC Property and bankruptcy is the best—indeed, only—venue to ensure equitable treatment of the Debtor's creditors.

4.      By not raising the argument in its opening brief, the Debtor has waived any request for attorneys' fees.  Attorneys fees are not warranted in any event, because Petitioning Creditors meet all the requirements of Section 303(b)(1), the Involuntary Petition was filed in good faith, and even if this Court found otherwise, it should use its discretion to not award and fees or costs.

5.      Finally, this case should remain in Chapter 7.  Here, the Debtor continues to face a substantial and continuing loss to or diminution of the estate, to the tune of over $1.2 million in the first nine (9) months of 2024.  Moreover, the Debtor's only hope for a confirmed plan is a plan of liquidation, which can be accomplished in a more cost effective and efficient manner in Chapter 7.

# FACTS

## The Debtor, MGC, and MGC's Property

The Debtor has had no operations since it ended its gambling cruise ship operations in 2000.[2] For the past quarter century, the Debtor has concentrated its efforts on the development of the MGC Property, which is owned by MGC, its wholly owned subsidiary.[3] That development is dependent upon the Debtor or MGC obtaining capital through either equity and/or debt financing to master plan, design, obtain permits for, construct, open, and operate a casino resort.[4]

The Debtor did not put forth any admissible evidence regarding the value of the MGC Property. However, as set forth more fully below, Deborah Vitale, the Debtor's CEO, testified that, given the current state of pending litigation in Mississippi concerning the MGC Property, there is a serious question is to the current value of the property. Specifically, Ms. Vitale testified: "I don't see how anybody could put this thing on the market without perpetrating a fraud on a potential purchaser without this eminent domain documentation being finalized. You don't know what you're selling"[5]

## The Debentures and Consent Judgment

In 2014, in an effort to raise funds to enable the Debtor to pay pre-construction expenses for the development of a casino on the Property, the Debtor borrowed $1,850,000 from various individuals and entities, including the Petitioning Creditors, who contributed $1,500,000 of this amount.[6] Petitioning Creditors are each holders of collateralized convertible senior debentures (collectively, the "Debentures") memorializing the terms of the loans made to the Debtor.[7] Each

---

[2] Ex. 60 at p. 6
[3] *Id.*
[4] Id.
[5] Dec. 4, 2024 Tr. at 139:15-18 (Vitale).
[6] Ex. 41; Ex. 53.
[7] Ex. 41.

of the Debentures provides that it shall bear interest at a fixed rate of 4% per annum and payable annually on March 1 of each year.[8]  The Debentures are secured by a Land Deed of Trust secured by the MGC Property.[9]

Although the Debtor made the 2015 installment of interest under the Debentures (albeit late), it failed to make the interest payments due March 1, 2016, and each year thereafter.[10]

On or about October 25, 2016, Petitioning Creditors (other than John Hawley) filed an action against the Debtor in the United States District Court for the District of Delaware under Case No. 1:16-cv-00989 (the "District Court Case").[11]  On or about February 28, 2019, John Hawley brought an action against the Debtor in the Superior Court of the State of Delaware under Case No. N19C-02-239 RRC (the "State Court Action" and together with the District Court Action, the "Prior Actions").[12]  The Prior Actions sought to recover the amount of one million five hundred thousand dollars in principal plus interest thereon from the Debtors, which amounts were duly owing under the Debentures.[13]

In or about December 2019, the Parties entered into a settlement agreement (the "Settlement Agreement") resolving the Prior Actions.[14]  Pursuant to the Settlement Agreement, the Debtor agreed to pay Petitioning Creditors certain amounts, including principal owed on the Debentures held by Petitioning Creditors , plus interest and other amounts when (or if) the Property was sold by MGC.[15]  Following execution of the Settlement Agreement, the parties entered into a stipulation of dismissal and the District Court Action was dismissed on or about January 15, 2020.

---

[8] *Id.*
[9] Ex. 45.
[10] Jan. 16, 2025 Tr. at 13:25-14:1 (Arneault); Dec. 4, 2024 Tr. at 20:11-20 (Vitale).
[11] Ex. 42.
[12] Ex. 43 at 2.
[13] *Id.*
[14] Ex. 44.
[15] *Id.*

Under the terms of the Settlement Agreement, if the MGC Property was not sold by December 31, 2021, the Petitioning Creditors were entitled to a judgment based on certain calculations.[16] The MGC Property was not sold by December 31, 2021.[17] Nevertheless, the Debtor requested additional time, stating that it had engaged a real estate broker and was actively attempting to sell the MGC Property.[18] To that end, the parties entered into an amendment to the Settlement Agreement effective as of April 1, 2022 (the "Amendment").[19]

On or about July 5, 2023, with the Debtor having made no progress in selling the Property and being in default of the Settlement Agreement and Amendment, Petitioning Creditors reopened the District Court Case and after the Debtor filed a response stating that it did not oppose the Petitioning Creditors' motion or the relief sought, the District Court reopened the case, vacated the dismissal and entered the consent judgment (the "Consent Judgment").[20]

The Consent Judgement awarded a judgment in favor of Petitioning Creditors and against the Debtor as follows:

> … judgment in the principal amount of ONE MILLION FIVE HUNDRED THOUSAND DOLLARS ($1,500,000); together with interest thereon at the rate of Four Percent (4%) per annum for the period from January 1, 2015 through December 31, 2019 in the amount of THREE HUNDRED THOUSAND DOLLARS ($300,000); plus interest on the principal amount at the rate of Six Percent (6%) per annum for the period from January 1, 2020 through March 31, 2022 in the amount of ONE HUNDRED TWELVE THOUSAND FIVE HUNDRED DOLLARS ($112,500); plus interest on the principal amount at the rate of Eight Percent (8%) per annum for the period from April 1, 2022 through the date of payment to each [Petitioning Creditor] (in place of any statutory post judgment rate of interest). No post-judgment interest shall be calculated as interest upon interest (e.g. post-judgment interest shall only apply to the $1,500,000 principal amount and not to any interest thereon).

2. The Judgment shall also include the amount of ONE HUNDRED SEVENTY-FIVE

---

[16] *Id.*
[17] Jan. 16, 2025 Tr. at 15:14-15 (Arneault).
[18] *Id.* at 15:16-18.
[19] Ex. 44.
[20] Ex. 53.

THOUSAND DOLLARS ($175,000) as and for [Petitioning Creditors]' attorneys' fees and costs, however no post-judgment interest shall apply to these attorneys' fees and costs.[21]

Accordingly, interest on the $1,500,000 principal amount of the Consent Judgment continues to accrue at the rate of 8% per annum.

