# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF DELAWARE

---

In Re:                                            )
                                                  )
DIAMONDHEAD CASINO  CORPORATION                   )
                                                  )      C. A. No. 24-11354-JKS
                                                  )
ALLEGED DEBTOR.                                   )      Chapter  7
                                                  )

---

**REPLY BRIEF OF THE ALLEGED DEBTOR, DIAMONDHEAD CASINO CORPORATION, IN SUPPORT OF ITS MOTION TO DISMISS THE INVOLUNTARY BANKRUPTCY PETITION OR, IN THE ALTERNATIVE, TO CONVERT THE CASE TO CHAPTER 11**

BIGGS & BATTAGLIA
Robert D. Goldberg (Delaware Bar ID #631)
921 N. Orange Street
Wilmington, DE  19899-1489
Telephone: (302) 655-9677
email: Goldberg@batlaw.com
ATTORNEY FOR DIAMONDHEAD
CASINO CORPORATION

Dated: March 14, 2025

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT ............................................................................    1

PRELIMINARY STATEMEMT ........................................................................    1

ARGUMENT ...................................................................................................    7

I.    INASMUCH AS PETITIONERS CONCEDE THAT THEY HAVE NO
      SECURED INTEREST IN ANY PROPERTY OF THE DEBTOR, THE
      COURT HAS JURISDICTION IN THIS CASE ........................................    7

II.   THE TOTALITY OF CIRCUMSTANCES WARRANTS A FINDING
      OF BAD FAITH AND DISMISSAL UNDER 11 U.S.C §303(a)(1) ........................    7

III.  ABSTENTION IS WARRANTED IN THIS CASE UNDER 11 U.S.C.
      §305(a)(1)...........................................................................................    10

IV.   THE DEBTOR HAS NOT WAIVED ITS REQUEST FOR ATTORNEYS
       FEES .................................................................................................    15

V.    IN THE EVENT THE COURT DECLINES TO DIMSISS THE INVOLUNTARY
      CHAPTER 7 PETITION, THE CASE SHOULD BE CONVERTED TO CHAPTER
       11......................................................................................................    15

CONCLUSION ...............................................................................................    15

# <u>TABLE OF AUTHORITIES</u>

## <u>CASES</u>

*In re Forever Green Athletic Fields, Inc.,*
500 B.R. 413, 428 (Bankr. E.D. Pa. 2013) ............................................................. 10

*Hoyd  v. Trussway Holding, LLC,*
2019 WL 994048  (Del. Ch. Feb. 28, 2019) ............................................................. 12

*In re Luxeyard, Inc.,*
556 B.R.27, 640 (Bankr.D..Del. 2016) ...................................................... 8

*In re Marciano,*
446, B.R. 407 (Bankr.C.D.Cal. 2010) ...................................................... 8

*In re NLG, LLC,*
203 WL 2053920 (Bank. D. Del. Feb. 13, 2023) .................................................. 15

*Lightning Lube, Inc. v. Witco Corp.*
4 F.3d 1153 (3rd Cir. 1993) ...................................................... 3

## <u>AUTHORITIES</u>

11 U.S.C. §303(a)(1) ...................................................................... 7

11 U.S.C. §305(a)(1) ...................................................................... 10

11 U.S.C. §101(32(A) ...................................................................... 12

Federal Rule of Evidence 701 ...................................................................... 3

IRS Revenue Ruling 59-60 ...................................................................... 12

## SUMMARY OF ARGUMENT

1.      Inasmuch as the Petitioners now concede that they have no security interest whatsoever in any property of the Debtor, this Court has jurisdiction in this case.

2.      The totality of circumstances in this case warrants a finding of bad faith and dismissal under 11 U.S.C. §303(a)(1) for one or more of the following reasons: (i) the Petition was filed to collect a debt, an improper bankruptcy purpose; (ii) there are state remedies available for Petitioners to collect their debt, including one which Petitioners previously agreed to use; (iii) the Petition does not serve a valid bankruptcy purpose, since it would not serve to maximize the value of Debtor's assets; (iv) there was no evidence of any payment of a preference or dissipation of assets on the part of the Debtor; (v) the Petition was filed in breach of an agreement reached with Petitioners on November 21, 2023; and (vi) the Petitioners made no reasonable inquiry into the relevant facts and pertinent law before filing this Petition.

