# EXHIBIT A

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>DIAMONDHEAD CASINO CORPORATION,<br><br>Alleged Debtor. | Chapter 7<br><br>Case No. 24-11354 (JKS)<br><br>**Related to D.I. 9** |

## OPINION[1]

Before the Court is the Motion[2] of the Alleged Debtor Diamondhead Casino Corporation

("Diamondhead" or "Alleged Debtor") to Dismiss the Involuntary Bankruptcy Petition, or, in the

Alternative, to Convert the Case to Chapter 11 (the "Motion").[3]  For the reasons stated herein,

the Motion will be denied.

### Procedural Background

On June 12, 2024, Edson Arneault, Kathleen and James Devlin, J. Steven Emerson,

Emerson Partners, J. Steven Emerson as Successor to Steven Emerson Roth IRA, John Hawley

as Servicing Agent for Argonaut 2000 Partners, L.P., Steven Rothstein, and Barry and Irene Stark

(collectively, the "Petitioning Creditors") filed an involuntary chapter 7 petition (the

"Involuntary Petition") against Diamondhead.[4]

---

[1]  This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of
Bankruptcy Procedure 7052.

[2]  D.I. 9 (*Motion of the Alleged Debtor Diamondhead Casino Corporation to Dismiss the Involuntary Bankruptcy
Petition, or, in the Alternative, to Convert the Case to Chapter 11*).

[3]  This is the second involuntary bankruptcy petition filed against Diamondhead, the first being on August 6, 2015.
The first involuntary petition was dismissed after a finding that the petition served an improper bankruptcy purpose.
*In re Diamondhead Casino Corp.*, No. 15-11647(LSS), 2016 WL 3284674 (Bankr. D. Del. June 7, 2016).

[4]  D.I. 1.

On July 18, 2024, Diamondhead filed the Motion[5] requesting the Court: (i) dismiss the Involuntary Petition on grounds that it was filed in bad faith and without a proper purpose;[6] (ii) award fees, costs and damages under 11 U.S.C. § 303(i); (iii) abstain from exercising jurisdiction under 11 U.S.C. § 305(a)(1); or, alternatively, (iv) convert the case to one under chapter 11.

On September 3, 2024, the Petitioning Creditors filed their opposition to the Motion[7] arguing the Involuntary Petition was filed in good faith and serves a legitimate bankruptcy purpose, and therefore, no fees, costs, or damages should be awarded. They further argue that abstention is not warranted, and that Diamondhead does not have an absolute right to convert the case to chapter 11.

An evidentiary hearing on the Motion was held on December 4, 2024, and January 16, 2025. The Court heard testimony from five witnesses[8] and considered various exhibits admitted into evidence.[9] The parties also filed post-trial briefs.[10] This is the Court's ruling.

---

[5] D.I. 9.

[6] In its post-trial brief, for the first time, Diamondhead challenges the Court's jurisdiction but does not argue the purported breach of the two agreements (Land Deed of Trust and November 21, 2023 Conference Call) as asserted in the opening brief. *Compare* D.I. 9 *and* D.I. 38.

[7] D.I. 11. (*Petitioning Creditors' Answering Brief in Opposition to Motion of the Alleged Debtor, Diamondhead Casino Corporation, to Dismiss the Involuntary Bankruptcy Petition or, in the Alternative, to Convert the Case to a Chapter 11*).

[8] Diamondhead presented the testimony of three witnesses: (i) Patrick Slagle, Vice President of Retail Brokerage and Capital Markets at Colliers International (*See* Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 7:16–19 (Slagle)); (ii) Gregory Harrison, Vice President of Diamondhead, and Director and Vice President of MGC (as defined herein) (*See* Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 24:24–26:2 (Harrison)); and (iii) Deborah Vitale, President and Chief Executive Officer of Diamondhead (*See* D.I. 23; Tr. Hr'g Dec. 4, 2024 (DI 27) at 74:5–6 (Harrison)). Petitioning Creditors proffered the testimony of two witnesses who were subject to cross-examination: (i) Edson Arneault, Petitioning Creditor, debenture holder, and former chairman of the board of directors of Diamondhead (*See* Tr. Hr'g Jan. 16, 2025 (D.I. 36) at 12:5–14 (Arneault)), and (ii) Jeffrey Wurst, Esquire, counsel for the Petitioning Creditors (*See* Tr. Hr'g Jan. 16, 2025 (D.I. 36) at 48:5–49:4 (Wurst)).

[9] *See* D.I. 37 (*Notice of Admitted Exhibits*).

[10] D.I. 38 (*Post-Hearing Brief of the Alleged Debtor, Diamondhead Casino Corporation, in Support of Its Motion to Dismiss the Involuntary Bankruptcy Petition, or, in the Alternative, to Convert the Case to Chapter 11*); D.I. 39 (*Petitioning Creditors' Post-Hearing Answering Brief in Opposition to Motion of the Alleged Debtor, Diamondhead Casino Corporation, to Dismiss the Involuntary Bankruptcy Petition or, in the Alternative, to Convert the Case to a Chapter 11*); D.I. 40 (*Reply Brief of the Alleged Debtor, Diamondhead Casino Corporation, in Support of Its Motion to Dismiss the Involuntary Bankruptcy Petition, or, in the Alternative, to Convert the Case to Chapter 11*).

## Factual Background[11]

### I.    Overview of Diamondhead Casino Corporation

Diamondhead, a Delaware corporation, has had no operations since 2000.[12]
Diamondhead's September 2024 10-Q lists assets totaling $5,607,770 and liabilities totaling
$19,855,180.[13]

According to the September 2024 10-Q: "In the past, in order to raise capital to continue
to pay on-going costs and expenses, the Company has borrowed funds, through Private
Placements of convertible instruments as well as through other secured notes . . . . The Company
is in default with respect to payment of both principal and interest under the terms of most of
these instruments."[14]

In addition to the money owed to Petitioning Creditors for their Debentures (as defined
below), Diamondhead owes over $1 million to Mr. Harrison[15] and at least $620,000 to Ms. Vitale
for unpaid salary, expenses, and rent.[16]

### A) MGC and the Property

Diamondhead is a holding company whose most valuable asset is its interest in its wholly
owned subsidiary, Mississippi Gaming Corporation ("MGC").[17]   MGC owns approximately 400

---

[11]  The Court writes for the benefit of the parties and assumes familiarity with the factual history.

[12]  Diamondhead Casino Corporation Form 10-Q for the period ending September 30, 2024 at 6 (Ex. 32)
("September 2024 10-Q") ("The Company has had no operations since it ended its gambling cruise ship operations
in 2000.").

[13]  September 10-Q at 1.

[14]  September 10-Q at 6.

[15]  *See* Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 26:4 (Harrison).

[16]  *See* Ex. 4 at 12; Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 121:7–12 (Vitale).

[17]  *See* Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 27:14 (Harrison).   Diamondhead also owns a residential lot in
Diamondhead, Mississippi.   No additional evidence was presented regarding this asset.   Ms. Vitale testified that she
did not know the value of the residential lot.   Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 146:19–22 (Vitale).

acres of undeveloped land located on Interstate 10 in Diamondhead, Mississippi (the

''Property'').[18]  The Property consists of four separate parcels.[19]  On August 21, 2014, the

Mississippi Gaming Commission granted Gaming Site Approval to MGC for a 50-acre gaming

site on the east end of the Property.[20]

As set forth in the Company's 10-Q, the Alleged Debtor's

> intent was and is to construct a casino resort and other amenities on
> the Property unilaterally or in conjunction with one or more joint
> venture partners. However, the Company has been unable, to date,
> to obtain financing to move the project forward and/or enter into a
> joint venture partnership. There can be no assurance that the
> substantial funds required for the design and construction of the
> project can be obtained or that such funds can be obtained on
> acceptable terms.  In addition, the Company has been unable to
> obtain financing to sustain the Company.  Due to its lack of
> financial resources, the Company was forced to explore other
> alternatives, including a sale of part or all of the Property.[21]

For over 20 years, Diamondhead has sought to develop or sell the Property, and/or pursue

a joint venture or financing for the development of the Property, without success.[22]

There are currently 21 liens on the Property totaling approximately $8.5 million.[23]

---

[18]  *See* September 2024 10-Q at 6.