## The Debtor's Financial Condition and Amounts Owed to Insiders

The Debtor has no operations, having ceased operating in 2000.[22] Further, the Debtor "has had no income or revenue from any operations since 2000."[23] There are currently 21 liens on the MGC Property totaling approximately $8.5 million.[24]

On August 14, 2024, the Debtor filed its Form 10-Q with the Securities and Exchange Commission for the quarterly period ending June 30, 2024.[25] That 10-Q listed the Debtor as having assets totaling $5,662,651 and liabilities totaling $19,471,680.[26] This shows an increase from the Debtor's total liabilities as of December 31, 2023, which totaled $18,676,733.[27] That 10-Q also listed a total stockholders' deficit in the amount of $13,809,029.[28] For the six month period ending June 30, 2024, the Debtor reported a net loss of $919,737.[29]

On November 13, 2024, the Debtor filed its 10-Q for the period ending September 30, 2024.[30] That 10-Q showed a further increase in the Debtor's liabilities to $19,855,180.[31] This represents *an increase of approximately $400,000 in liabilities in the three months ending June*

---

[21] Ex. 53 at pp. 3-4.
[22] Ex. 60 at p. 6.
[23] *Id.*
[24] Dec. 4, 2024 Tr. at 114:10-11 (Vitale); Op. Br. at 12.
[25] Ex. 60.
[26] Ex. 60 at 1. This was an increase from the Debtor's total liabilities as of December 31, 2023, which totaled $18,676,733.
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] Ex. 32.
[31] *Id.* at 1.

30, 2024 and approximately $1.2 million in the nine months ending December 31, 2023.[32]

Accordingly, the Debtor appears to be accruing approximately $400,000 in additional liabilities

every three months.  As of September 30, 2024, the Debtor had a total stockholders' deficit of

$14,247,410.[33]

According to its 10-Q ending September 30, 2024, the Debtor had not filed its federal tax

returns for the tax years 2016-2023, nor had it filed its Mississippi state tax returns for the tax years

2018-2023.[34]

Throughout this entire period, the Debtor has been controlled by Deborah Vitale, the

Debtor's CEO, and Gregory A. Harrison, Chairman of the Debtor's Board of Directors.[35]  Ms.

Vitale and Mr. Harrison allege they hold both secured and unsecured claims  against the Debtor

consisting of salary, directors, fees tax payment, and rent, among other things.[36]

Specifically, Mr. Harrison is owed approximately $1 million from the Debtor.[37]

Approximately $150,000 of that amount is related to directors' fees.[38]  Mr. Harrison is owed

another $170,000 in salary.[39]  Additionally, Mr. Harrison is owed approximately $680,000 in

related to tax payments made by Mr. Harrison for taxes related to the MGC Property.[40]  Mr.

Harrison allegedly has several first priority liens secured by the MGC property for debts owed by

the Debtor.[41]  This includes liens related to taxes, and Mr. Harrison's own debenture.[42]

---

[32] *Compare* Ex. 32 at 1 to Ex. 60 at 1.

[33] Ex. 32 at 1.

[34] Ex. 32 at 17.

[35] Dec. 4, 2024 Tr. 91:1-7 (Vitale); *id.* at 25:3-7 (Harrison); 71:22-23 (Harrison; 74:5-6 (Harrison).

[36] *See, e.g. Id.* at 121:1-8 (Vitale); *Id.* at 118:7-9 (Vitale); 145:4-9 (Vitale); *Id.* at 60:6-65:2 (Harrison).

[37] *Id.* at 60:6-7 (Harrison).

[38] *Id.* at 60-9-11 (Harrison).  This is calculated at $15,000 each year for ten (10) years.  *Id.* at 60:9-11.

[39] *Id.* at 60:15-17 (Harrison).  Mr. Harrison testified the Debtor lacks sufficient cash to pay this expense.  *Id.* This expense accrues interest at 4% per annum.  *Id.* at 60:25-61-4 (Harrison).

[40] *Id.* at 61:5-12 (Harrison).  *See also* Ex. 36 (showing over $412,000 due to Mr. Harrison under first lien related to property taxes).

[41] Dec. 4, 2024 Tr. at 62:13-65:2 (Harrison).

[42] *Id.*

The lien related to taxes is often referred to the "Tax Lien" and the lien related to certain amounts owed to Mr. Harrison ($150,000) and Mr. Vitale (approximately $1.8 million).[43]  There is also an alleged lien referred to by Mr. Harrison and Ms. Vitale as the "Executives Lien."

Ms. Vitale, though accruing salary, has not been paid since 2015.[44]  The Debtor estimates that Ms. Vitale is owed "salary in in excess of $1 million."[45]  Ms. Vitale is also owed approximately $620,000 in rent, which she claims is owed by the Debtor,[46] despite the lease for the office being in the name of non-Debtor Casino World, Inc.[47]

The Tax Lien, Executives Lien, and Debenture debt are *pari passu* to each other.[48]

**<u>The Debtor is Insolvent</u>**

The Debtors' liabilities exceed its assets.  As set forth the Debtor's SEC filings, the consolidated liabilities of the Debtor and its affiliates total over $19 million, while their assets are listed at approximately $5.6 million.  *See* Ex. 32 at p. 1 (showing, as of September 30, 2024, assets of $5.605 million and liabilities of $19.855 million); Ex. 60 at p. 1 (showing, as of June 30, 2024, assets of $5.66 million and liabilities of $19.471 million).  Indeed, a comparison of its assets and liabilities shows that, while its assets continue to decline, its liabilities continue to increase. *See* Ex. 32 at 1 (showing $5.814 million in assets and $18.677 million in liabilities as of December 31, 2023).  Critically, the Debtor itself does not own the MGC Property, the value of which lies in the gaming site approval held by MGC, not the Debtor.  Ms.  Vitale testified:

> It doesn't run with the land.  It was given to Mississippi Gaming Corporation.  They hold the gaming site approval.  Diamondhead Casino Corporation does not. … you cannot transfer, sell, or assign gaming site approval.  It doesn't go with the property. It goes to Mississippi Gaming Corporation.

---

[43] Dec. 4, 2024 Tr. at 118:4-10 (Vitale) (discussing Executives Lien); *id.* at 64:18-20 (discussing same) (Harrison)
[44] *Id.* at 60:19-22 (Harrison).  Mr. Harrison testified the Debtor lacks sufficient cash to pay this expense. *Id.*
[45] Op. Br. at 7.
[46] Dec. 4, 2024 Tr. at 121:7-12 (Vitale).
[47] *See* Ex. 34 (lease); Dec. 4, 2024 Tr. at 122:3 ("The lease is with – it was with Casino World, Inc.).
[48] *See* Dec. 4, 2024 Tr. at 63:13-16 (Harrison).