3.      The totality of circumstances demonstrate that this Court should exercise its discretion to abstain under 11 U.S.C. §305(a)(1) inasmuch as the interests of the creditors and the Debtor would be better served by dismissal.

4.      The Debtor did not waive its request for attorneys' fees and extensively briefed the Petitioners' bad faith in its Opening Brief.

5.      In the event the Court declines to dismiss the Involuntary Chapter 7 Petition, the case should be converted to Chapter 11.

## PRELIMINARY STATEMENT

The Petitioners' Answering Brief is replete with material, inaccurate statements of fact. These statements include, but are not limited to, the following.

1)  The Petitioners state: "[a]cording to its 10-Q ending September 30, 2024, the Debtor had not

filed its federal tax returns for the tax years 2016-2023..." (citing "Ex. 32 at 17" in footnote 34)(D.I.

39, p.14). The Form 10-Q, on which Petitioners rely, states the exact *opposite*:

> The Company and its subsidiaries file their federal tax return on a consolidated
> basis. As of September 30, 2024, the Company had not filed its federal tax returns
> for the years ended December 31, 2023, 2022, 2021, 2020, 2019, 2018, 2017 and
> 2016. **In November 2024, the Company filed these federal tax returns. No tax
> was due with these federal returns**. (Emphasis added.)(Ex. 32 at p.18, par. 7)

2)  The Petitioners state that "the Debtor does not own real property." (D.I. 39, p.3) In fact, the

Debtor owns a residential property in Diamondhead, Mississippi. (TR.II: 146:19-20;  I.D. 9-1, ¶

32) This fact appears in each Form 10-K filed by Debtor since 2011 under "Item 2. Properties."

3)  The Petitioners state that "the Court heard testimony from Deborah Vitale, Gregory Harrison,

Edson Arneault and Jeffrey Wurst." (D.I. 39, p.2). Petitioners conveniently omit Patrick Slagle,

the Vice President of Colliers, who testified that, after completing its extensive investigation of

the property, Colliers International put the Property on the market for sale at $60 million. (TRI:

19:18-20) (See, also Ex. 25)(Colliers Sales Brochure).

4) The Petitioners incorrectly claim throughout their brief that "[t]he Debtor failed to put forth *any*

evidence of value" as to the MGC Property. (Emphasis in original)(D.I. 39, p.20) (See also, D.I.

39: pages 6, 8, 10, 16). There are two types of evidence: documentary and testimonial. The Debtor

produced both. As detailed in Debtor's Opening Brief (D.I. 38, at 7-9), Ms. Vitale, Mr. Harrison

and Mr. Slagle all <u>testified</u> as to the value of the Diamondhead Property. While not repeating those

statements here, suffice it to say, Ms. Vitale expressly testified that the Company's "casino property

is a million an acre. There's no doubt about that." (TRI: 116:11-13).[1] The Debtor also submitted

---

[1] See Federal Rule of Evidence 701 Advisory Committee Notes (most courts have permitted the
owner or officer of a business to testify to the value of the business without the necessity of

<u>documentary</u> evidence as to the value of the Property, which were admitted as "Joint" Exhibits. These include: i) Joint Ex. 64 (Phoenix Gaming and Entertainment Letter of Intent to buy 25 acres of the MGC Property for $1 million per acre); ii) Joint Ex. 25 (the Colliers sales brochure, marketing the property for $60 million); iii) Joint Ex. 28 (Form 8-K filed April 3, 2023 (Entry into a Material Definitive Agreement for the purchase of 10% of the common stock of MGC for $6 million)(like Colliers' valuation, this equates to a $60 million valuation for 100% of MGC); Joint Ex. 10 (CBRE draft "Valuation" Report Completed for valuation of Tranche 3 Debentures.")(The Company, counsel for the Petitioners, and Mr. Arneault relied on the draft Newmark appraisal to structure their deal.) The Petitioners did not object to this testimony or to this documentation.