[19]  Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 147:17–20 (Vitale).

[20]  *See* Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 97:17–18 (Vitale).

[21]  Diamondhead Casino Corporation Form 10-Q for the period ending June 30, 2024 at 6 (Ex. 60) (''June 2024 10-Q''); September 2024 10-Q.

[22]  *See* Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 99–103 (Vitale); Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 70:23–25 (Harrison); *see also* Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 103:7–14 (Vitale) (''Every time we had a deal, if there was no money that came through, that was -- that end of the, we were willing to do virtually any deal we could get, but the other people just couldn't come up with the money or their financing died. Donald Trump, I mean we had a deal with him. His financing disappeared. He went bankrupt. So there you go. It wasn't us. It was them.'').

[23]  Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 114:10–11 (Vitale).

### B) Value of the Property

The evidence before the Court regarding the value of the Property is inconclusive.  Ms. Vitale testified "the casino property is a million an acre."[24]  Mr. Harrison testified regarding a letter of intent from August of 2024 offering $50 million for the Property, but no letter of intent was produced, and according to Mr. Harrison the buyer stepped away after the Involuntary Petition was filed.[25]  He also stated: "the appraisal is $57 million.  It's worth more than that.  If we sold it for $50 million, hooray.  If we sold it for $41 million, the letter of intent I have from a valid money source is $41 million, well, I'll go with that."[26]  Mr. Slagle testified that five informal expressions of interest were received in the latest round of marketing, but no one ascribed a value to the Property in those discussions.[27]  Diamondhead's September 2024 10-Q, which is consolidated and includes the accounts of Diamondhead and its wholly owned subsidiaries, lists the value of its land holdings at $4,691,430.[28]  For over 20 years, there has been no deal for the sale or development of the Property.  Furthermore, no expert testimony was presented, nor were valuations, appraisals, or letters of intent admitted into evidence, for the purpose of showing the appraised value of the Property.[29]

---

[24]  Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 116:12 (Vitale).

[25]  Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 72:11–19 (Harrison).

[26]  Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 76:6–14 (Harrison).

[27]  Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 14:15–15:3 (Slagle).

[28]  September 2024 10-Q at 7.

[29]  One valuation report and two appraisals were admitted as evidence solely for the purpose of showing that Diamondhead and MGC received and relied on the appraisals, not to prove the value of the Property.  *See* Ex. 1, Ex. 2, and Ex. 3.  *See also* Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 53:4–54:25 (discussion regarding admissibility).

## II.    The Petitioning Creditors

To raise capital to pay on-going costs and expenses, Diamondhead borrowed from various individuals and entities.[30]  The Petitioning Creditors are each holders of collateralized convertible senior debentures (collectively, the "Debentures") memorializing the terms of the loans made to the Alleged Debtor.[31]  Each of the Debentures provides that it shall bear interest at a fixed rate of 4% per annum and payable annually on March 1 of each year.[32]  The Debentures are secured by a Land Deed of Trust secured by the Property.[33]

On or about October 25, 2016, the Petitioning Creditors, other than John Hawley, filed an action against Diamondhead in the United States District Court for the District of Delaware (the "District Court Action"),[34] and on or about February 28, 2019, Mr. Hawley filed an action against Diamondhead in the Superior Court of the State of Delaware (together with the District Court Action, the "Prior Actions").[35]  These Prior Actions sought to recover the amount of $1,500,000 in principal, plus interest, due and owing under the Debentures.[36]  In December 2019, the parties entered into a settlement agreement (the "Settlement Agreement") resolving the Prior Actions and Diamondhead agreed to pay the Petitioning Creditors the principal owed on the Debentures held by the Petitioning Creditors, plus interest and other amounts.[37]  Under the terms of the Settlement Agreement, if MGC did not enter a signed written contract for the sale of the

---

[30]  *See* September 2024 10-Q at 9–16.

[31]  *See* Ex. 41; Ex. 53.

[32]  *See* Ex. 41.

[33]  Ex. 45 ("Land Deed of Trust").

[34]  Ex. 42.

[35]  *See* Tr. Hr'g Jan. 16, 2025 (D.I. 36) at 14:8–10 (Arneault).

[36]  Ex 43 at 2. D.I. 12 at ¶9.

[37]  Ex. 43.

Property by December 31, 2021, the Petitioning Creditors were entitled to a judgment based on certain agreed calculations described therein.[38]

The parties subsequently entered into an amendment to the Settlement Agreement, effective as of April 1, 2022, providing that if the Petitioning Creditors were not paid in full by March 31, 2023, they were authorized to enter into an agreed upon consent judgment.[39]

After failing to reach further agreement with Diamondhead for the Petitioning Creditors' forbearance,[40] in July 2023, the Petitioning Creditors moved to reopen the District Court Action, vacate the dismissal, and enter judgment on consent.[41]  On September 20, 2023, the District Court entered a consent judgment ("Consent Judgment") in favor of Petitioning Creditors and against Diamondhead in the principal amount of $1,500,000, plus interest and $175,000 in attorneys' fees and costs.[42]

## III.  MGC Eminent Domain Proceedings

Since 2020, MGC has been involved in eminent domain proceedings related to the Property, commenced by Cooperative Energy, in the Special Court of Eminent Domain, Hancock County, Mississippi.[43]  On October 17, 2023, that court entered an order approving a settlement in the amount of $1,000,000 and an order approving disbursement of funds to MGC.[44]  On October 20, 2023, MGC received $845,378 as part of the settlement.[45]  Certain debts were paid

---

[38] Ex. 43.

[39] Ex. 44.

[40] Tr. Hr'g Jan.16, 2025 (D.I. 36) at 52:15–21 (Wurst).

[41] Tr. Hr'g Jan.16, 2025 (D.I. 36) at 16:1–6 (Arneault).

[42] Ex. 53.

[43] *See* September 2024 10-Q at 23.

[44] September 2024 10-Q at 23.

[45] September 2024 10-Q at 23.

from the proceeds of the eminent domain settlement.[46]  The parties to the eminent domain proceeding continue to negotiate the wording of two easements.[47]  Once the easements are finalized, MGC will receive the remaining $154,622 due under the settlement.[48]

## IV.  The November 21 Conference Call

On November 21, 2023, Ms. Vitale and Messrs. Harrison, Wurst, and Arneault had a telephone conference (the "November 21 Conference Call") and discussed, among other things, the desire of certain Petitioning Creditors to be paid, a possible forbearance by the Petitioning Creditors, and the payment of Mr. Wurst's attorneys' fees.[49]  During the call, the parties discussed January 31, 2024 as the "drop-dead date" for the sale of the Property.[50]  The parties, however, dispute the meaning of "drop-dead date."  Diamondhead argues the "drop-dead date" was the date Diamondhead would list the Property for sale if Petitioning Creditors were not paid.[51]  The Petitioning Creditors argue the drop-dead-date was the date by which the Property would be sold by auction.[52]  Both Messrs. Arneault and Wurst testified that while the parties

---

[46]  *See* Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 124:4–125:14 (Vitale).