Dec. 4, 2024 Tr. at 139:6-11. Thus, the value *of the Debtor* is unknown, nor is the value of the MGC Property.

The Debtor has not provided any admissible evidence as to the value of the MGC Property. Although it submitted certain valuations and testimony related to those valuations, the valuations were admitted for the sole purpose of showing that the Debtor and MGC relied on the valuations. *See* D.I. 37 ("Per the parties' oral stipulation at the December 4, 2024 hearing, Exhibits 1-3 are admitted for the limited purpose that the Debtor and Mississippi Gaming Corporation relied on the documents. They are not admitted appraisal purposes."). As such, there is no evidence before this Court as to the value of the MGC Property, the gaming rights, or the Debtor itself. Indeed, even according to Ms. Vitale, due to the eminent domain proceedings plaguing the MGC Property, the value of the property is unknown. *See* Dec. 4, 2024 Tr. at 139:15-18 (Vitale: "I mean I don't see how anybody could put this thing on the market without perpetrating a fraud on a potential purchaser, without this eminent domain being finalized. You don't know what you're selling.").

**The Debtor's Unsuccessful Efforts to Sell the Property**

The Debtor has been trying to sell the MGC Property for over twenty years.[49] Nevertheless, the Debtor has been unwilling or unable to affect a sale. The Debtor has not provided any evidence that it has received any firm offers to purchase the MGC Property, despite many years of trying. Indeed, there is not even a written expression or indication of interest in the trial record.

The MGC Property is the subject of an eminent domain proceeding in Mississippi the "Eminent Domain Proceedings").[50] In 2024, Ms. Vitale, on behalf of MGC, partially settled the Eminent Domain Proceedings.[51] However, additional settlement language with respect to an easement

---

[49] Dec. 4, 2024 Tr. at 70:22-25 (Harrison); 125:15-22 (Vitale).
[50] *See* Dec. 4, 2024 Tr. at 48:15-49:24 (Harrison); 110:8-23 (Vitale).
[51] *Id.* at 57:20-58:1 (Harrison).

needs to be finalized.

According to the Debtor, its efforts to sell the MGC Property are currently constrained by eminent domain proceedings in Mississippi.[52]  Ms. Vitale testified that "the eminent domain proceeding … is critical to the value of this property …."[53] The parties to the dispute are "not done working on the wording of these easements … and the way it's worded now -- nobody would buy this property …."[54]  Indeed, Ms. Vitale testified that

> this eminent domain thing is a really  … big problem … I don't see how anybody could put this thing on the market without perpetrating a fraud on a potential purchaser without this eminent domain documentation being finalized.  You don't know what you're selling.[55]

Nonetheless, Colliers International is allegedly marketing the MGC Property at the Debtor's request.[56]  And the Debtor is also marketing the MGC Property on its own.[57]

**Payments to Insiders**

As a result of the partial settlement of the Eminent Domain Proceedings, MGC received a total of $1 million.  From that amount, Ms. Vitale directed $102,000 to Mr. Harrison to pay of part of his Tax Lien.[58]  Ms. Vitale also paid herself $99,000 "for out-of-pocket expenses."[59]

**ARGUMENT**

**I.    THIS COURT HAS SUBJECT MATTER JURISDICTION**

This Court has subject matter jurisdiction over this involuntary proceeding.  Petitioning Creditors meet the requirements of 11 U.S.C. § 303(b)(1), as they are not secured in any property

---

[52] *Id.* at 47:23-48:24 (Harrison).
[53] *Id.* at 110:12—14 (Vitale).
[54] *Id.* at 110:18-21 (Vitale).
[55] Id. *at* 138:24-139:18 (Vitale).
[56] *See Id.* at 10:20-12:16 (Slagle); Op. Br. at 10; Ex. 26.  Patrick Slagle is leading the marketing effort for Colliers. He testified he has never sold a casino or gaming property.  Dec. 4, 2024 Tr. at 20:17-21 (Slagle).
[57] *See* Dec. 4, 2024 Tr. at 13:8-10 (Slagle) (noting Colliers has non-exclusive marketing agreement); 71:1-72:5 (Harrison).
[58] Dec. 4, 2024 Tr. at 55:17-56:2 (Harrison).
[59] *Id.* at 124:7-12 (Vitale).

**of the Debtor**.   Section 303(b)(1) of the Bankruptcy Code states, in relevant part:

> An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—
>
> (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least [$18,600] more than the value of any lien on **property of the debtor** securing such claims held by the holders of such claims

11 U.S.C. § 303(b)(1) (emphasis added).  As set forth below, the $175,000 in attorneys' fees which comprise a portion of the Consent Judgement is unsecured, as a federal judgment lien only creates a security interest in real property of the Debtor, and **the Debtor** does not own any real property.[60] Similarly, the Deeds of Trust securing Petitioning Creditors' Debentures are secured by the MGC Property—an asset of non-Debtor MGC.  Thus, as to the *Debtor*, Petitioning Creditors claim is unsecured.[61]  Assuming, *arguendo,* that their claims were secured by the asset of the Debtor (which it is not), the Petitioning Creditors' claim would still be under-secured in an amount exceeding $18,600.

### A.    Petitioning Creditors Hold an Unsecured Claim Against the Debtor

Petitioning Creditors hold two valid, but separate, types of liens.  As set forth below, the Petitioning Creditors hold a first priority lien on property owned by non-debtor, MGC, as reflected in the Deed of Trust given by MGC.  Petitioning Creditor Judgement  includes $175,000 for attorneys' fees. Pursuant to 28 U.S.C. § 3201:

> A judgment in a civil action shall create a lien on all *real property of a judgment debtor* on filing a certified copy of the abstract of the judgment in the manner in which a notice of tax lien would be filed under paragraphs (1) and (2) of section

---

[60] The Debtor's only asset is its ownership of the shares of stock of MGC and based upon the 21 liens against the MGC Property it is unknown whether there is any value to the Debtor's stock.

[61] The Petitioning Creditors' collateral is the **property of MGC**, the Debtor's subsidiary – not the Debtor.

6323(f) of the Internal Revenue Code of 1986. A lien created under this paragraph is for the amount necessary to satisfy the judgment, including costs and interest.[62]

Here, setting aside the fact that Petitioning Creditors did not file a certified copy of the abstract of judgment in any manner, the judgment debtor—the Debtor—does not own any real property.[63]  As such, the Judgment Lien does not attach to anything.  Thus, the entirety of the Petitioning Creditors' judgment lien is unsecured as to the Debtor and the attorneys' fees portion of the Consent Judgement –which is indisputably above $18,600—is certainly unsecured.