The Debtor also testified that it relied on appraisals over the last ten years (Exhibits 1, 2 and 3). The reliance on appraisals is common in the real estate world. Sellers, purchasers, banks, financial lenders and investors routinely rely on property appraisals. Management of a publicly-traded company would expose the Company and themselves to substantial liability if they were to structure a deal without having the benefit of an appraisal. Even the Petitioners requested, and were given, copies of the most recent appraisals.

5)  The Petitioners claim that "[t]he Debtor has not provided any evidence that it has received any firm offers to purchase the MGC Property, despite many years of trying. Indeed, **there is not even a written expression or indication of interest in the trial record**." (Emphasis added.)(D.I. 39, p.16). However, Mr. Slagle testified that Colliers had received expressions of interest. (TRI: 14:13-17) Mr. Harrison testified that the Company had a Letter of Intent from a group that offered $40 million "[t]o buy the land." (TRI: 72:1-3) and "[p]roof of funds has been satisfied."(TRI: 71:10-

---

qualifying the witness as an accountant, appraiser, or similar expert. See, e.g., *Lightning Lube, Inc. v. Witco Corp*. 4 F.3d 1153 (3rd Cir. 1993).

16). He testified that Ms. Vitale was on her seventh draft of a purchase agreement for a $50 million deal ("the Bruce" deal) (TRI: 72:16-19), which ended with the filing of this Petition. Ms. Vitale testified that she had cut various deals over the years which had not been funded, including one with Trump Entertainment Resorts which, unfortunately, went bankrupt. (See, Ex. 63)

Contrary to Petitioners statement, there are also written expressions or indications of interest in the trial record including: i) Joint Ex. 64 (Phoenix Gaming and Entertainment Letter of Intent to buy 25 acres of the MGC Property for $1 million per acre); and ii) Joint Ex. 28 (Form 8-K filed April 3, 2023 (Entry into a Material Definitive Agreement for the purchase of 10% of the common stock of MGC for $6 million). In addition, various emails in the record between the parties and their attorneys contain written expressions or indications of interest. (See, e.g., Ex: 12, 14, 22, 23, 54, 55)

6)   The Petitioners state that "[t]he *Debtor testified* that it has financed its operating losses by accruing some $20 million in liabilities which continue to grow *by sucking the equity (if there is any)* out of the MGC Property." (Emphasis added.)(D.I. 39, p.7). Petitioners, understandably, cite no record support for this alleged testimony inasmuch as there is no such testimony.  The  Debtor is not sucking equity "*out*" of the Property. In fact, the Debtor's management is responsible for "*putting*" all of the equity into the Property. The Property was purchased in 1993 for a mere $4 million. Mr. Harrison, a Mississippi licensed engineer with an environmental background, and Ms. Vitale, a trial attorney with an environmental background, "put" the equity "into" the Property by fighting the environmental lawsuits and obtaining the very entitlements, zoning, and Gaming Site Approval that make the Property so valuable today. Moreover, they did so at no extra cost to the Company for their legal and engineering services.

4

7) The Petitioners claim that Ms. Vitale testified "that, given the current state of pending litigation in Mississippi concerning the MGC Property, *there is a serious question as to the current value of the property*." (Emphasis added.)(D.I. 39, p.10). The Petitioners misstate the record. Ms. Vitale testified unequivocally that the Company's "casino property is a million an acre. There's no doubt about that." (TRI: 116:11-13). Ms. Vitale made it equally clear, however, that in the context of an auction, the eminent domain documentation <u>had</u> to be finalized <u>before</u> an auctioneer could put the property up for auction. Bankruptcy court auctioneers generally do not provide for due diligence periods or meetings with the property owner. Ms. Vitale made it very clear that "anybody [she] talked to..they're going to know this has to get done." (TRI: 139, 24-25)"The finalization of the easement documentation has nothing to do with the *current value of the property*. It concerns the wording and scope of the two permanent easements. Ms. Vitale was concerned that the final wording of the easements, once filed, had to be "right" or they could result in a potential loss of value in the future.