[47]  September 2024 10-Q at 23.

[48]  September 2024 10-Q at 23.

[49]  *See* Tr. Hr'g Jan. 16, 2025 (D.I. 36) at 30:4–20 (Arneault) ("[w]e were negotiating . . . the ability to recoup legal fees that we had to incur if we did not foreclose at that time and the ability to have a definitive date upon which we wouldn't have to have these discussions anymore . . . . [E]verybody was pretty tired after 10 years of continued efforts to sell it without anything being done and they wanted something definitive including reimbursement of their legal fees if they were going to stand by."); Tr. Hr'g Jan. 16, 2025 (D.I. 36) 53:6–12 (Wurst) ("Mr. Wurst would testify that by November 21st, 2023, almost four years since the original settlement agreement and seven years after the default, the petitioning creditors insisted that the property be auctioned off unless the most recent potential interests described by Ms. Vitale actually materialized in a binding written offer that would result in the petitioning creditors getting paid in full.").

[50]  *See* Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 105 (Vitale).

[51]  *See* D.I. 38 at 9; Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 33:9–15 (Harrison); Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 104:25–106:8 (Vitale). Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 76:15–21 (Harrison) ("Q: All right. And just so I'm clear, then, so the entire agreement that was reached was that if the Petitioning Creditors did not get paid in full by January 31st, 2024, Diamondhead would put the property up for sale? A: Yes, sir, all or in part. Q: That was the entire agreement? A: Yes, that was it.").

[52]  *See* Tr. Hr'g Jan. 16, 2025 (D.I. 36) at 19:4–8 (Wurst) ("Mr. Wurst would also have testified that any agreement would require that if the property were not sold by the end date of a forbearance agreement, the property needed to

discussed the terms upon which the Petitioning Creditors would continue to forbear, no oral or written agreement was reached.[53]  Mr. Harrison, on the other hand, believes there was an agreement with Messrs. Arneault and Wurst.[54]

After January 31, 2024 passed with no sale, Ms. Vitale retained Colliers International, a real estate brokerage firm, to assist in marketing and financing the development of the Property and/or the sale of all or part of the Property.[55]  Colliers announced publicly that the Property was for sale in late April or May of 2024.[56]

## V.     The Involuntary Petition

According to Mr. Wurst, following the November 21 Conference Call the parties continued to negotiate (even after the January 31, 2024 deadline), and the Petitioning Creditors deferred filing an involuntary petition to allow additional time for Ms. Vitale to complete any of "the believed-to-be deals she was pursuing."[57]  Over four months after the aforementioned January 31, 2024 drop-dead date, the Petitioning Creditors filed the Involuntary Petition on June 12, 2024.[58]

## Jurisdiction

The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for*

---

be sold by auction."); Tr. Hr'g Jan. 16, 2025 (D.I. 36) at 31:3–10 (Arneault) ("The drop-dead date, in my opinion, not being a lawyer, was a point in time that it would be auctioned off.").

[53]  Tr. Hr'g Jan. 16, 2025 (D.I. 36) at 18:5–7 (Arneault); Tr. Hr'g Jan. 16, 2025 (D.I. 36) at 56:1–11 (Wurst).

[54]  Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 45:9–15 (Harrison).

[55]  Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 8:2–25 (Slagle).

[56]  Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 21:6–7 (Slagle).

[57]  Tr. Hr'g Jan. 16, 2025 (D.I. 36) at 56:12–57:5 (Wurst).

[58]  Tr. Hr'g Jan. 16, 2025 (D.I. 36) at 56:24–25 (Wurst); D.I. 1.

*the District of Delaware*, dated February 29, 2012.  This is a core proceeding pursuant to 28

U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Analysis

### I.      Petitioning Creditors Meet the Requirements of Section 303(b)(1)

In its post-hearing brief, for the first time, Diamondhead argues that the Involuntary

Petition should be dismissed because the Court lacks jurisdiction under section 303(b)(1),[59]

because the Petitioning Creditors fail to establish that each petitioner holds an unsecured claim

totaling at least $18,600 more than the value of any lien on property of the Alleged Debtor.[60]

Diamondhead does not dispute the numerosity requirement of section 303, nor suggest that the

claims are subject to a bona fide dispute.

The Petitioning Creditors counter that they have met the requirements of section

303(b)(1) because they are not secured in any property of the Alleged Debtor.  They cite to the

Consent Judgment which includes $175,000 for attorneys' fees that are not secured, and further

argue that a federal judgment only creates a security interest in real property held by a debtor

and, here, Diamondhead is not the owner of the Property.[61]  They argue that because

Diamondhead does not own any real property, the judgment lien does not attach to anything,

rendering the entire Consent Judgment unsecured as to the Alleged Debtor.  In addition, they

note that "[n]either the Debentures, nor the Deeds of Trust securing the Debentures, provide a

security interest in any property of the Debtor."[62]  Moreover, the Petitioning Creditors argue that

---

[59]  D.I. 38 at 13.  In its Reply Brief, Diamondhead states it questioned the Court's jurisdiction since the Petitioning Creditors have been proceeding as if Diamondhead owned the Property and as if they were entitled to the proceeds of the eminent domain settlement. *See* D.I. 40 at 7.

[60]  D.I. 38 at 14.

[61]  D.I. 39 at 13 (citing 28 U.S.C. § 3201 which provides, "A judgment in a civil action shall create a lien on all real property of a judgment debtor on filing a certified copy of the abstract of the judgment . . .").

[62]  D.I. 39 at 14.

even if the Court only considered the $175,000 judgment for attorneys' fees, they remain unsecured creditors and satisfy section 303(b).[63] Finally, they maintain that secured creditors may be petitioning creditors under section 303(b)(1), and that they are under-secured in an aggregate amount exceeding $18,600.[64]

In its Reply, Diamondhead reverses its stance stating: "[i]nasmuch as Petitioners concede that they have no secured interest in any property of the [Alleged Debtor], the Court has jurisdiction in this case."[65]

Section 303(b) of the Bankruptcy Code contains three requirements for commencing an involuntary case against a debtor, such as Diamondhead, who has 12 or more creditors: (1) there must be three or more petitioning creditors; (2) each petitioning creditor must hold a claim against the debtor that is not contingent as to liability or the subject of a bona fide dispute; and (3) the claims must aggregate at least $18,600 more than the value of liens on the debtor's property.[66] The Third Circuit in *Paradise Hotel Corp.* established that the qualification of a petitioner under section 303(b)(1) is "broad enough to include a fully secured holder of a non-contingent, undisputed claim."[67] In addition, if an alleged debtor challenges an involuntary petition, section 303(h) requires the court to find the debtor is generally not paying debts as they become due, unless the unpaid debt is the subject of a bona fide dispute.[68]

---

[63] D.I. 39 at 14.

[64] D.I. 39 at 15–16.

[65] D.I. 40 at 7.

[66] 11 U.S.C. § 303; *see also In re Forever Green Ath. Fields, Inc.*, 804 F.3d 328, 335 (3d Cir. 2015); *In re PTGi Int'l Carrier Servs.*, No. 24-12603 (TMH), 2025 Bankr. LEXIS 620, *8 (Bankr. D. Del. Mar. 14, 2025).

[67] *Paradise Hotel Corp. v. Bank of Nova Scotia*, 842 F.2d 47, 49 (3d Cir. 1988); *see also In re King*, 664 B.R. 162 (B.A.P. 9th Cir. 2024) (holding section 303(b) does not prevent secured creditors from qualifying as either a petitioning creditor or a countable creditor).