The Debtor concedes as much, stating, on Page 5 of its Post-Hearing Opening Brief that "the attorneys' fees and increased interest agreed to in the Consent Judgment entered on September 20, 2023 were not covered under Petitioners [sic] first lien and would only get paid after all 21 property liens had been paid off first."  Op. Br. at 5.

Accordingly, the Petitioning Creditors therefore satisfy the requirements of Section 303(b)(1).

### B.    Petitioning Creditors' First Priority Lien Does Not Attach to Property of the Debtor

The Debtor admits, as it must, that Petitioning Creditors' lien related to the Debentures is a lien **on the MGC Property**.  *See* Post-Hearing Op. Br. at 12.  Neither the Debentures, nor the Deeds of Trust securing the Debentures, provide a security interest in any **property of the Debtor**.

### C.    Secured Creditors Can Properly Be Petitioning Creditors

The Debtor asserts, without citation to authority, that "Section 303(b)(1) requires that each petitioning creditor to hold non-contingent, undisputed, *unsecured* claims …" Op. Br. at 13.  This is incorrect.  The word "unsecured" is not present in section 303(b)(1).  The Bankruptcy Code

---

[62] 28 U.S.C. § 3201(a) (emphasis added).
[63] *See, e.g., In re Gregory Rockhouse Ranch*, 380 B.R. 258, 266 (Bankr. D.N.M. 2007) (citing New Mexico law to find that "Debtors correctly assert that Glenn's transcript of judgment is unsecured as to Donald Wayne Gregory because he owns no real property to which the transcript of judgment can attach.")

defines a "claim" as, among other things as the "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, ***secured***, or unsecured." 11 U.S.C. § 101(5)(A) (emphasis added). Thus, under the plain language of Section 303(b)(1), a secured creditor can be a petitioning creditor. *See Paradise Hotel Corp. v. Bank of Nova Scotia*, 842 F.2d 47, 49-50 (3d Cir. 1988) ("read literally, this section requires only that a petitioner be an entity which holds a non-contingent, undisputed claim against the debtor. Its description of the qualification of a petitioner is, therefore, broad enough to include a fully secured holder of a non-contingent, undisputed claim.")

The last part of Section 303(b)(1), requiring that the claims—secured or unsecured—aggregate at least $18,600 more than the value of any property of the debtor, however, requires secured creditors (in the aggregate) to be undersecured by that amount. *See In re Diamondhead Casino Corp.*, 540 B.R. 499 (Bankr. D. Del. 2015) (citing requirement in 303(b)(1) that "the petitioning creditors' claims are unsecured or *undersecured* by at least $15,325 …") (emphasis added).

### D.    To the Extent Secured Creditors Hold a Lien on Property of the Debtor, they are Undersecured in an Aggregate Amount Exceeding $18,600

The Debtor failed to put forth *any* evidence of value. The appraisals relied upon by the Debtor (Ex. 1-3) were not admitted as evidence of value. *See* D.I. 37 ("Per the parties' oral stipulation at the December 4, 2024 hearing, Exhibits 1-3 are admitted for the limited purpose that the Debtor and Mississippi Gaming Corporation relied on the documents. They are not admitted appraisal purposes."). Testimony regarding *potential* deals for the MGC Property are also insufficient to show the property's value at any point in time. *See, e.g. Hoyd v. Trussway Holding, LLC*, 2019 WL 994048, at *1 (Del. Ch. Feb. 28, 2019) (finding "a contemporaneous-but-

unconsummated sales process provides no meaningful evidence of value."). If anything, the Debtor's testimony only shows that it has been unable to secure a buyer for the MGC Property at any price.

The only evidence of value before this Court is contained in the Debtor's consolidated balance sheets in its SEC filings, which include the assets and liabilities of MGC. Those filings show a book value of $5,233,204 for the MGC Property. *See* Ex. 30 at p. 1; Ex. 60 at p 4. However, according to the Debtor itself, the total amount of first lien debt (including the Petitioning Creditors' Debentures) totals "approximately $5.5 million with interest." Post-Hearing Op. Br. at 13. The Debtor's testimony coupled with the other evidence indicates that the first lien holders are undersecured on the MGC Property by an amount not less than $300,000. Of the approximately $5.5 million in first lien debt, Petitioning Creditors' debt on the liens (including interest) totals less than $2.5 million – about 45% of the total first lien debt.

As such, even if the book value could be used as the measure of value of the MGC Property,[64] applying that percentage to the $300,000 security deficiency between the book value and the first lien debt implies that the Petitioning Creditors are undersecured by no less than $135,000. Thus, even if the MGC Property was to be considered to be **property of the Debtor** in determining whether the Petitioning Creditors are undersecured (which it is not), the Petitioning Creditors would still be undersecured by an amount in excess of $18,600.

## II.    THE INVOLUNTARY PETITION WAS FILED IN GOOD FAITH

The Debtor no longer asserts that Petitioning Creditors acted in bad faith because they allegedly violated provisions in the Land Deed of Trust and a non-existent oral agreement,[65] and

---

[64] As noted above, given the eminent domain proceedings and Ms. Vitale's testimony, the MGC Property apparently has little to no fair market value.
[65] *See* Motion at 5-10.

has therefore waived that argument.[66] Instead, the Debtor now argues that the Involuntary Petition was filed in bad faith because it was allegedly filed for an improper bankruptcy purpose - to collect a debt - and that there are state law remedies available for petitioners to collect their debt.

## A.    Legal Standard

The determination of bad faith is "a fact intensive determination …" *In re Lilley*, 91 F.3d 491, 496 (3d Cir. 1996). The Petitioning Creditors are "presumed to have acted in good faith." *In re Forever Green Athletics Fields, Inc.*, 804 F.3d 328, 335 (3d Cir. 2015). "To dismiss the petition, the debtor must show by a preponderance of the evidence that the creditors acted in bad faith." *Id.* (citation omitted). In the Third Circuit, bad faith is determined under the "totality of the circumstances" test. *Forever Green*, 804 F.3d at 336.

## B.    Collection of a Debt is a Proper Bankruptcy Purpose

Despite the Debtors protests to the contrary, utilizing bankruptcy as a method to collect on a debt is a valid bankruptcy purpose. Indeed, the *only* reason why a creditor would file an involuntary petition is to recover on a debt owed to it by a debtor. The bankruptcy process allows for an orderly distribution where, as here, amounts are owed to many creditors, holding debts of various priority, including debts *pari passu* to one another. As the court explained in *In re Marciano*:

> In the absence of an involuntary petition, creditors can collect upon judgments only by invoking state law remedies that contain no provisions for pro rata distribution among competing creditors. In the case of an alleged debtor who lacks sufficient funds to satisfy all judgments, like Marciano, some judgment creditors may obtain a complete recovery to the detriment of others. Such an outcome contravenes the "central policy behind involuntary petitions," which is "to protect the threatened depletion of assets or to prevent the unequal treatment of similar situated creditors.