8) The Petitioners claim that "**Debtor's Management is Dissipating Assets, Showing Preference to Insiders**." (D.I. 39, p.22) Petitioners claim that "the Debtor used what little cash it received to mostly pay its insiders-Mr. (sic) Vitale and Mr. Harrison." (D.I. 39, p. 27). As the record confirms, the *Debtor* did not pay Ms. Vitale or Mr. Harrison <u>anything</u>.

9)  The Petitioners claim that Vitale made distributions to Harrison related to the Tax Lien but did not make *pari passu* distributions with other first lien holders and that "Ms. Vitale has also chosen to pay herself rent, which rent is not subject to any liens, ahead of secured creditors."(D.I. 39, p. 22). As the record confirms, the *Debtor* made no distributions or payments to Mr. Harrison. MGC <u>reimbursed</u> Mr. Harrison and two unrelated parties out of the eminent domain proceeds for property tax payments made pursuant to an agreement approved by the Board of Directors and

fully disclosed in its SEC filings. No tax lien was ever placed on the Property for these property taxes. (See Ex. 57: Liens List). Likewise, the *Debtor* did not pay Ms. Vitale any rent. *MGC* paid Ms. Vitale *some* rent. Moreover, the payment of rent is not, in any case, a dissipation of assets. The Petitioners seem to believe that Ms. Vitale, who leases a fully furnished and equipped office building to a publicly-traded company, cannot collect any rent until all of the Company's secured creditors have been paid first! This contention is meritless.

10) The Petitioners wrongly state that "the Debtor is a non-operating holding company and its subsidiary, MGC is also non-operating." The Debtor and MGC are both fully operating companies with separate Boards of Directors, separate books and records, separate bank accounts, and separate responsibilities. The Petitioners are confusing operating entities with operations.

11) The Petitioners incorrectly state that "[t]hroughout this entire period, the Debtor has been controlled by Deborah Vitale, the Debtor's CEO, and Gregory A. Harrison, Chairman of the Board of Directors." (D.I. 39, p.14) It is unclear what period Petitioners are referring to, but the Debtor has had at least five Presidents, five Chairpersons of the Board, including the Petitioner, Arneault, and numerous Board members. Ms. Vitale and Mr. Harrison serve at the pleasure and direction of the Board of Directors, which currently has six members, including the son of the General Partner of College Health and Investment, Ltd., a major creditor and shareholder, who was placed on the Board as part of a settlement agreement. (See Form 10-K, for December 31, 2023, at p.29, Note 10 and *College Health & Investment, L.P. v. Diamondhead Casino Corporation* (C.A. No. N15C-01-119)(Superior Court of the State of Delaware). In a publicly-traded company, the Board, elected by the stockholders, "controls" the company. If the Board is unhappy with the President, it can call a vote to remove her immediately. As the SEC filings confirm, Ms. Vitale does not have, and has never had, any employment agreement with the Company.

**ARGUMENT**

## I.     INASMUCH AS PETITIONERS CONCEDE THAT THEY HAVE NO SECURED INTEREST IN ANY PROPERTY OF THE DEBTOR, THE COURT HAS JURISDICTION IN THIS CASE

The Debtor questioned the Court's jurisdiction in this case since the Petitioners have been proceeding *as if* the *Debtor* owned the Diamondhead, Mississippi Property and *as if* they were entitled to the proceeds of the eminent domain settlement. The Petitioners now admit that "[n]either the Debentures, nor the Deeds of Trust securing the Debentures, provide a security interest in any **property of the Debtor**.")(Emphasis in original.)(D.I. 39, p.19) Thus, the Petitioners admittedly have a security interest only in property of Mississippi Gaming Corporation ("MGC"), which is not the *Debtor.* Therefore, Petitioners must look to MGC to obtain satisfaction on their debt under and pursuant to their security agreement with the other first lien security holders and under and pursuant to their indenture agreement in the Land Deed of Trust. Therefore, attempting to put the *Debtor* into bankruptcy serves no legitimate bankruptcy purpose.[2] Ironically, the Petitioners will likely end up in Mississippi where their security is located and where they agreed to go in the first place.