[68] 11 U.S.C. §303(h)(1).

The record reflects that the Petitioning Creditors have a Consent Judgment against Diamondhead in the principal amount of $1,500,000, plus interest and $175,000 in attorneys' fees and costs. The Petitioning Creditors represented that they did not file a certified copy of the abstract of judgment in any manner because Diamondhead does not own any real property, and, as a result the lien does not attach to anything.[69] It is undisputed that Diamondhead does not own the Property; MGC owns the Property.[70]

The Court finds that the evidence establishes, and it is now undisputed, that: (1) there are more than three Petitioning Creditors, (2) each Petitioning Creditor holds a claim against the Alleged Debtor that is not subject to dispute, and (3) the claims against Diamondhead aggregate at least $18,600 more than the value of any lien on the property of the Alleged Debtor. The evidence also shows Diamondhead is not paying its debts as they come due.[71] Thus, the Court finds that the requirements of section 303(b)(1) are satisfied, and the Court has jurisdiction over this matter.

## II.    The Involuntary Petition was Not Filed in Bad Faith

Diamondhead next argues that the Involuntary Petition was filed in bad faith because there is no legitimate bankruptcy purpose.[72] First, Diamondhead argues the Petitioning Creditors

---

[69] *But see* Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 146:19–24 (Vitale) (Testifying that Diamondhead owns a residential lot in Diamondhead, Mississippi).

[70] The Petitioning Creditors' first priority lien related to the Debentures is a lien on MGC property, not Diamondhead property. *See* Ex. 41 (*First Tranche Collateralized Convertible Senior Debenture*) at Section 2.3 ("The Company is securing its obligations to pay the principal of and all interest on this Debenture by executing and recording a Deed of Trust.").

[71] *See, e.g.*, Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 120:5–8 (Vitale) (Testifying that Diamondhead is not able to pay its obligations as they become due and is in default of all major debentures and promissory notes); Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 60:11–23 (Harrison) (Testifying that Diamondhead does not have funds to pay directors' fees or Mr. Harrison's accrued salary).

[72] D.I. 38 at 15–16. In its Motion, Diamondhead argues the Involuntary Petition was filed in bad faith because the Petitioning Creditors breached two agreements (Land Deed of Trust and November 21, 2023 Conference Call), but abandons those arguments in its post-trial brief. The evidence does not support a finding of bad faith based on a purported breach of the two agreements. First, no evidence was presented regarding the Land Deed of Trust which

filed the Involuntary Petition to get their debts paid and contends an involuntary petition may not be used as a substitute for customary debt-collection procedures.[73]   Second, Diamondhead argues there are adequate state law remedies available, including a judicial foreclosure action in Mississippi as described in the Land Deed of Trust.[74]   Third, Diamondhead claims there must be a plausible reason to believe the bankruptcy system is necessary to maximize recovery for creditors, and the only way to maximize value for creditors is to avoid selling the Property at a decreased value in a chapter 7 bankruptcy case.[75]   Fourth, Diamondhead asserts there is no evidence of preferential payments or dissipation of assets.[76]   Diamondhead maintains that the only funds used to make payments came from the eminent domain settlement which are funds of MGC, not Diamondhead.[77]   Fifth, Diamondhead claims the Petitioning Creditors failed to make a reasonable inquiry into the relevant facts and law.[78]

The Petitioning Creditors counter that collecting on a debt is a valid bankruptcy purpose, especially because Diamondhead is not paying its debts as they come due and there are amounts owed to multiple creditors holding debts of various priority—including debts *pari passu* to one another.[79]   They argue that when a debtor is a corporation, the purpose of a chapter 7 case is to distribute assets as part of a fair and orderly liquidation for creditors and that a chapter 7 liquidation is the most efficient way to accomplish such a distribution.[80]   They further maintain

---

relates to MSG, not Diamondhead. Second, the evidence demonstrates that the parties did not reach agreement on the November 21 Conference Call and, as a result, no agreement was breached.

[73] D.I. 38 at 16.

[74] D.I. 38 at 17–18.

[75] D.I. 38 at 18–19.

[76] D.I. 38 at 19.

[77] D.I. 38 at 19–20.

[78] D.I. 38 at 23.

[79] D.I. 39 at 17.

[80] D.I. 39 at 19–20 (citing *In re Nash Engineering Co.*, 643 B.R. 654, 662 (Bankr. D. Conn. 2022)).

that Diamondhead used what little cash it received from the eminent domain settlement to pay insiders.[81]  Lastly, the Petitioning Creditors argue that they made reasonable inquiry into the facts and law because, among other things, Diamondhead's financial information is public in 10-Qs and other SEC filings, Mr. Arneault, one of the Petitioning Creditors, is the former Chairman of the Board of Diamondhead, the Petitioning Creditors and Diamondhead have had numerous discussions over the years, and the Petitioning Creditors retained experienced bankruptcy counsel to represent their interests.[82]

An involuntary petition is an "extreme remedy with serious consequences to the alleged debtor" and may be dismissed for bad faith even if the petitioning creditors satisfy the statutory criteria.[83]  The Third Circuit has counseled that "the good faith requirement ensures that the Bankruptcy Code's careful balancing of interests is not undermined by petitioners whose aims are antithetical to the basic purposes of bankruptcy."[84]  In *In re Forever Green Athletic Fields, Inc.*, the Third Circuit adopted a fact-intensive "totality of the circumstances" approach for determining bad faith under section 303.[85]  The Court explained that some factors to consider in making such a determination include whether:

> the creditors satisfied the statutory criteria for filing the petition; the involuntary petition was meritorious; the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing; there was evidence of preferential payments to certain creditors or of dissipation of the debtor's assets; the filing was motivated by ill will or a desire to harass; the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect

---

[81]  D.I. 39 at 22.

[82]  D.I. 39 at 24.

[83]  *In re Forever Green Ath. Fields, Inc.*, 804 F.3d 328, 335 (3d Cir. 2015); *In re McDonald Trucking Co., Inc.*, 76 B.R. 513, 516 (Bankr. W.D. Pa. 1987) ("The filing of an involuntary petition by a creditor must be carefully scrutinized by the Court because such an action is extreme in nature and carries with it serious consequences to the public embarrassment.").

[84]  *In re Forever Green Ath. Fields, Inc.*, 804 F.3d at 334 (citing *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119 (3d Cir. 2004)).

[85]  *Id.*; *See also In re Diamondhead Casino Corp.*, 540 B.R. 499, 507 (Bankr. D. Del. 2015).

against other creditors doing the same; the filing was used as a tactical advantage in pending actions; the filing was used as a substitute for customary debt-collection procedures; and the filing had suspicious timing.[86]

The Third Circuit also held that when a motion to dismiss an involuntary petition is filed pursuant to section 303, "in terms of allocating burdens of proof, [petitioning] creditors are presumed to have acted in good faith," and "[t]o dismiss the petition, the [alleged] debtor must show by a preponderance of the evidence that the [petitioning] creditors acted in bad faith."[87]

The Court considers the various *Forever Green* factors to determine whether the Petitioning Creditors acted in bad faith.