---

[66] *See In re Maxus Energy Corp.*, 641 B.R. 467, 523 n. 165 (Bank. D. Del. 2022) (citing *Thor Merritt Square, LLC v. Bayview Malls LLC*, 2010 WL 972776, at *5 (Del. Ch. 2010) (discussing how "[t]he failure to raise a legal issue in an opening brief generally constitutes a waiver of the ability to raise that issue in connection with a matter under submission with the court" and finding that defendants waived arguments asserted in reply for the first time in connection with the specific motion); and L.B.R. 7007-2(b)(ii) ("The party filing the opening brief shall not reserve material for the reply brief that should have been included in a full and fair opening brief.").

Whenever this situation is implicated, a creditor should be able to compel liquidation or reorganization of the Debtor's estate through an involuntary petition."

446 B.R. 407 (Bank. C.D. Cal. 2010) (citation omitted). *See also In re Forever Green Athletic Fields, Inc.*, 500 B.R. 413, 425 (Bank. E.D. Pa. 2013) ("involuntary Chapter 7 petitions serve to prevent a debtor from choosing to pay certain creditors over other similarly situated creditors."); *In re Luxeyard, Inc.*, 556 B.R. 627, 640 (Bankr. D. Del. 2016) (a "creditor may use the device of an involuntary petition when bankruptcy is necessary to assure equal distribution among creditors. As such, it is proper to file an involuntary petition to 'protect against other creditors obtaining a disproportionate share of the debtor's assets.'"). Further, "[s]eeking that other creditors join in filing an involuntary petition in order to pursue debt collection in the bankruptcy court is not an improper bankruptcy purpose." *In re Better Roads Asphalt, LLC*, 608 B.R. 7, 15 (Bankr. D. P.R. 2019) (*citing In re Basil Street Partners, LLC*, 477 B.R., 846, 853 (Bankr. M.D. Fla. 2012)).

The cases cited by the Debtor in support of its position are inapposite and actually support Petitioning Creditors' use of the bankruptcy process in this instance.

In *In re Mountain Dairies, Inc.*, 372 B.R. 623 (Bankr. S.D.N.Y. 2007), an involuntary petition was filed by a single creditor with a claim subject to a *bona fide* dispute. *Id.* at 625. The sole petitioning creditor's claim was based on an alleged breach of contract, *id.* at 627. The petitioning creditor initiated an action in Pennsylvania state court, but the case was dismissed for lack of jurisdiction due to a forum selection clause. *Id.* at 628. Following dismissal of the Pennsylvania action, the petitioning creditor commenced an involuntary bankruptcy. *Id.* at 628-29. In addition to finding a *bona fide* dispute, making the petitioning creditor ineligible under Section 303 of the Bankruptcy Code, the bankruptcy court also found that, as there was essentially a two-party dispute where there was an alternative state court remedy—namely, filing a breach of contract action in the proper jurisdiction— and no other identified creditors, the court determined

that " [p]ari passu distribution is therefore not an issue" and invoked abstention as an alternative basis to dismiss the involuntary petition.  *Id.* at 636-37.

*In re Century Title Marble, Inc.*, 152 b.r. 688 (Bankr. S.D. Fla. 1993) is not an abstention opinion.  Rather, it addresses a sanctions motion filed by the alleged debtor following dismissal of an involuntary bankruptcy where "the involuntary petition as the petition was not executed by the three petitioning creditors and, instead, was improperly signed by attorney Levin, as attorney-in-fact." *Id.* at 688.  It therefore has no bearing on this instant matter.

*In re Nordbrook*, 772 F.2d 397 (8th Cir. 1985), like *Mountain Dairies*, involved a single creditor with "an isolated disputed claim" and where there concurrently existed "a pending case in an Iowa District Court in which [the petitioning creditor] is attempting to enforce the same claim against Nordbrook as has been asserted in this case" and "was the only obligation of the debtor not being paid in the regular course of the debtor's business."  *Id*. at 399-400 (quoting *In re Gerald L. Nordbrock*, 52 B.R. 370, 371-72 (D.Neb. 1984) (quotations omitted).

Here, there is no question that the Debtor is not paying its debts as they come due.[67] Further, Petitioning Creditors hold unsecured claims *pari passu* with other unsecured creditors. To the extent Petitioning Creditors hold secured claims, those claims are held *pari passu* with other Debenture holders, as well as with holders (all or substantially all insiders) of the Executives Liens and Tax Liens.  As set forth more fully below, bankruptcy therefore provides an appropriate—indeed the only—method of ensuring a fair distribution to creditors.

### C.    The Involuntary Petition Serves a Legitimate Bankruptcy Purpose

"[W]hen the debtor is a corporation, the only purpose of a Chapter 7 case is to marshal and

---

[67] *See, e.g.* Dec. 4, 2024 Tr. at 120:5-8 (Vitale) (Q. And is the Debtor able to pay those obligations as they come due? A. No. We're in default of all our major debentures and promissory notes".); *Id.* at 60:11-23 (Harrison) (Testifying that Debtor does not have funds to pay directors' fees or Mr. Harrison's accrued salary).

distribute assets as part of the fair and orderly liquidation of assets for creditors, *which may explain the relatively few corporate Chapter 7 cases dismissed for lack of a legitimate bankruptcy purpose under either section 707(a) or 305(a)*." *In re Nash Engineering Co*, 643 B.R. 654, 662 (Bankr. D. Conn. 2022) (emphasis added) *rev'd* on other grounds by *In re Nash Engineering Co.,* 619 F.Supp.3d 268 (D. Conn. 2022).

A "creditor may use the device of an involuntary petition when bankruptcy is necessary to assure equal distribution among creditors. As such, it is proper to file an involuntary petition to 'protect against other creditors obtaining a disproportionate share of the debtor's assets.'" *In re Luxeyard, Inc.*, 556 B.R. 627, 640 (Bankr. D. Del. 2016) (citations omitted). Further, "[s]eeking that other creditors join in filing an involuntary petition in order to pursue debt collection in the bankruptcy court is not an improper bankruptcy purpose." *In re Better Roads Asphalt, LLC*, 608 B.R. 7, 15 (Bankr. D. P.R. 2019) (citing In re Basil Street Partners, LLC, 477 B.R., 846, 853 (Bankr. M.D. Fla. 2012)).

Here, the Debtor's insiders are both secured and unsecured creditors. Moreover, the accrued debt of the Debtor continues to increase.[68] In addition to the Petitioning Creditors, there are other creditors who hold a first lien position on the Property. There are also twenty additional lienholders on the MGC Property as well as other unsecured creditors of the Debtor. The most efficient way to fairly and properly distribute the Debtor's assets is through a Chapter 7 liquidation.