## II.    THE TOTALITY OF CIRCUMSTANCES WARRANTS A FINDING OF BAD FAITH AND DISMISSAL UNDER 11 U.S.C §303(a)(1)

The Petitioners concede that a finding of bad faith is based on a totality of the circumstances test." (D.I. 39, p.22) However, the Petitioners contend that "[d]ebt collection is a legitimate bankruptcy purpose ..."(D.I. 39, p.8) "Indeed, the *only* reason why a creditor would file an involuntary petition is to recover on a debt owed to it by a debtor." (D.I. 39, p.22) This is the identical position the Petitioners vehemently asserted in their closing argument. However, the

---

[2] Petitioners have no security interest in MGC's stock, nor did MGC guarantee the Debentures.

Petitioners do not cite a single case in support of this contention nor could they. Based on the case law cited in Debtor's brief, the use of a bankruptcy court for debt collection purposes is wholly improper and constitutes bad faith. If debt collection were a legitimate bankruptcy purpose, the bankruptcy courts would be inundated with collection cases.

The Petitioners rely on case law which only further confirms that the use of a bankruptcy court for debt collection purposes in this case is wholly improper. Petitioners rely on *In re Marciano*, 446, B.R. 407 (Bankr.D.Cal. 2010) and *In re Luxeyard, Inc*., 556 B.R.27, 640 (Bankr.D.Del. 2016). These cases underscore the need for a proper bankruptcy purpose, such as the need to prevent the unequal treatment of similarly situated creditors or to prevent management from depleting a Company's assets, neither of which is present here.

The Petitioners' contention that a bankruptcy is necessary "to protect against other creditors obtaining a disproportionate share of the debtor's assets" (D.I. 39, p. 27) does not apply in this case since the majority of the Company's debt is secured by liens on the Diamondhead Property. The order of payment is strictly determined by the date and time each lien was filed and recorded. Judgment creditors are also paid in the order in which their judgments were recorded. This is not a case where unsecured creditors are fighting over limited assets.

The Petitioners wrongly claim that "[t]he Debtor no longer asserts that Petitioning Creditors acted in bad faith because they allegedly violated provisions in the Land Deed of Trust .... and has therefore waived that argument." (D.I. 39, p 21-22). It is hard to believe Petitioners could even make such a claim since the Debtor devoted an entire section in its Opening Brief to this very issue! (See Section II B, pp.20-21)("The Petition should be dismissed inasmuch as there are state remedies available to Petitioners to collect their debt.")(D.I. 38, p. 20) The Debtor based its argument on the Land Deed of Trust which provides for a "judicial foreclosure action in

Mississippi in the event of a default." (Id. 20) The Debtor expressly argued that "[t]he [Chapter 7] filing is being used as a substitute for customary debt-collection procedures and to circumvent the state forum and Mississippi Trustee [who Petitioners] previously agreed to use in the indenture." (D.I. 38, p.21) Since the Petitioners obviously had state law remedies available to them, they did not need the protections of a Bankruptcy Court and, therefore, the filing was in bad faith. The Petitioners' repeated attempts to mislead this Court on such critical, but readily disproven matters of record, which are dispositive of issues before this Court, warrants a finding of post-petition bad faith.