### A) Petitioning Creditors Made a Reasonable Inquiry into the Facts and Law

The evidence shows that the Petitioning Creditors made a reasonable inquiry into the facts and law prior to filing the Involuntary Petition. The Petitioning Creditors have been creditors of Diamondhead since 2014 when they received their Debentures. They have been represented by counsel since at least the time the debenture holders filed their 2016 lawsuit against Diamondhead.[88] As discussed above, the Petitioning Creditors pursued the Prior Actions against Diamondhead, including negotiating the Settlement Agreement, an extension of that agreement, and the Consent Judgment. Months prior to filing the Involuntary Petition, the Petitioning Creditors requested the November 21 Conference Call to discuss payment of their debt, a possible forbearance, and the sale of the Property. According to Mr. Wurst, following the

---

[86] *Id.*

[87] *Id.* (citing *In re Bayshore Wire Prods. Corp. (In re Bayshore Wire Prods.)*, 209 F.3d 100, 105 (2d Cir. 2000)). On the other hand, in *In re Tamecki*, 229 F.3d 205, 207 (3d Cir. 2000), the Third Circuit held that a motion to dismiss filed pursuant to section 707(a) "calls into question a petitioner's good faith, the burden shifts to the petitioner to prove his good faith." The Alleged Debtor moved to dismiss the Involuntary Petition under section 303 of the Bankruptcy Code, not section 707. *See* Motion at 1.

[88] See Ex. 42.

November 21 Conference Call the parties continued to negotiate, and the Petitioning Creditors deferred filing an involuntary petition to allow additional time for Ms. Vitale to complete any deals she was pursuing.[89]

The record establishes, among other things, that the Petitioning Creditors were aware of (a) ongoing efforts to develop, sell, and/or enter into a financing transaction with respect to the Property over the years, (b) the various appraisals for the Property, (c) the Gaming Site Approval for the Property; (d) the pending eminent domain proceeding;[90] and (e) the retention of Colliers[91] and the marketing brochure it prepared.  The Petitioning Creditors were in regular contact with Ms. Vitale and Mr. Harrison regarding the company, the debt, and the status of efforts to sell or develop the Property.

Diamondhead contends that the Court's 2016 opinion dismissing the first involuntary petition addresses many of the legal arguments presented to this Court.  However, the facts surrounding the instant petition are distinguishable.  The 2015 involuntary chapter 7 petition was filed by a different set of petitioners.[92]  That petition was filed on the heels of a proxy fight, and the court found the petitioners were acting more as shareholders than as creditors in an effort to effectuate a change in management through the bankruptcy process.[93]  In the nine years since the first involuntary petition was filed, Diamondhead's financial condition has further deteriorated; Diamondhead's total liabilities exceeded $19 million as of September 30, 2024 and that amount

---

[89]  Tr. Hr'g Jan. 16, 2025 (D.I. 36) at 56:12–57:5 (Wurst).

[90]  Tr. Hr'g Dec. 4, 2025 (D.I. 27) 51:24–52:3 (Harrison) ("[T]hey notified us in every way possible, to include the newspaper. And so, I pointed out to Ted Arneault, I said, you and your attorney got these notices and you all chose not to go to Mississippi and petition for a percentage of the eminent domain.").

[91]  *See* Tr. Hr'g Dec. 4, 2025 (D.I. 27) 44:15–19 (Harrison) ("Deborah was in communication with them all the time, so they knew. When we signed on, they knew.").

[92]  *See In re Diamondhead Casino Corp.*, No. 15-11647 (LSS), 2016 Bankr. LEXIS 2450 at *2 (Bankr. D. Del. June 7, 2016) (Listing the petitioners).

[93]  *Id.* at *54.

continues to increase.[94]   Likewise, the Petitioning Creditors' debt has continued to accumulate. The facts demonstrate that the Petitioning Creditors made the requisite inquiry, and were well-aware of, the relevant facts and law.

### B) There is Evidence of Dissipation of Assets

The Court next turns to consideration of preferential payments and dissipation of assets. The Petitioning Creditors have not provided clear evidence of preferential payments, but there is evidence of dissipation of assets.

Ms. Vitale testified she paid herself $99,000 for out-out-pocket expenses after receiving the eminent domain proceeds.[95]   It is not clear from the record whether that money was paid to satisfy debts owed by Diamondhead or MGC.   Nor is it clear whether that payment was made by Diamondhead or MGC.   Ms. Vitale also testified about other individuals who loaned against the eminent domain proceedings and were paid back immediately from the eminent domain settlement proceeds.[96]   Diamondhead's 10-Qs reflect that the two individual lenders were paid $20,000 each out of the proceeds of the eminent domain settlement.[97]   The Diamondhead 10-Qs are consolidated and include the accounts of both Diamondhead and its wholly owned subsidiaries.[98]   Like the $99,000 payment to Ms. Vitale, it is unclear whether the payments to the two individuals were for debts owed by Diamondhead or MGC.

---

[94] *See* September 2024 10-Q at 1 (listing total liabilities as of December 31, 2023 at $18,676,733 and total liabilities as of September 30, 2024 at $19,855,180).

[95] Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 124:11–12 (Vitale).

[96] Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 125:6–14 (Vitale).

[97] June 2024 10-Q at 15; September 2024 10-Q at 15.

[98] *See* June 2024 10-Q at 7; September 2024 10-Q at 7.

In addition, Mr. Harrison testified he received $102,000 from the eminent domain settlement for repayment of a short-term loan he provided to pay property taxes.[99]  The Court disagrees with the Petitioning Creditors' characterization of loan repayments to Mr. Harrison as preferential payments made by Diamondhead.  Mr. Harrison was repaid on account of certain promissory notes issued to him for his payment of the Property taxes.[100]  The July 28, 2023, promissory note is between Mr. Harrison and MGC, not Diamondhead.[101]  The evidence also shows the payments made to Mr. Harrison on account of that debt came directly from an MGC checking account.[102]  Thus, the repayment of Mr. Harrison's loan was not a payment from Diamondhead, but rather a payment from MGC out of eminent domain settlement proceeds for a debt owed by MGC.

With respect to the dissipation of assets, Diamondhead's SEC filings show the assets of the Company are steadily decreasing as liabilities increase.  As of December 31, 2023, total assets were $5,814,030.[103]  As of June 30, 2024, total assets were $5,662,651.[104]  By September 30, 2024, total assets were $5,607,770.[105]  The liabilities, on the other hand, continue to increase.  As of December 31, 2023, total liabilities were $18,676,733.[106]  As of June 30, 2024, total

---

[99]  Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 55:17–21 (Harrison).

[100]  *See* June 2024 10-Q at 16 (explaining the board of directors issued two different promissory notes to the Chairman, Mr. Harrison, on February 17, 2023, and July 28, 2023, totaling $100,000 which were repaid by the company out of the eminent domain proceedings).

[101]  Ex. 35.

[102]  Ex. 37.

[103]  June 2024 10-Q at 1.

[104]  June 2024 10-Q at 1.

[105]  September 2024 10-Q at 1.

[106]  June 2024 10-Q at 1.

liabilities were $19,471,680.[107]  By September 30, 2024, total liabilities were $19,855,180.[108]
And, as previously noted, Diamondhead has no operations, no source of income, and is unable to
pay its debts as they become due.

### C) The Filing Was Not Motivated by Ill-Will or a Desire to Harass

Next, the evidence does not show the Petitioning Creditors are motivated by ill-will or
personal disputes.  On the contrary, the email exchanges in evidence and the testimony presented
show that the Petitioning Creditors and Diamondhead communicated and worked cooperatively
for years.[109]  The Petitioning Creditors do not hide that they want to be paid after years of
waiting.[110]  However, a desire to be paid is not unreasonable under the circumstances, nor is it on
its face evidence of ill-will or a desire to harass.  Instead, the evidence shows that for almost a
decade there were good faith attempts by certain Petitioning Creditors to help develop the
Property and negotiate forbearance agreements.