The instant case is similar to that of *Betterroads*, where the Bankruptcy Court found that "[t]he evidence presented showed that the involuntary debtors had defaulted on their loan payments and, that the lenders had engaged in active collection actions. The discussions by and

---

[68] Although the Debtor asserts that its subsidiary holds approximately $1 million in funds from a settlement agreement, the Debtor does not state the amount of MGC's debts. Moreover, the Debtor itself is running net losses of over $900,000 every six months.

between the lenders, including the syndicate lenders, and the advice provided by their legal counsel show that the decision to file the involuntary petitions was more in the nature of a studied business decision tha[n] an action to harass or merely seek an alternate collection forum." *Id.*

The same is true here.  The Debtor defaulted on its loan payments, not just to the Petitioning Creditors, but to all other debenture holders, as well.  This includes not only other first lien Debenture holders, but holders of twenty (20) other lien priority levels.  The Debtors have also defaulted on amounts owed related to rent, director services, the Executive Lien and Tax Lien, among other obligations.  Petitioning Creditors, through their legal counsel, engaged in many discussions with the Debtor, including agreeing several times to forebear on collecting on the decade-old debt.  After several years of waiting for the Debtors to actually repay the amounts owed under the Debentures and, later, the Consent Judgement, the Petitioning Creditors made a studied business decision to place the Debtor into an involuntary bankruptcy.

The cases Debtor cites are inapposite.  *In re Murray*,[69] was an individual involuntary Chapter 7 filing where there was a single existing creditor of the alleged debtor.  *Id.* at 59.  In addition, among other things, "there were no other creditors to protect, and [the bankruptcy] had been brought solely as a judgment enforcement device for which adequate remedies existed in state law … [and] that Murray did not want or need a discharge and no other goals of bankruptcy, such as *pari passu* distribution among competing creditors, would be served by continuing the petition." *Id.* at 61.

In *In re Petro Fill, Inc.*,[70] the bankruptcy court determined that the alleged debtor was paying its undisputed debts they became due.  *Id.* at 30.  Further, the bankruptcy court found that, as a shareholder of the alleged debtor, the at least one petitioning creditor had the ability to bring

---

[69] 900 F.3d (2d Cir. 2018).
[70] 144 B.R. 26 (Bank. W.D. Pa. 1992) (dismissing involuntary bankruptcy but declining to award attorneys' fees).

a dissolution action under state law and the petition creditors could have brought an action in state court that would have the same result sought in bankruptcy court. *Id.* at 30-31. The bankruptcy court therefore held that "a chapter 7 proceeding[] is not to be regarded as a suitable alternative to dissolution of a deadlocked corporation in state court when the latter remedy is readily available." *Id.* at 31.

Here, given the presence of the Executive Liens and Tax Liens—which are held by insiders—together with other first lien holders of debentures, there is a need for *pari passu* distribution, making bankruptcy the appropriate vehicle. As the *Murry* court noted, "[b]ankruptcy was created as a collective remedy, to achieve *pari passu* distribution amongst creditors ...." *In re Murray*, 543 B.R. at 486. *See also In re Luxeyard, Inc.,* 556 B.R. 627, 640–41 (Bankr. D. Del. 2016) ("[I]t is proper to file an involuntary petition to protect against other creditors obtaining a disproportionate share of the debtor's assets."). Here, despite holding *pari passu* claims with the Petitioning Creditors, Vitale made distributions to Harrison related to the Tax Lien[71] but did not that distribution *pari passu* with other first lien holders. Ms. Vitale has also chosen to pay herself rent, which rent is not subject to any liens, ahead of secured creditors.

### D.     Debtor's Management is Dissipating Assets, Showing Preference to Insiders

The Debtor, admittedly, is not paying its debts as they become due,[72] as does not have sufficient cash.[73] Nevertheless, the Debtor used what little cash it received to mostly pay its insiders—Mr. Vitale and Mr. Harrison. Specifically, despite the holding liens *pari passu* with other first lien holders, including Petitioning Creditors, Ms. Vitale used money to pay herself on

---

[71] *See* Exhibit 36 (showing Harrison first lien tax payment "paid on 11-1-23 with eminent domain funds."
[72] Dec. 4, 2024 Tr. at 120:5-8 (Vitale).
[73] Dec. 4, 2024 Tr. at 59:1-15 (Harrison).

unsecured claims[74] and to pay back Mr. Harrison for certain tax payments.[75]  Ms. Vitale made

these payments contrary to Mr. Harrison's testimony that "[i]f money comes in, we would pay the

debentures … we would forfeit *pari passu*."[76]  In making such payments, Ms. Vitale has preferred

insiders over other creditors, to the detriment of the Debtor's other creditors.[77]

The Debtor appears to argue that there was no preferential payment or dissipation of assets

because the funds used to pay Ms. Vitale's expenses and Mr. Harrison's tax liens were "payments

made by *the Debtor*" but rather Mississippi Corporation.  Op. Br. at 20.  But, Ms. Vitale controls

how the payments flow.  And, the debts paid were antecedent debts of the Debtor.  Further, the

Debtor, being the parent of MGC, had in interest in the eminent domain funds, which makes the

payments preferential.

### E.    Petitioning Creditors Made a Reasonable Inquiry into the Fact and Law

The Debtor asserts that Petitioning Creditors did not make a reasonable inquiry to the facts

and law.  Op. Br. at 23.  Yet, in the very next sentence, the Debtor acknowledges that "counsel for

Petitioners was familiar with the last Chapter 7 Involuntary Petition that was filed against the

Debtor in this Court in 2015."  *Id.*  Indeed, Petitioning Creditors are intimately aware of the facts

surrounding the Debtor.[78]

The Debtor also makes the incredible claim that "Petitioners made no attempt to examine

the Company's financial records <u>before</u> filing their Petition … After the Petition was filed, the

Petitioners … made no effort to obtain or review the Company's financial records … The failure

to request any financial records speaks volumes.  Op. Br. at 23.  This is nonsensical.  The Debtor

---

[74] Dec. 4, 2024 Tr. at 124:7-124:11 (Vitale) ("I paid myself 99,000 for expenses, out-of-pocket expenses.").
[75] **Cite.;** *See also* Ex. 36 (showing payment of "AMOUNT DUE UNDER FIRST LIEN" to Mr. Harrison related to taxes).
[76] Dec. 4, 2024 Tr. at 63:16-19 (Harrison).
[77] *See* 11 U.S.C. § 547.
[78] *See* Jan. 16, 2025 Tr. 12:3-19:19 (Arneault); *Id.* at 46:10-57:21 (Wurst).

is a publicly traded company.[79]  There is no need for discovery of financial information at this stage when the Company has filed 10-Qs and similar filings with the SEC.  Indeed, the Debtor's 10-Q as of June 30, 2024 (the approximate time of the Petition Date) is cited heavily in Petitioning Creditors' Answering Brief.[80]  And, given Mr. Arneault's former position with the company, together with the facts that the Company has had no operations since 2000, the Petitioning Creditors' numerous discussions over the years with the Debtor and the obviousness that the Debtor has not been paying its debts as they become due, the Petitioning Creditors had all the financial information they needed prior to the Petition Date to make the involuntary filing in good faith.