The Petitioners claim that a Chapter 7 is required "[t]o prevent the insiders from continuing to prefer to themselves (as they did with respect to payments related to an eminent domain proceeding) ...." (D.I. 39, p.2)  As the Petitioners know full well, the *Debtor* made no payments to Mr. Harrison or Ms. Vitale. ***MGC*** reimbursed Mr. Harrison and two other unrelated parties for tax payments made and reimbursed Ms. Vitale for expenses paid. These payments were not, as a matter of law, preference payments. Nor were they, in *any* way, improper. The Special Court of Eminent Domain, not Ms. Vitale, awarded the eminent domain proceeds to **MGC.** The Petitioners were served with notice of the eminent domain proceedings, but made no claim for these funds. The Petitioners now contend that "the Debtor, being the parent of MGC, had an interest in the eminent domain funds, which makes the payments preferential." (D.I. 39, p.28) The Petitioners cite no legal support for this novel proposition nor could they inasmuch as it is plainly incorrect, as a matter of law.

The Petitioners claim that they made a reasonable inquiry into the facts because they read Debtor's SEC filings and hired someone familiar with the debentures and the Company. As previously shown, Petitioners got basic information wrong. In addition, the Company's financial

statements are filed on a consolidated basis. Thus, the Petitioners could not possibly discern which company or which subsidiary made a particular payment to a particular person at a particular time. This could only be gleaned from reviewing the separate checking account ledgers for the parent and each subsidiary.  Moreover, the Petitioners attempts to show that the Company debt is growing ignores the fact that the Company is a development stage entity with no revenue stream, where debt is expected to grow until a deal or sale is consummated. Of course, Colliers was working to do just that when this Petition was filed. Moreover, as Ms. Vitale testified, the Company and its auditors are working to remove approximately $4 million of old, uncollectible debt from its books and records (TRI:115:1-15).

In its Opening Brief, the Debtor argued that "the Petitioners' total disregard for the impact the filing would have on other creditors also constitutes bad faith. See, *In re Forever Green Athletic Fields, Inc.*, 500 B.R. 413, 428 (Bankr. E.D. Pa. 2013)." (D.I. 38, p. 20) The Petitioners did not respond to this argument. They simply ignored it.

## III.   ABSTENTION IS WARRANTED IN THIS CASE UNDER 11 U.S.C. §305(a)(1)

The Petitioners concede that under §305(a)(1) of the Bankruptcy Code, a Bankruptcy Court may dismiss a case if the interests of creditors <u>and</u> the debtor would be better served by such dismissal after considering the totality of circumstances.

The Petitioners claim that a Chapter 7 "is the most efficient process to repay creditors." (D.I. 39, p.31). On the contrary, in this case, a Chapter 7 is <u>not</u> "the most efficient way to repay creditors." Here, by filing this Chapter 7, the Petitioners have sabotaged "the most efficient way to repay creditors" by cutting the legs out from under Colliers just as it had started the marketing process. (TRI: 11:16)

A Chapter 7 does not "better serve" the interests of creditors <u>and</u> the Debtor. It puts the Debtor out of business. It benefits only the first lien holders to the detriment of all other secured and unsecured creditors, judgment holders, approximately 2000 shareholders and approximately 300 former employees of the Debtor. Indeed, based on the Petitioners' own position, it does not even serve the interest of the Petitioners.

The Petitioners' current position is that "[t]he <u>only</u> evidence of value before this Court is contained in the Debtor's consolidated balance sheets in its SEC filings, which include the assets and liabilities of MGC. Those filings show a book value of $5,233,204 for the MGC Property." (Emphasis added.) (D.I. 39, p.16) The Petitioners then deduct the total amount of the first lien, approximately $5.5 million, from the recorded book value, to find that even the first lien holders are under-secured by at least $300,000! (*Id.*)[3] Based on Petitioners' own position, it follows that a Chapter 7 liquidation would be an unmitigated disaster, not only for the junior lien holders, but for the Petitioners herein as well, who won't even recover the full amount of their debentures, let alone attorneys' fees. Therefore, based on Petitioners' own argument, a Chapter 7 filing would <u>not</u> serve the better interests of the Petitioners themselves, let alone the Debtor or other creditors.[4]

---

[3]    The Petitioners' current position is totally inconsistent with the testimony of Petitioners' own lawyer who testified that there was sufficient security to reach the unsecured attorneys' fees, which meant the security was sufficient to cover all twenty-one liens (approximately $11 million with interest) and any judgments against Debtor prior to that of the Petitioners, including the Judgment evidenced by Joint Exhibit 62, for approximately $400,000, inclusive of post judgment interest.