### D) The Petitioning Creditors Did Not Use the Filing to Obtain a Disproportionate Advantage for Themselves

Diamondhead does not argue, and the evidence does not show, that the Petitioning
Creditors used the involuntary chapter 7 filing to obtain a disproportionate advantage for
themselves.  The Court finds this factor weighs against a finding of bad faith.

---

[107]  June 2024 10-Q at 1.

[108]  September 2024 10-Q at 1.

[109]  *See e.g.,* Ex. 23 (Ms. Vitale telling Mr. Harrison, "Ted Arneault called me today. We had a nice talk"); Ex. 27
(Mr. Arneault telling Mr. Harrison, "Please keep in touch and we'll make it a positive experience to get this done so
that everybody gets what they want, including your shareholders and all of the note holders").

[110] Tr. Hr'g Jan 16, 2024 (D.I. 36) at 54:11–14 (Wurst) ("[W]hile the November 21st, 2023 call was cordial, [Mr.
Wurst] made it clear that the petitioning creditors no longer had any patience and were insisting on getting paid
promptly.").

### E) The Filing Was Not Used as a Tactical Advantage in Pending Actions

Diamondhead does not argue, and no evidence was presented, that the Involuntary

Petition was filed as a tactical advantage in a pending action or litigation.  In fact, no evidence

was presented of any pending litigation between the parties in which the Petitioning Creditors

could gain a tactical advantage.  The Court finds this factor weighs against a finding of bad faith.

### F) Bankruptcy is Not Being Used as a Substitute for Customary Debt Collection Procedures

Diamondhead argues there are state law remedies available for the Petitioning Creditors

to collect their debt.  First, it contends the Petitioning Creditors must commence a judicial

foreclosure action in Mississippi state court as provided for in the Land Deed of Trust.[111]

However, the foreclosure action is not an exclusive remedy.[112]  Second, Diamondhead argues the

Petitioning Creditors can pursue their collection rights pursuant to the Consent Judgment using

customary debt-collection procedures.[113]  While it may be possible to collect on the Consent

Judgment outside of bankruptcy, bankruptcy is an efficient forum to effectuate the orderly

collection, liquidation, and distribution of the assets of a corporation, like Diamondhead, for the

benefit of all creditors, particularly where there are many creditors with varying levels of priority

including debts that share *pari passu* to one another.[114]

---

[111] D.I. 38 at 17; Land Deed of Trust at 2.

[112] Land Deed of Trust at 2 ("If Debtor shall be in default as provided in Paragraph 7, then, in that event, the entire Indebtedness, together with all interest accrued thereon, shall, *at the option of Secured Party*, be and become at once due and payable with notice to Debtor, and Trustee shall, at the request of Secured Party, institute a judicial foreclosure action to sell the Property conveyed . . . .") [emphasis added].

[113] D.I. 38 at 17.

[114] *In re Nash Eng'g Co.*, 643 B.R. 654, 662 (Bankr. D. Conn. 2022) (explaining that when the debtor is a corporation, the only purpose of a chapter 7 case is to marshal and distribute assets as part of the fair and orderly liquidation of assets for creditors); *Asociación de Titulares de Condominio Castillo v. DiMarco (In re Asociación de Titulares de Condominio Castillo)*, 581 B.R. 346, 362 (B.A.P. 1st Cir. 2018) (holding that only purpose served in a chapter 7 case for a non-individual is the fair and orderly liquidation of assets for creditors); *In re Boca Vill. Ass'n*, 422 B.R. 318, 324 (Bankr. S.D. Fla. 2009) (agreeing that the only purpose served in a corporate chapter 7 case is the fair and orderly liquidation of corporate assets to creditors); *In re Int'l Zinc Coatings & Chem. Corp.*, 355 B.R. 76,

Diamondhead cites to *In re Murray*[115] and *In re Peto Fill, Inc.*[116] for the proposition that Petitioning Creditors must resort to state court remedies.  *In re Murray* is distinguishable.  That case involved an individual debtor who moved to dismiss an involuntary chapter 7 case filed against him by his sole creditor.  The individual debtor's sole asset was a residential cooperative apartment which he held with his wife in a tenancy by the entirety.[117]  There, the court found the purpose of the involuntary petition was to take advantage of bankruptcy remedies which would allow the petitioner to force a sale of the apartment notwithstanding the debtor's wife's interest, rather than using state law remedies which would permit the petitioner to execute only on the debtor's interest.[118]  The Second Circuit affirmed the bankruptcy court's finding that "the petition was simply a judgment enforcement tactic for a two-party dispute for which there were adequate remedies under state law and that continuing the case would not serve any bankruptcy purposes such as ensuring equal distribution among creditors or otherwise protecting assets from depletion."[119]  The instant case is not a two party dispute with petitioners attempting to take advantage of the bankruptcy laws to gain a benefit they could not obtain in state court.  Rather, this case involves a corporation with depleting assets and numerous creditors who will collectively reap the benefits of an orderly liquidation and distribution in accordance with the priorities set forth in the Bankruptcy Code.

---

85 (Bankr. N.D. Ill. 2006) (explaining that corporate chapter 7 cases serve the limited purpose of permitting the fair and orderly liquidation of corporate assets).

[115]  900 F.3d 53, 59–60 (2d Cir. 2018).

[116]  144 B.R. 26, 31 (Bankr. W. D. Pa. 1992).

[117]  *In re Murray*, 900 F.3d at 57.

[118]  *Id.*

[119]  *Id.* at 56.

In fact, the Second Circuit in *Murray* observed that there is a greater need for the collective remedies available only in bankruptcy in those cases where the value of a debtor's interest is speculative and there are more creditors.[120] Here, the value of Diamondhead's underlying interest is speculative and there is a larger creditor body, showing a greater need for the collective remedies found only in bankruptcy court.

*In re Petro Fill* is also inapposite as the alleged debtor in that case was generally paying its debts as they came due (except debts allegedly owed to petitioning creditors because of a dispute between Petro Fill's sole shareholders and the resultant deadlock concerning its control and operation), and the chapter 7 proceeding was filed as an alternative to the dissolution of a deadlocked corporation in state court.[121] The bankruptcy court held that state court remedies were available for deadlocked corporations to attain the same result they sought in the bankruptcy case.[122] Here, Diamondhead is not paying debts as they become due and there is no such corporate gridlock with a corresponding state law procedure on point to accomplish the result that the Petitioning Creditors seek in bankruptcy.

Diamondhead next argues that collecting a debt is an impermissible use of the bankruptcy court.[123] It contends that the purpose of a chapter 7 proceeding is to achieve a greater distribution among unsecured creditors than would otherwise be available outside of bankruptcy,

---

[120] *Id.* (citing *In re Tsunis*, 39 B.R. 977, 979 (E.D.N.Y. 1983), *aff'd*, 733 F.2d 27 (2d Cir. 1984) (per curiam) ("This case can be distinguished from *In re Tsunis*, in which a district court, in the context of an involuntary petition, found that New York proceedings were inadequate in part because of the speculative value of the debtor's interest. In that case, because four creditors filed the petition, there was a greater need for the collective remedies available only in bankruptcy court.").

[121] *See In re Petro Fill, Inc.*, 144 B.R. at 31.