The Petitioning Creditors also made a relevant inquiry into the law.  They retained experienced bankruptcy counsel who had experience with both the original Debentures and Petitioning Creditors' various dealings and negotiations with the Debtor.

It is therefore hard to imagine petitioners who have a better grasp on the law and facts than Petitioning Creditors.  *See, e.g. In re Luxeyard, Inc.*, 556 B.R. 627, 644 (Bank. D. Del. 2016) (finding petitioning creditor made reasonable inquiry into facts and law where creditor reviewed Debtor's financial records, had discussions with management and consulted an attorney regarding available relief in a bankruptcy case).[81]  This factor also weighs heavily in favor of a finding of Petitioning Creditors' good faith.

---

[79] *See* Exhibits 28 (March 31, 2023 8-K), Exhibit 29 (September 30, 2023 10-Q), Exhibit 32 (September 30, 2024 10-Q), and Exhibit 60 (June 30, 2024 10-Q).

[80] *See* D.I. 11 at pp. 2, 6-10, and 20.

[81] *See also In re Park Place Development Primary, LLC*, 2021 WL 5072976 (Bankr. D. Del. Nov. 2, 2021) ("Counsel for the Petitioning Creditors was well prepared and well-versed with respect to the facts of this case at oral argument. Based on the submissions received and oral argument, it is evident that counsel for the Petitioning Creditors conducted their due diligence prior to the filing of this Involuntary Petition.").

## III.    ABSTENTION IS NOT WARRANTED

### A.    Legal Standard

"Whether to dismiss a case or abstain pursuant to section 305 is committed to the discretion of the bankruptcy court, and is determined based upon the totality of the circumstances." *In re Northshore Mainland Services, Inc.*, 537 B.R. 192, 203 (Bank. D. Del. 2015).

> The courts that have construed § 305(a)(1) are in general agreement that abstention in a properly filed bankruptcy case is an extraordinary remedy, and that dismissal is appropriate under § 305(a)(1) *only* in the situation where the court finds that both 'creditors and the debtor' would be 'better served' by a dismissal." "Granting an abstention motion pursuant to § 305(a)(1) requires more than a simple balancing of harm to the debtor and creditors; rather, the interests of both the debtor and its creditors must be served by granting the requested relief." The movant bears the burden to demonstrate that the interests of the debtors and creditors would benefit from dismissal.

*In re AMC Investors, LLC,* 406 B.R. 478, 487-488 (Bankr. D. Del. 2009) (citations omitted) (emphasis added). Courts consider several factors to gauge the overall best interests of the creditors and debtor. They include:

> (1) the economy and efficiency of administration;
> (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court;
> (3) whether federal proceedings are necessary to reach a just and equitable solution;
> (4) whether there is an alternative means of achieving an equitable distribution of assets;
> (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;
> (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and
> (7) the purpose for which bankruptcy jurisdiction has been sought.

*Id.* at 489. "While all factors are considered, they are not given equal weight in each case, nor should the Court conduct a strict balancing." *Id.* As the moving party, the Debtor bears the burden to demonstrate that the interests of the debtor and its creditors would benefit from dismissal or suspension of proceedings under § 305(a)(1). *In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 462-

63 (Bank. S.D.N.Y. 2008).

Here, it is not in the best interests of the Debtor or the creditors to dismiss or abstain from moving forward with this bankruptcy case. As set forth above and below, the Debtor has no operations, no income and continues to incur additional debt with no ability to repay the debt outside of a sale. A Chapter 7 bankruptcy is the most efficient process repay creditors.

### B.     Economy and Efficiency

"[E]conomy and efficiency of administration[] considers whether administration of a case in bankruptcy court is needlessly costly or disruptive to the business. Abstention and dismissal may be appropriate where 'an ably-functioning, going-concern business is being foisted in disruptive fashion into a bankruptcy.'" *In re Traxcell Technologies, LLC*, 657 B.R. 453, 464 (Bankr. W.D. Tex. 2024) (citation omitted). Here, the Debtor is a non-operating holding company and its subsidiary, MGC is also non-operating, holding only an undeveloped piece of real estate and gaming rights. There would be no disruption to the Debtor's business.

A chapter 7 liquidation would also not be needlessly costly. Indeed, it would put a stop to the Debtor's accrual of salary, rent, directors' fees and other expenses that continue to accrue. It would also allow for all claims against the Debtor—including the 21 levels of debenture liens, tax claims, and other claims, to be adjudicated in one forum pursuant to an established distribution scheme rather than a "race to the courthouse" where multiple creditors will attempt to litigate their claims against the Debtor to achieve a more favorable priority.

### C.     There is No Alternative Adequate Forum

The Debtor asserts that a judicial foreclosure process in Mississippi is adequate to protect Petitioning Creditors' interests. Op. Br. at 25. But, first, Petitioning Creditors' attorneys' fees awarded in the Consent Judgement are not subject to any liens on property of MGC. And, if the Debtor's estimation of the value of MGC Property is correct, after payments to secured creditors,

monies would flow from MGC up to the Debtor and there would need to be a process to adjudicate payment to creditors of Debtor. Indeed, the interests of *all* creditors must be protected and bankruptcy offers the only forum where that can occur.

### D.    Bankruptcy is the Only Adequate Forum

As set forth above, only the federal bankruptcy scheme provides an adequate mechanism to adjudicate all of the claims against the Debtor and ensures distribution of the Debtor's assets as part of a fair and orderly liquidation of assets.

### E.    There is No Adequate Alternative Means Available for an Equitable Distribution of Assets

As set forth above, there is no adequate alternative means for an equitable distribution of assets.

### F.    The Debtors and Creditors Are Unable to Work Out a Less Expensive Arrangement Which Better Serves All Interests

Here, over the course of ten years, Petitioning Creditors have tried to work out an out of court workout of their claims. For many years, the parties were successful. However, at this juncture, there is no out-of-court workout forthcoming that would allow for the liquidation, and fair and equitable distribution, of assets.