The Court may take judicial notice of the records of the Superior Court for the State of Delaware. There is one other prior Judgment in the amount of $244,537.44 without post-judgment interest. (*College Health & Investment, L.P. v. Diamondhead Casino Corporation* (C.A. No. N15C-01-119)(Superior Court of the State of Delaware).

[4]    As Judge Silverstein stated in the last bankruptcy case filed against this Debtor and equally applicable here, with respect to reliance on the value listed in the Company's books and records for fifteen years: "[t]his position is not only inconsistent with the standards for conducting an insolvency analysis, but with Petitioning Creditors investments in the Company." (D.I. 38, p.6)

The Petitioners contend that "[t]estimony regarding *potential* deals for the MGC Property are also insufficient to show the property's value at any point in time. See, e.g. *Hoyd v. Trussway Holding, LLC*, 2019 WL 994048, at *1 (Del.Ch. Feb. 28, 2019)(finding "a contemporaneous-but-unconsummated sales process provides no meaningful evidence of value.") (D.I. 39, pp. 20-21). Actually, the *Hoyd* case stands for the opposite proposition.

*Hoyd* deals with a Chancery Court's fair value appraisal right of shareholders of a manufacturing company and focuses on differing revenue projections of the parties' experts over nine years. Contrary to Petitioners' contention, the Court expressly rejected the contention that "potential acquisitions not yet close to consummation" were "outside the operative reality of an entity for appraisal purposes." *Id*. at 16. The Chancery Court found that indications of interest and the single offer for $170 million made for the company, although subsequently withdrawn, was useful, but only as a very rough reasonableness check. *Id.* at 14. The Court noted that it had discretion to consider all relevant factors to determine the going concern value of the subject company and could consider proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court..." *Id.* at 13.

Incredibly, the Petitioners' state that there is no <u>adequate</u> judicial foreclosure process in Mississippi because the "attorneys' fees awarded in the Consent Judgment are not subject to any liens on property of MGC." (D.I. 39, p 31). As suspected, the Petitioners, who have a first lien, were never concerned about collecting their debt. Their attorneys were concerned about collecting

---

The test for "insolvency" requires that an entity's property be valued at a "fair valuation." 11 U.S.C. §101(32(A). Book value reflects the original cost of the property. Fair market value is generally defined as "[t]he price at which the property would change hands between a willing buyer and a willing sell when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts." IRS Revenue Ruling 59-60. Under this test, book value provides no evidence of fair market value.

attorneys' fees! This admission explains why the attorneys circumvented the procedure set forth in the Land Deed of Trust and why they filed a federal lawsuit and then filed this bankruptcy petition instead. This admission is nothing less than an admission of bad faith. The entire course of litigation between Debtor and Petitioners, including Petitioners' choice of this bankruptcy forum, and even whether to forebear from this filing, was driven by attorneys' fees. Indeed, according to the Petitioners' version of the November 21, 2023 conference call between the parties, this Petition would not have been filed if Ms. Vitale had agreed to pay an additional $50,000 in attorneys' fees, yet another indicia of Petitioners' pre-petition bad faith.

The Petitioners further claim that the creditors' claims against the Debtor need to be "adjudicated in one forum pursuant to an established distribution scheme..." (D.I. 39, p. 31) There is nothing to adjudicate. The Debtor does not deny its debts. It fully discloses them in detail in its SEC filings. The order of payment is strictly determined by the date and time each lien was filed and recorded. That order is also disclosed in the Debtor's SEC filings. Judgment creditors are also paid in the order in which their judgments were recorded. Once the lien holders are paid, the state court Trustee, like a Chapter 7 Trustee, could distribute the remainder based on simple ratio and proportion.