[122] *Id.*

[123] *See* D.I. 38 at 15–16.

and that a sale of the Property in bankruptcy will result in a loss of value.[124]  Diamondhead also

suggests the filing of the Involuntary Petition was driven by collection of attorneys' fees.[125]

Diamondhead insists that the value of the Property is more than enough to pay all

creditors if the Property is sold.  Diamondhead claims there are parties interested in the Property

and appraisals reflecting a value worth tens of millions of dollars.  In other bankruptcy contexts,

courts typically look to the fair market value to determine the value of property in bankruptcy.[126]

It has been held that the fair market value is ". . . the price which a willing seller under no

compulsion to sell and a willing buyer under no compulsion to buy would agree upon after the

property has been exposed to the market for a reasonable time."[127]  Real property valuations are

generally supported by expert testimony and appraisals.[128]

In this case, no firm offers to purchase the Property exist, no expert testimony was

presented regarding the value of the property at the hearing, and no appraisals of the Property

were submitted into evidence for the purpose of proving value of the Property.  Diamondhead

has been trying to sell or develop the property for over 20 years, and any potential deals have

failed to close, including recent talks with a potential buying group which did not materialize.[129]

Since the Involuntary Petition was filed in June 2024, Diamondhead has not apprised the Court

of any new offers to purchase, letters of intent, or alterative transactions.  As a result, the Court is

---

[124]  D.I. 38 at 19.

[125]  *See* D.I. 40 at 12–13.

[126]  *See e.g., In re Heritage Highgate, Inc.*, 679 F.3d 132, 142 (3d Cir. 2012); *Rodgers, Powers & Schwartz, LLP v. Minkina (In re Minkina)*, 79 F.4th 142, 152 (1st Cir. 2023); *David G. Waltrip, LLC v. Sawyers (In re Sawyers)*, 2 F.4th 1133, 1138 (8th Cir. 2021).

[127]  *In re McElwee*, 449 B.R. 669, 676 (Bankr. M.D. Pa. 2011) (citing *In re Serda*, 395 B.R. 450, 453–54 (Bankr. E.D. Cal. 2008)).

[128]  *See e.g., In re Majestic Star Casino, LLC*, 457 B.R. 327, 340 (Bankr. D. Del. 2011), order aff'd, appeal dismissed, No. BR 09-14136-KG, 2013 WL 6504624 (D. Del. Dec. 10, 2013); *In re McElwee*, 449 B.R. at 676; *In re Creekside Sr. Apartments, LP*, 477 B.R. 40, 51 (B.A.P. 6th Cir. 2012).

[129]  *See* Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 74:13–14 (Harrison).

not in a position to adopt any of the various values that Ms. Vitale and Mr. Harrison, both of whom are not experts for the purpose of appraising real property, allege.[130]

The facts show more than two decades of attempted sales and/or development of the Property to no avail, increased liabilities, decreased assets, and a Company that is unable to pay its debts as they come due. Stopping losses and marshaling and distributing the assets of a corporate debtor in a fair and orderly fashion for the benefit of all creditors is the primary purpose of any corporate chapter 7 case.[131]

As to the argument that the Involuntary Petition was filed to recover attorneys' fees, the evidence shows otherwise. Mr. Arneault testified that his motivation was to recover on the debt owed to him because he believes his money is in danger after ten years of waiting for progress. He stated at the evidentiary hearing, "until you get it back there is no question that it's in danger. Having [the Property] have a certain value is one thing. Having the willingness to collect on any value that would pay the debenture holders is a different thing."[132]

Based on the evidence, the Court finds the bankruptcy was not filed as an improper substitute for customary debt-collections procedures.

---

[130] *See e.g., In re Smith*, 267 B.R. 568, 574−75 (Bankr. S.D. Ohio 2001) (holding that real estate broker of 30 years with limited appraisal training was qualified as expert for purposes of providing valuation testimony but admitting it was a close call). *Hebbler v. Turner*, No. CIV.A. 03-388, 2004 WL 414821, at *3 (E.D. La. Mar. 3, 2004) (disqualifying commercial real estate agent for purposes of providing opinion on valuation of commercial property because agent was neither a licensed real estate broker nor licensed appraiser, agent's opinion was only based on personal experience, review of lease documents and interviews with property owners, and agent could not demonstrate generally accepted methods of appraisal and did not offer indication of method she used to come to her opinion).

[131] *See supra* footnote 114.

[132] *See* Tr. Hr'g Jan. 16, 2025 (D.I. 36) at 38:2–7 (Arneault).

### G) The Timing of the Filing Was Not Suspicious

Diamondhead does not argue, and the evidence does not show, that the timing of the Involuntary Petition was suspicious.  The Court finds this factor does not support a finding of bad faith.

### H) The Totality of the Circumstances Weighs Against a Finding of Bad Faith

For the reasons discussed herein, under the *In re Forever Green Athletic Fields* totality of the circumstances test, the Court finds that Diamondhead has not proved by a preponderance of the evidence that the Involuntary Petition was filed in bad faith.

## III.    The Case Should Not be Converted from Chapter 7 to Chapter 11

Diamondhead argues that in the event the Motion is denied, the case should be converted to a case under chapter 11.  Diamondhead maintains that a chapter 7 debtor has a near unbridled right to convert the case to chapter 11.

The Petitioning Creditors, on the other hand, assert that the right of a chapter 7 debtor to convert the case to chapter 11 is limited by the express language of section 706(d).  The Petitioning Creditors argue Diamondhead does not qualify for chapter 11 pursuant to section 1112(b)(1) as cause would exist for the Court to convert a chapter 11 case to chapter 7.  More specifically, the Petitioning Creditors assert there is a substantial or continuing loss to or diminution in the estate and an inability to effectuate substantial consummation of a confirmed plan.

Section 706(a) of the Bankruptcy Code provides that the debtor may convert a case under chapter 7 to a case under chapter 11 at any time if the case has not been converted under section 1112.[133]  The Supreme Court in *Marrama v. Citizen's Bank*, and this Court in *In re NLG*, held that

---

[133]  11 U.S.C. § 706(a).

a debtor's right to convert a chapter 7 case to another chapter is not absolute.[134]  Instead, section 706(a) must be read in conjunction with section 706(d) which states "a case may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter."[135]

A debtor may not qualify as a debtor under chapter 11 if, pursuant to section 1112(b)(1), cause exists for the court to convert a debtor's chapter 11 case to a chapter 7 case or dismiss it.[136] In deciding a motion to convert under section 706(a), courts consider "the totality of the circumstances," including the factors set forth in section 1112(b)(4).[137]  Here, the record reflects cause exists for denying Diamondhead's request to convert the case to chapter 11.  Specifically, there is a substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation.[138]

Diamondhead has incurred continuing losses over the past several years, has no operations, and generates no operating revenues.[139]  The September 2024 10-Q shows an increase of approximately $400,000 in liabilities from the period ending June 30, 2024, and approximately $1.2 million from the period ending December 31, 2023.[140]

---

[134] *Marrama v. Citizens Bank*, 549 U.S. 365, 372 (2007) (holding that the words "unless the debtor may be a debtor under such chapter" expressly conditions a debtor's right to convert on its ability to qualify as a "debtor" under that chapter); *In re NLG, LLC*, No. 21-11269 (JKS), 2023 Bankr. LEXIS 398, *9 (Bankr. D. Del. Feb. 16, 2023) ("[S]ection 706(a) does not give the Debtor the absolute right to convert the chapter 7 case to a case under chapter 11.").

[135] *Id.*

[136] *In re NLG*, 2023 Bankr. LEXIS 398 at *10.

[137] *Id.* (citing *Nimoityn v. Schubert (In re Nimoityn)*, No. 21-CV-02709, 2022 U.S. Dist. LEXIS 30351, 2022 WL 523601, at *1 (E.D. Pa. Feb. 22, 2022)).

[138] *See* 11 U.S.C § 1112(b)(4)(A).

[139] September 2024 10-Q at 6.