### G.    The Bankruptcy was Filed for a Legitimate Purpose

As explained above, the Involuntary Petition was filed for a legitimate bankruptcy purpose.

### H.    A Chapter 7 is in the Best Interests of the Debtors and Creditors

Viewing the totality of the circumstances, abstention is not warranted in this case. The Debtor, a non-operating holding company, continues to accrue liabilities in the form of salary, rent and directors' fees, among other expenses, *which grew by over $1.2 million in just 9 months*.[82] Far

---

[82] *Compare* Debtor's liabilities as of December 31, 2023 of $18,676,733 (Ex. 60 at 1) to June 30, 2024 of $19,471,680 (Ex. 60 at 1) to Debtor's liabilities of $19,855,180 (Ex. 32 at 1).

from being costly, a chapter 7 bankruptcy will "stop the bleeding."

One therefore wonders why the Debtor is insistent of remaining out of bankruptcy.  As this Court stated in *AMC Investors* "since the Alleged Debtors are insolvent, non-operating limited liability companies that hold stock in a defunct computer company, it is not clear how a bankruptcy petition is harmful. In fact, the only entities that may be harmed by entering an order for relief in this case are the officers and directors of the Alleged Debtors. While these individuals may desire to avoid the threat of lawsuits pursued by a chapter 7 trustee, their interests are not relevant in a decision to abstain under section 305(a)(1)." 406 B.R. at 489.  It is acknowledge that the sale of the undeveloped MGC Property is the only way creditors will be repaid.  Bankruptcy is there best venue to ensure repayment and the equitable treatment of creditors.

The Debtor's request for abstention should therefore be denied.

## IV.    THE DEBTOR HAS WAIVED ITS REQUEST FOR ATTORNEYS' FEES

Because this case was filed in good faith and Petitioning Creditors satisfy all the requirements of Section 303(b)(1), there is no basis to award the Debtor any attorneys' fees.  But, even if this Court were to determine either that Petitioning Creditors do not satisfy Section 303(b)(1)'s requirements or that this case was filed in bad faith, by not raising a request for attorneys' fees in its post-hearing opening brief, the Debtor has waived its right to ask for this relief.[83]

Even if not waived, relief under Section 303(i) is discretionary and should not be awarded here.  *See In re Analytica Wire, Inc.*, 392 B.R. 618, 620 (Bankr. D. Del. 2008) (stating awards under Section 303(i) are discretionary).  "To evaluate whether a § 303(i) award is appropriate, bankruptcy courts regularly look to the totality of the circumstances." *In re Forever Green Athletic*

---

[83] *See* n. 65, *supra.*

*Fields, Inc.*, 2007 WL 1753104, at *9 (Bankr. E.D. Pa. May 3, 2017). "Applying the totality of the circumstances analysis, bankruptcy courts will consider: (1) the petitioners' relative culpability, (2) the petitioner's motives for joining the involuntary petition, (3) the merits of the involuntary petition, (4) the relative reasonableness of the debtor's and petitioners' conduct, and (5) other circumstances this Court may deem relevant to the exercise of its discretion." *Id.*

Here, the merits of the Involuntary Petition are strong. The Debtor has no operations, no income, and owes a substantial amount to a wide variety of creditors, including the Petitioning Creditors. The Debtor's main asset is its interest in its wholly owned subsidiary, MGC, whose main asset is an undeveloped piece of land that the Debtor has been unable or unwilling to sell. As such, to the extent this Court dismisses this bankruptcy case under Section 303, it should exercise its discretion and not award fees, expenses or other costs to the Debtor. Petitioning Creditors hire experienced bankruptcy counsel to file the Involuntary Petition and did so with the purpose of providing a level playing field for all creditors, many of whom have been waiting over a decade to be paid by the Debtor.[84]

## V.   THIS CASE SHOULD REMAIN IN CHAPTER 7

As this Court should not dismiss or abstain from presiding over this bankruptcy, the Debtor requests, in the alternative, that if the Involuntary Petition is not dismissed, it be allowed to convert the case to one under Chapter 11. However, "[c]onversion under section 706(a) is limited by the express language of section 706(d), which provides that "a case may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter." *In re NLG, LLC*, 2023 WL 2053920, at *5 (Bank. D. Del. Feb. 13, 2023).

As was the case in *NLG*, Diamondhead cannot convert this case to one under Chapter 11

---

[84] *See* Jan. 16, 2025 Tr. at 57:6-14 (Wurst).

because "the Debtor's right to convert is expressly conditioned on NLG satisfying the requirements

of the destination chapter – chapter 11." *Id.*  As the *NLG* Court explained:

> A debtor may not qualify as a "debtor" under chapter 11, if pursuant to 11 U.S.C.
> § 1112(b)(1), "cause" exists for the court to convert a debtor's chapter 11 case to a
> chapter 7 case or dismiss it. In deciding a contested motion to convert under section
> 706(a), with sections 706(d) and 1112(b)(4) in mind, courts consider the "totality
> of the circumstances," including the factors set forth in 1112(b)(4).

*Id.* at *6.

As in *NLG*, at least two of Section 1112(b)(4)'s "cause" factors are present here:

"substantial or continuing loss to or diminution of the estate and the absence of a reasonable

likelihood of rehabilitation," and "inability to effectuate substantial consummation of a confirmed

plan." *See In re NLG*, 2023 WL 2053920, at *6.  As noted above, the Debtor's liabilities increased

by over $1.2 million in the nine (9) months since December 31, 2023.  This has been the pattern

for years and there is no reasonable likelihood of rehabilitation.

At the time of the December 4, 2024 hearing, the Debtor had less than $5,000 in cash[85]

and does not appear capable of funding a plan of reorganization.  Without evidence, the Debtor

suggests that it may be able to obtain financing for a Chapter 11 plan.[86]  But any plan under

Chapter 11 would necessarily be a plan of liquidation, which can be accomplished in a more cost

effective and efficient manner through a Chapter 7.   Accordingly, this Court should not convert

this case to one under Chapter 11 and this Case should remain under Chapter 7.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should deny the Motion to Dismiss and this case

should proceed as a Chapter 7 liquidation.

---

[85] *See* Dec. 4, 2024 Tr. at 59:8-9 (Harrison); 146:2-4 (Vitale).
[86] *See* Op. Br. at 30.

**ARMSTRONG TEASDALE LLP**

/s/ Jonathan M. Stemerman
Jonathan M. Stemerman (No. 4510)
Denisse Guevara (No. 7206)
1007 North Market Street, Third Floor
Wilmington, Delaware 19801
Telephone: (302) 416-9670
jstemerman@atllp.com
dguevara@atllp.com

*Counsel to Petitioning Creditors*

Dated: March 4, 2025
        Wilmington, Delaware