The Petitioners claim "[i]t is long overdue to have the process taken over by a fair-minded independent person-and that person is the Chapter 7 Trustee to serve in this case." (D.I. 39, p.1) However, the right to put a company in bankruptcy is not based on the mere passage of time. If it were, the bankruptcy courts would be full of routine collection cases. The Petitioners also seem to have forgotten that the Company hired the Petitioner, Edson Arneault, to cut a deal. Apparently, he was neither "fair-minded" or "unwilling" or "unable" to do so. The Company retained Colliers International, an independent third-party, to monetize or sell the Property. After Colliers spent

months preparing its marketing materials and had only started to actively market the Property, the Petitioners filed the Petition herein, knowing that Colliers had interested prospects, including a casino. It appears the intent of this filing was to sabotage Colliers' efforts and prevent any success.

Incredibly, the Petitioners claim that in a Chapter 7, "[t]here would be no disruption to the Debtor's business." (D.I. 39, p.31). A Chapter 7 will kill the Company. It will be out of business. The filing of this Petition has already caused irreparable damage to the Debtor and MGC. Everything came to a halt with this filing. The investing public and non-bankruptcy attorneys make no distinction between an involuntary bankruptcy filing and a voluntary bankruptcy filing. The mere mention of a "bankruptcy" is a killer to any deal. No one will move with a bankruptcy hanging over the Company. A bankruptcy filing is nothing short of catastrophic, especially for a small company. A dismissal of this case will allow Colliers and its thousands of worldwide employees to monetize the Property or sell it in an arms' length transaction so as to get everyone paid. It is the only financial course of action that makes sense for all stakeholders involved, including Petitioners.

Finally, Petitioners contend that a Chapter 7 would somehow "stop the bleeding." (D.I. 39, p. 33). The Trustee has to get paid. Any lawyers or accountants he hires have to get paid. The auctioneer has to get paid. The property taxes have to get paid. No one is getting paid at Diamondhead. They are working for nothing. The patient is not bleeding. The patient is alive, cognizant, fully mobile, eating, and nowhere near terminal. The patient can survive and go on to live a full life with one simple deal. A Chapter 7 would only kill the patient.

**IV.    THE DEBTOR HAS NOT WAIVED ITS REQUEST FOR ATTORNEYS' FEES**

The Debtor has not waived its request for attorneys' fees based on bad faith. It briefed the Petitioners' bad faith extensively in its Opening Brief. (D.I. 38, pp.15-23). Unless and until the Court enters an Order under Section 303(i), there is nothing else for the Debtor to brief.

**V.    IN THE EVENT THE COURT DECLINES TO DISMISS THE INVOLUNTARY CHAPTER 7 PETITION, THE CASE SHOULD BE CONVERTED TO CHAPTER 11**

Despite the case law on this subject, the Petitioners continue to rely on *In re NLG,* 203 WL2053920 (Bankr.D.Del. 2023), a case filed in bad faith, in sole support of their position that the Debtor may <u>not</u> convert this case to a Chapter 11. Petitioners now also claim that the "Debtor does not appear capable of funding a plan of reorganization" This, despite the testimony of Debtor's President, who testified that she had "already talked to some people about debtor-in-possession financing...which I'm learning all about, and it's very expensive, but it takes out the debt and they'll do it." (TR.II: 147:4-9).

**CONCLUSION**

WHEREFORE, the Debtor respectfully requests that the Court grant the Motion to Dismiss or, alternatively, convert the case to one under Chapter 11 of Title 11 of the U.S. Code and grant such other and further relief as the Court deems proper.

Dated: March 14, 2025.

Respectfully submitted,
BIGGS & BATTAGLIA

/s/ Robert D. Goldberg
Robert D. Goldberg (Delaware Bar ID #631)
921 N. Orange Street
Wilmington, DE  19899-1489
Telephone: (302) 655-9677
Goldberg@batlaw.com

*Attorney for Diamondhead Casino Corporation*

15