[140] *See* June 2024 10-Q at 1; September 2024 10-Q at 1.

Mr. Harrison was asked if Diamondhead had the cash to pay its debts as they become due and replied: "Well, up until this minute, I mean, it's sort of been, I've been the one taking care of that."[141]  According to Mr. Harrison, Diamondhead has approximately $11 million of debt, owes interest on liens, has defaulted on a number of loans, and does not have the money to pay director fees.[142]  He testified that Ms. Vitale, the only person on Diamondhead's payroll, has not been paid since June 2015 because Diamondhead does not have the money to pay her.[143]  He also testified he is owed approximately $1 million, of which $150,000 is for director fees, and an additional $170,000 or so in his capacity as an employee (with interest accruing).[144]  Mr. Harrison explained he is also owed money related to the Property taxes, an SEC audit report, and other things.[145]

Ms. Vitale also confirmed that the Alleged Debtor is not paying debts when due and is "in default of all of our major debentures and promissory notes."[146]  She testified that Diamondhead's liabilities "increase daily because of the interest rate on all the debt, on all the debentures and promissory notes."[147]  She also testified that Diamondhead continues to accrue her salary (director fees) and rent[148] and that she is owed $620,000 in unpaid rent.[149]  Importantly, both Mr. Harrison and Ms. Vitale testified that Diamondhead's liabilities, including

---

[141]  Tr. Hr'g. Dec. 4, 2024 (D.I. 27) at 59:12–15 (Harrison).

[142]  Tr. Hr'g. Dec. 4, 2024 (D.I. 27) at 59:16–60:5 (Harrison).

[143]  Tr. Hr'g. Dec. 4, 2024 (D.I. 27) at 60:19–24 (Harrison).

[144]  Tr. Hr'g. Dec. 4, 2024 (D.I. 27) at 60:6–61:4 (Harrison) (Mr. Harrison has since requested that he be removed from Diamondhead's payroll).

[145]  Tr. Hr'g. Dec. 4, 2024 (D.I. 27) at 61:5–11 (Harrison).

[146]  Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 120:5–8. (Vitale).

[147]  Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 122:9-13. (Vitale).

[148]  Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 145:4-25. (Vitale).

[149]  Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 121:76-12. (Vitale).

rent, interest, insurance, and utilities continue to accrue and that Diamondhead is not able to pay its debts as they become due.[150]  Ms. Vitale also confirmed that in order for Diamondhead to remain in bankruptcy, it would need to obtain financing.[151]

In sum, Diamondhead has no operating business from which to generate income to pay expenses, and it continues to accrue post-petition liabilities.  Diamondhead is unable to pay its debts as they come due and is administratively insolvent.  The Court finds there is continuing loss to the estate.

Furthermore, based on the facts before the Court, including the lack of operations, lack of funds to pay debts, escalating debt, inability to sell or develop the Property, the Court finds there is not a reasonable likelihood of rehabilitation.[152]

For the foregoing reasons, the Court concludes that Diamondhead does not qualify as a chapter 11 debtor and this case cannot be converted to one under chapter 11.

## IV.    Abstention is Not Warranted

Diamondhead argues the Court should abstain because a bankruptcy case would add additional expense, and there is no threat of harm to the assets of Diamondhead or MGC, nor evidence of improper payments being made to creditors, nor assets being dissipated.  Further, Diamondhead argues that state courts are available to protect the interests of the Petitioning Creditors, and the parties previously chose a Mississippi judicial foreclosure process for this very purpose.  Diamondhead asserts the following: a sale in chapter 7 would result in the sale of the subsidiary's primary asset at a devalued price; alternative means exist for an equitable distribution of assets; the parties can proceed in good faith outside of bankruptcy to maximize

---

[150]  Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 60:12–61:4 (Harrison); Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 120–22 (Vitale).

[151]  Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 146:7–11. (Vitale).

[152]  Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 70:20–25 (Harrison); Tr. Hr'g Dec. 4, 2024 (D.I. 27) at 125:15–22 (Vitale).

Diamondhead's assets for the benefit of all creditors; and the only motivation of the Petitioning Creditors is to collect a debt.[153]  Diamondhead also argues that a chapter 7 case undermines Colliers' marketing process.[154]  Finally, Diamondhead claims a chapter 7 case would not "stop the bleeding" because no one working at Diamondhead is being paid.[155]

Petitioning Creditors argue: abstention is inappropriate because there would be no disruption to Diamondhead's business as a non-operating holding company; a chapter 7 liquidation would put a stop to the accrual of salary, rent, directors' fees, and other expenses; there is no alternative adequate forum; there is no current out-of-court workout that would allow for liquidation and fair distribution of assets; the bankruptcy serves a legitimate purpose; and a chapter 7 case is in the best interest of debtors and creditors.[156]

Under section 305(a)(1) of the Bankruptcy Code, the Court, after notice and a hearing, may dismiss a case at any time "if the interests of creditors and the debtor would be better served by such dismissal."[157]  "Whether to dismiss a case or abstain pursuant to section 305 is committed to the discretion of the bankruptcy court, and is determined based upon the totality of the circumstances."[158]  Courts are in general agreement that abstention in a properly filed bankruptcy is an extraordinary remedy.[159]  "Granting an abstention motion requires more than a simple balancing of harm to the debtor and creditors; rather, the interests of both the debtor and

---

[153] See Ex. 38 at 24–29.

[154] See Ex. 40 at 11.

[155] See Ex. 40 at 14.

[156] See Ex. 39 at 25–28.

[157] 11 U.S.C. §305(a)(1).

[158] *In re Northshore Mainland Services, Inc.*, 537 B.R. 192, 203 (Bank. D. Del. 2015).

[159] *Id.*; *See also In re Amc Inv'rs, LLC*, 406 B.R. 478, 488 (Bankr. D. Del. 2009) (citing *In re Eastman*, 188 B.R. 621, 624 (B.A.P. 9th Cir. 1995)).

its creditors must be served by granting the requested relief."[160]  The movant bears the burden to demonstrate that the interests of the debtors and creditors would benefit from dismissal.[161]

Courts consider the following non-exclusive factors "to gauge the overall best interests" of the debtor and creditors:

(1) the economy and efficiency of administration;

(2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court;

(3) whether federal proceedings are necessary to reach a just and equitable solution;

(4) whether there is an alternative means of achieving an equitable distribution of assets;

(5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;

(6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and

(7) the purpose for which bankruptcy jurisdiction has been sought.[162]

While all factors are considered, they are not given equal weight in each case, nor should the Court conduct a strict balancing.[163]

As discussed at length above, the bankruptcy filing serves a proper purpose. Diamondhead is a corporate debtor with many debts at varying levels of priority owing to many creditors, including debts *pari passu* to each other.  A bankruptcy proceeding is the most efficient and fair way to collect and marshal Diamondhead's assets for distribution to all creditors.  The Court therefore finds abstention is not appropriate under the circumstances.

---

[160] *Id.* (citing *In re Amc Inv'rs, LLC*, 406 B.R. at 488).

[161] *Id.*

[162] *Id.*

[163] *In re Amc Inv'rs, LLC*, 406 B.R. at 488.

## V.      Diamondhead is not Entitled to Attorneys' Fees

Diamondhead requests attorneys' fees on account of Petitioning Creditors purported bad faith.  For the reasons discussed, the Court finds that the Involuntary Petition was not filed in bad faith.  Consequently, Diamondhead's request for attorneys' fees is denied.

## CONCLUSION

For the reasons stated herein, the Motion is denied.

Dated: July 30, 2025

_____
J. Kate Stickles
United States Bankruptcy Judge

31